UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------X
HUDSON REALTY CAPITAL LLC,                :    Case No. 1:04-CV-10243 (MEL)
                                          :
                Plaintiff,               :
                                          :    AFFIDAVIT OF
      -against-                          :    PERRY FREITAS IN SUPPORT
                                          :    OF MOTION FOR SUMMARY
25 WIGGINS AVENUE LLC and                 :    JUDGMENT
DR. LAXMAN DESAI,                         :
                                          :
                Defendants.              :
-----------------------------------------------------------X

STATE OF NEW JERSEY    )
                              ) ss.:
COUNTY OF BERGEN       )

      PERRY FREITAS being duly sworn deposes and says:

      1.    I am a Director of Hudson Realty Capital LLC ("Plaintiff" or "Lender"), the plaintiff in the instant action. I am fully familiar with the facts and events of this case based on my review of the pertinent files and records maintained by Lender in connection with the transaction from which this action arises. I make this affidavit based upon personal knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

A.    The Letter Agreement

      2.    By this action, Lender seeks to recover sums due and owing to it pursuant to a letter agreement dated July 1, 2003 (the "Letter Agreement") between, *inter alia*, Laxman Desai ("Desai") and Lender. A true and correct copy of the complaint in this action is annexed hereto as **Exhibit A**. A true and correct copy of the answer filed by Desai is annexed hereto as **Exhibit B**.

163569

3.     Pursuant to the Letter Agreement, Desai agreed to borrow and Lender agreed to lend, at an annual interest rate of 12%, up to $5,000,000 for the acquisition of real property known as 25 Wiggins Avenue, Bedford, Massachusetts (the "Property"), subject to certain conditions set forth in the Letter Agreement. A true and correct copy of the Letter Agreement is annexed hereto as **Exhibit C**.

4.     Pursuant to the Letter Agreement, the borrower was to be a bankruptcy remote entity in which Desai was to be the member, principal or partner (the "Borrower"). See Exh. C at 1. Desai, as guarantor, guaranteed payment of all sums due Lender pursuant to the Letter Agreement. In this regard, the Letter Agreement provided:

> 100% of the Loan, plus all accrued interest, plus all costs of enforcement of the Loan, plus any and all sums due or to become due Lender under the Loan Documents, shall be guaranteed by Dr. Laxman Desai[,] the principal(s) of the Borrower, its Manager or General Partner, as the case shall be and any other persons or members controlling more than 10% of the Borrower (collectively, "Guarantor(s)"). In addition, Guarantor(s) shall be required to execute an environmental indemnity agreement in form and substance satisfactory to Lender."

Id. at 3.

5.     The Letter Agreement required the Borrower to pay, whether or not a final loan commitment was issued, "all legal fees and disbursements associated with the preparation for and closing of the Loan . . . " Id. at 2.

6.     The Letter Agreement also required the Borrower and Guarantor to pay a "Break-Up Fee" in the amount of 2% of the loan in the event the Borrower either obtained alternative financing for acquisition of the Property or conveyed its interest in the Property

163569

2

within six (6) months of the date of the Letter Agreement. In this regard, the Letter Agreement provided:

> The Borrower and Guarantor(s) hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited, and extremely competitive; (c) compensation to the Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit the resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry, in the event the Borrower does not complete this proposed transaction or obtains financing from a competitor of the Lender. Accordingly, the Borrower hereby expressly agrees that, **for the six (6) month period commencing upon the execution of the Letter, but prior to its funding of the Loan, in the event the Borrower or an affiliate or controlled entity (a) obtains debt or equity financing for the Property from a source other than Lender, or (b) sells, assigns or otherwise conveys the Property or its interest therein Lender shall be deemed to have earned a Break-Up Fee**, and shall be entitled to be paid the same, in the amount of two percent (2%) of the Loan.

Id. at 3 (Emphasis added).

7.     Desai as Guarantor expressly agreed to pay any Break-Up Fee that might be due pursuant to the Letter Agreement as well as any costs incurred in connection with collecting same. In this regard, the Letter Agreement provided:

> Payment of all fees and expenses referred to in this Paragraph (Break-Up Fee), are guaranteed by the Borrower, Principal(s), and Guarantor(s), and each of them, each of whom indicate their acceptance of the terms of this paragraph by executing this Letter. The Borrower, Principal(s), and the Guarantor(s) hereby consent, on behalf of themselves, and all related or affiliated entities which have an interest in this transaction or which have a right or title in or to the Collateral, to the filing or recordation of a lis pendens or any other appropriate documentation to evidence a lien for the payment required, including all attorneys'

>fees and costs of collection pursuant to this Paragraph (Break-Up Fee).

Id.

B.  A Break-Up Fee is Due and Owing

8. As set forth in the Letter Agreement, a Break-Up Fee would be deemed earned in the event that within six months of July 1, 2003, the Borrower either (a) obtained alternative financing for acquisition of the Property or (b) conveyed its interest in the Property. In fact, Borrower both obtained alternative financing and conveyed its interest in the Property within six months of July 1, 2003, thereby incurring an obligation to pay the Break-Up Fee.

9. Borrower's interest in the Property at the time the Letter Agreement was executed consisted of an agreement of purchase and sale dated March 13, 2003, between Opta Food Ingredients, Inc. (the Property's owner) and Toxikon Corporation (a corporation wholly owned by Desai) (the "Purchase and Sale Agreement"). A true and correct copy of the Purchase and Sale Agreement is annexed hereto as **Exhibit D**.

10. Pursuant to the Purchase and Sale Agreement, Toxicon was to pay $4,850,000 for the Property. See Exh. D at 2.

11. Rather than proceed with the acquisition pursuant to the Purchase and Sale Agreement, with financing from Lender pursuant to the Letter Agreement, Desai (apparently to avoid incurring a Break-Up Fee) obtained "disguised" alternative financing and attempted to structure his acquisition of the Property to hide from Lender the fact that he was acquiring the Property with alternative financing. In fact, in August 2003 Desai directly informed

163569

4

Lender that he intended to accomplish his financial objective of acquiring the Property through means other than Lender's proposed financing.

12. As stated in more detail in paragraphs 13 through 20 below, in furtherance of Desai's alternative plan, Desai **both** (a) exchanged the Purchase and Sale Agreement for a lease, with Toxikon as a front, with an associated option to purchase the Property **and** (b) sought and obtained a commitment for financing the contemplated execution of the purchase option from Commerce Bank & Trust Company. All this was accomplished within six (6) months of July 1, 2003.

13. On or about September 22, 2003, Desai, on behalf of Toxikon Corporation, executed a lease with Opta Food Ingredients, Inc. (the "Lease") with respect to the Property for a term that was to expire upon the earlier of "(a) 11:59 P.M. on September 13, 2004 or (b) the termination of that certain Option Agreement of even date herewith (the "Option Agreement"), between Lessor, as seller thereunder, and Laxman S. Desai, an individual . . . and the controlling shareholder of Lessee, as purchaser thereunder (the "Purchaser")." A true and correct copy of the Lease is annexed hereto as **Exhibit E**. (See Lease at 2.)

14. Pursuant to the Lease, the Purchaser (i.e., Desai) was to pay (b) base rent of $300,000 per year and (b) additional rent to compensate the seller for the real estate taxes, water and sewer charges and other charges imposed in connection with the Property. Id. at 2-3 (Sections 2-3). However, Desai's obligation to pay base rent, so long as it was not in default of its other obligations under the Lease, was **completely waived**. Id. at 2-3 (Section 1). In other words, as long as it paid the owner's expenses, Desai's company received one-year's free rent.

15.  As recited in the Lease, Desai and the Seller also entered into an option agreement dated as of September 22, 2003 (the "Option Agreement").  A true and correct copy of the Option Agreement is annexed hereto as **Exhibit F**.  The purchase price for exercising the option to acquire the Property was, not surprisingly, the same price set forth in the Purchase and Sale Agreement, i.e., $4,850,000.  The option must be exercised, "if at all, by written notice to Seller (the "Option Notice") on of before 5:00 p.m. on September 22, 2004."  See Exh. F Section 1.2.

16.  The Option Agreement specifically recites that "in consideration for the mutual promises, covenants and agreements" set forth therein, Desai releases the seller from the obligations set forth in the Purchase and Sale Agreement.  In this regard, the Option Agreement provides:

> This Agreement contains all the terms and provisions between Seller, Purchaser and Toxikon relative to the Property and the matters set forth herein and no prior or contemporaneous agreement or understanding pertaining to the same shall be of any force or effect.  This Agreement supercedes the Purchase Agreement and the Purchase Agreement shall hereafter have no force or effect.  Each party hereby releases the other from any and all damages, claims, actions, causes of action and obligations under the Purchase Agreement or relating thereto.

Id. Section 3.1.

17.  It is worthy of note that the Option Agreement recites, self-servingly but inaccurately, that "Toxikon is unable to obtain the financing necessary to acquire the Property in accordance with the terms of the Purchase Agreement . . ." Id. at 1.  In fact, by letter dated August 27, 2003 (a copy of which is annexed hereto as **Exhibit G**), Lender had expressly informed Desai that "Lender hereby confirms that Lender is ready, willing and able

to fund the Loan (subject to Borrower's satisfaction of all conditions precedent to such funding imposed by the Lender under the Letter)."

18.   It is also worth of note that Desai admits that the terms of the Purchase and Sale Agreement were incorporated into the Option Agreement. In response to Lender's interrogatories in this case, Desai states that "I understand that my interest in 25 Wiggins Avenue, Bedford, Massachusetts, is defined by the Option Agreement, amendments thereto, and a certain Purchase and Sales Agreement, the terms of which are incorporated in the Option Agreement, including a certain Lease Agreement between Opta Foods, as lessor, and Toxikon Corporation, as lessee." A true and correct copy of Defendant's Answers to Plaintiff's First Set of Interrogatories is annexed hereto as **Exhibit H**. (See Answer to Interrogatory No. 10.)

19.   Thus, within six months of July 1, 2003, Desai transferred his interest in the Property by exchanging the Purchase and Sale Agreement for the Option Agreement. The financial terms of the acquisition remained the same, however.

20.   In addition to conveying his interest in the Property, which is sufficient in and of itself to render the Break-Up Fee due and owing, Desai also obtained alternative financing for his acquisition of the Property pursuant to the Option Agreement. On or about December 10, 2003, Commerce Bank & Trust Company delivered to Desai a conditional commitment to provide a mortgage loan for the acquisition of the Property at an interest rate of 3.6% above the Federal Home Loan Bank 5/10 rate, "fixed at the time of closing" (the "Commerce Bank Commitment"). Desai, individually and on behalf of Toxikon Corporation, executed the Commerce Bank Commitment on December 31, 2003. A true and correct copy of the Commerce Bank Commitment is annexed hereto as **Exhibit I**.

C.    <u>Lender Has Incurred Unreimbursed Costs and Legal Fees</u>

21.    As discussed above, Desai as Guarantor, guaranteed the payment of (a) Lender's legal fees in connection with preparing for the closing, (b) the Break-Up Fee and (c) Lender's legal fees and expenses incurred in collecting the Break-Up Fee.

22.    As of May 20, 2004, Lender had incurred $29,116.10 in unreimbursed legal fees and other expenses in connection with preparing for the closing and in this action to collect the Break-Up Fee. Such amounts do not include the expenses incurred in making this motion or certain other services performed by counsel in connection with this case since May 20, 2004.

23.    Under the circumstances described herein, Lender is entitled to summary judgment as to Desai's liability for the Break-Up Fee of $100,000 (2% of $5,000,000) and for Lender's legal fees and expenses in an amount to be determined at trial, but no less than the $29,116.10 incurred as of May 20, 2004.

Dated:    June 30, 2004

_____ 7/1/2004
PERRY FREITAS

Sworn to before me this
_1_ day of July, 2004

_____
NOTARY PUBLIC

PATRICIA LLOYD
Notary Public, State of New York
No. 03-4812139
Qualified in Bronx County
Commission Expires August 31, 2006

07/01/2004  13:19  2125327901                              PAGE  02