UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL NO. 1:04-CV
10243 MEL

HUDSON REALTY CAPITAL LLC, Plaintiff

v.

25 WIGGINS AVENUE LLC and
LAXMAN S. DESAI, Defendants

### AFFIDAVIT OF LAXMAN S. DESAI

Laxman S. Desai, on oath says and deposes as follows:

1. I am the defendant in this case.

2. I am the CEO of Toxikon Corporation, a Massachusetts corporation, which is in the business of providing laboratory and materials testing services, and consulting services since 1982. Toxikon's principal place of business is at 15 Wiggins Avenue, Bedford, Massachusetts.

3. I am the owner of the entity which owns the business premises from which Toxikon operates.

4. During year 2002, I decided to expand Toxikon's business premises for two reasons: First, Toxikon needed additional space from which to conduct its affairs. Secondly, to capture increased business opportunities for Toxikon, expanded facilities and capabilities were required. I began to look at appropriate sites.

5.  On or about March 14, 2003, I entered into a purchase/sales agreement to acquire the premises located at 25 Wiggins Avenue, Bedford, which is immediately adjacent to Toxikon's building. The purchase and sales agreement and amendments to it are hereto attached as *Exhibit A* and incorporated herein by reference. It provides, in pertinent part, as follows: That I would purchase the property for $ 4,850,000.00; that the time of the closing would be in accordance with paragraph 4.1; and that the actual closing date was extended in accordance with Amendments to the Purchase and Sales Agreement.

6.  To finance the acquisition of and build-out of 25 Wiggins Avenue, I retained the services of Patrick J. Bisceglia, of Bluestone Realty Advisors Inc., of White Plains, NY, on a non-exclusive basis, to procure such financing.

7.  Mr. Bisceglia procured a "term sheet" from Hudson Realty Capital LLC, a private franchise firm, on or about July 1, 2003, which is hereto attached as *Exhibit B* and made part hereof. The "term sheet" provides that Hudson Realty Capital LLC is "interested" in making a loan of "not to exceed $5 million" on the property provided that loan to collateral value could be agreed upon between Hudson Realty Capital LLC and me. Even though the "term sheet" recites that the collateral for the proposed loan was the property itself, i.e. 25 Wiggins Avenue, it was understood by me that the collateral's value had to be appraised and determined to Hudson's satisfaction. The amount of the proposed loan was not agreed upon in the "term sheet."

8.  In addition to the vague and ambiguous reference to 25 Wiggins Avenue, as the "collateral" for the proposed loan, the "term sheet" requires the proposed loan be "secured by a first mortgage, an assignment of rents, leases and profits on the property and/or equipment used in connection with the property ... and such property shall be subject to pledge of equity interests to no other liens or

2

encumbrances ... and no additional senior or secondary financing ... either secured or unsecured."

9. The proposed loan "term sheet" further required that I personally guarantee repayment of the proposed loan.

10. The proposed loan "term sheet" required that I give additional collateral to secure repayment of the proposed loan.

11. The proposed loan "term sheet" gave Hudson Realty Capital LLC the opportunity to investigate and analyze my financial status before making a firm commitment to make the loan and to determine the value of collateral, the identity of specific collateral and the amount of the loan.

12. I was required by the "term sheet" to pay due diligence fees and expenses, and have done so.

13. The "term sheet" for the proposed loan included the following specific language:

> "*If the transaction contemplated by this letter of intent is not consumed on or before July 31, 2003, then the terms and conditions set forth herein shall thereafter expire, without further notice or act of any kind by Lender or any other party. Time shall be of the essence with respect to the foregoing expiration date and the performance by Borrower, Principal(s) and Guarantor(s) under all of the loan documents.*"

and

> "*This proposal shall expire on July 1, 2003. Please indicate your acceptance of this proposal by signing and returning same with the specified moneys in the form of a bank check or wire the total sum of $15,000.00. Lender will then commence due diligence and begin initial documentation of the Loan. This proposal outlines the general terms and conditions under which Lender shall proceed and does not constitute a*

*loan commitment, either express or implied, on behalf of Lender, and does not impose any obligation on Lender to make the loan."*

14. During the month July 2003, I provided "due diligence" financial information including personal and corporate tax returns, banking information, financial statements on Toxikon Corporation, my own financial statements, real estate deeds, real estate appraisals, appraisals of Toxikon business equipment and other "due diligence" materials including building condition surveys and environmental surveys to Hudson Realty Capital. Hudson was not satisfied by my submissions and requested further additional information and materials from me.

15. By July 31, 2003, there was no agreement between Hudson Realty Capital LLC and me as to the identity of the collateral to be given to secure repayment of the proposed loan beyond a first mortgage on 25 Wiggins itself; as to the value of additional collateral to be given to secure repayment; as to the amount of the loan to be made; or as to the text of the proposed loan documents. No loan commitment letter had issued by July 31, 2003.

16. Through July 2003, Hudson Realty Capital LLC continuously demanded of me that I provide additional collateral. Specifically, Hudson demanded that 15 Wiggins and 675 Indiantown be included as part of the collateral, even though I continuously told Hudson that those properties *could not* be part of the deal. *Exhibit C.* Hudson also demand that my personal residence be given as additional collateral even though my personal residence is owned by a trust controlled by my wife for the benefit of our child. While I did not rule out posting my personal residence as additional collateral, Hudson Realty Capital LLC and I never agreed to include either 15 Wiggins or my personal residence as additional collateral for the proposed loan, and could not reach agreement on the other collateral being demanded.

4

17. During July 2003, Hudson also demanded that my real estate in Palm Beach County, Florida, including 675 Indiantown Road, be included as additional collateral for the proposed loan. While I was willing to do that, I could not pledge 675 Indiantown because of restrictions in my mortgage on that property. Hudson was still not satisfied that there was sufficient equity in those holdings to be of value to it as additional collateral on the proposed loan.

18. As of July 31, 2004, Hudson had not committed to a loan and no terms of an actual loan had been agreed upon. Because I did not have financing in place, the closing date on my purchase and sales agreement had to be extended further or I was at risk of losing my deposit on 25 Wiggins.

19. On July 31, 2003, I concluded that it was not possible to negotiate a loan agreement with Hudson Realty Capital LLC, even though discussions between us on values of proposed collateral and on the identity of the collateral itself, beyond the first mortgage to be granted on 25 Wiggins itself continued briefly after July 31, 2003. I further concluded I could not purchase 25 Wiggins at that time because I had no financing to do so.

20. On August 25, 2003, I instructed my broker, Mr. Bisceglia, to tell Hudson Realty Capital LLC that I was no longer interested in either continuing to discuss proposed loan terms or in doing a loan with Hudson Realty Capital LLC under any circumstances or conditions. The "term sheet" had expired and no extension of the "term sheet" had been signed or even proposed. The arrangement with Hudson had expired and was nothing more than a failed negotiation.

21. On August 27, 2003, after Hudson was told by Mr. Bisceglia that I was not going to deal with Hudson, I received a facsimile letter which is hereto

attached and made part hereof as *Exhibit D.* Hudson's letter is factually incorrect in that it states as follows:

> " ... Obligor ... is proceeding to accomplish its financial objectives through means other than Lender's proposed financing."

This is not true as Hudson's "interest" in making a loan to me expired on July 31, 2003, without a loan agreement being made.

22. As the end of August 2003 approached, I was confronted with the reasonable likelihood of forfeiting my substantial deposit on the 25 Wiggins deal as I did not have the cash on hand to close or to do the required build-out to make the new building fit for Toxikon's purposes. Hudson Realty Capital LLC knew that the 25 Wiggins purchase/sales agreement had been extended several times and yet it did nothing to extend its "letter of intent" with me. Upon the expiration of the "letter of intent"/"term sheet", it was my right to consider the Hudson matter a dead item.

23. Seller of 25 Wiggins was not willing to extend the purchase/sales agreement beyond August 29, 2003, but was willing to grant to me an option to purchase the property to be exercised when I had financing and on the further condition that I lease the 25 Wiggins building. The Option Agreement and Lease Agreement are hereto attached and made part hereof as *Exhibit E* and *Exhibit F*, respectively. Given my financial predicament, and having substantial cash invested in 25 Wiggins, which would be applied to option and lease payments, I had no alternative but to agree to Seller's proposal for 25 Wiggins.

24. Prior to July 31, 2003, my objective with respect to 25 Wiggins was to purchase it and to close on that sale with financing provided by Hudson

Realty Capital LLC during the summer of year 2003. But Hudson never committed to make the loan. Hudson frustrated my objectives and did not assist in accomplishing my objective. In fact, Hudson's failure to commit to the loan nearly caused me to lose my substantial deposit.

25. I have paid Hudson for due diligence fees, expenses, and for lawyers' fees under the July 1, 2003 "term sheet." I owe nothing further to Hudson Realty Capital LLC on this proposed loan because Hudson never committed to make a loan because the "deal" never got beyond the negotiation stage; and lastly, because the "term sheet" expired on July 31, 2003 when the "contemplated transaction" did not close by that date, time being of the essence.

26. During the autumn of 2003, I applied to Commerce Bank and Trust Company for financing so I could conclude the purchase of 25 Wiggins. Commerce issued a commitment letter to me on or about December 10, 2003. However, I did not proceed with financing through Commerce Bank.

27. I concluded the acquisition of 25 Wiggins on June 15, 2004.

Signed under the penalty of perjury on August 9, 2004.

_____
Laxman S. Desai