UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
HUDSON REALTY CAPITAL LLC,                : Case No. 1:
                                          : 04-CV-10243 (MEL)
                    Plaintiff,            :
                                          :
        - against -                       : **MEMORANDUM OF LAW**
                                          : **IN SUPPORT OF**
25 WIGGINS AVENUE LLC and                 : **PLAINTIFF'S RENEWED**
DR. LAXMAN DESAI,                         : **MOTION FOR SUMMARY**
                                          : **JUDGMENT**
                    Defendants.           :
------------------------------------------------------------x

## INTRODUCTION

Plaintiff Hudson Realty Capital LLC ("Plaintiff" or "Lender"), by its counsel Greenberg Traurig, LLP and Birnbaum & Godkin, LLP, submits this memorandum of law in support of its motion for summary judgment on its complaint seeking (a) a Break-Up Fee in the amount of $100,000 and (b) its unreimbursed costs and expenses, including its attorneys' fees in an amount to be determined following submission of a verified petition for fees and expenses, pursuant to the terms of a letter agreement dated July 1, 2003 (the "Letter Agreement").

## PRELIMINARY STATEMENT

In 2003, Plaintiff specialized in providing acquisition and other secured financing to borrowers who were on very tight schedules or who did not have access to financing from a bank or other institutional lender. In order to prevent its significant expenditure of resources necessary to consider such loans from being wasted and to prevent borrowers from using Lender as a "stalking horse" to obtain financing from Lender's competitors, Lender included

in its loan applications a provision that requires the applicant to deal exclusively with Lender for a six-month period unless Lender paid a "Break-Up Fee" of 2% of the amount of the anticipated loan. This case arises from defendant's use of Lender as a stalking horse to obtain alternative financing for the acquisition of property known as 25 Wiggins Avenue, Bedford, Massachusetts (the "Property"). Lender seeks recovery of its contractual Break-Up Fee of $100,000 as well as other reimbursable expenses.

Defendant Laxman Desai ("Defendant" or "Borrower") is liable to Lender for the Break-Up Fee and various expenses incurred by Lender in connection with a proposed mortgage loan because, during the six (6) months following execution of the Letter Agreement, Borrower both (a) transferred his interest in the Property and (b) obtained a conditional commitment for acquisition financing from another lender. Pursuant to the Letter Agreement, either one of those actions was sufficient to render Borrower liable for the Break-Up Fee and the costs incurred by Lender to collect it. The undisputed facts of record demonstrate that Borrower re-structured his acquisition of the Property by voluntarily exchanging his contractual right to purchase it for a short term lease with an option to buy at the very same price. The alternative structure is a sham and does not insulate Borrower from his clear contractual obligations. Thereafter, Borrower obtained a conditional financing commitment from another lender and then refused to pay the Break-Up Fee and other expenses to which Lender was entitled.

After taking document discovery and propounding interrogatories, but prior to depositions, Lender moved for summary judgment based on the undisputed facts. In opposition, Borrower argued that notwithstanding that the Break-Up Fee provision binds

Borrower for six months, the Letter Agreement and all Borrower's obligations thereunder terminated on July 31, 2003, pursuant to a separate, more general provision in the Letter Agreement. The Court denied Lender's motion on the sole basis that the Letter Agreement was ambiguous as to "whether the obligations under the Break-Up Fee clause are subject to the six month time frame as recited in that clause, or whether the obligations were annulled by the July 31, 2003 expiration date expressed in the Closing, Time of the Essence Clause."

Now, with discovery completed, Lender renews its motion for summary judgment and the extrinsic evidence -- most importantly Borrower's own testimony -- establishes that Borrower has no evidence to sustain its argument that the parties intended to terminate Borrower's obligations as of July 31, 2003. In fact, Borrower admitted under oath that when he executed the Letter Agreement, he had no such understanding of the Break-Up Fee clause. As discussed below, a party cannot create a contractual ambiguity merely by claiming -- through its lawyer -- that it had a different (but unspecified) understanding of the agreement. Extrinsic proof must offered to support the party's alleged interpretation. Where, as here, there is no extrinsic evidence to support a party's interpretation, any ambiguity should be resolved against him as a matter of law, and summary judgment may be granted based on the resulting interpretation of the contract.

As demonstrated herein, Borrower cannot establish a material issue of fact casting doubt on his obligation to pay Lender the sums to which it is so clearly entitled pursuant to the terms of the parties' written agreement.

## FACTS

The facts underlying this case are set forth in the Lender's Statement of Undisputed Facts, submitted herewith pursuant to Local Rule 56.1.

## ARGUMENT

### POINT I

**LENDER IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FACTS ARE UNDISPUTED AND THE ALLEGED CONTRACTUAL AMBIGUITY MUST BE RESOLVED IN LENDER'S FAVOR**

When, as here, the moving party shows the absence of a genuine issue of material fact, such that it is entitled to judgment as a matter of law, summary judgment should be granted in its favor. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252-57 (1986). As stated by Fed. R. Civ. P. 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."

Pursuant to Fed. R. Civ. P. 56, "[s]ummary judgment is appropriate when . . . there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Res. Corp., 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Id. at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The opponent must "establish the existence of a fact issue which is both

'material,' in that it might affect the outcome of the litigation, ... and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent." Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989) (citations omitted).

A.   Contractual Ambiguity Does Not Bar Summary Judgment

Lender has demonstrated the absence of a material fact issue and its resulting entitlement to judgment as a matter of law. The facts are not substantially disputed. Borrower's exchange of the Purchase and Sale Agreement for the Lease and Option and its procurement and execution of a commitment letter from Commerce Bank, all within six months of July 3, 2003, have been admitted. The only reason the Court denied Lender's prior motion for summary judgment is that, prior to the conduct of depositions, it found that the Letter Agreement was ambiguous as to the duration of the Break-Up Fee obligation. As discussed herein, that ambiguity must now be resolved by the Court in Lender's favor, based upon the absence of any evidence supporting Borrower's alleged interpretation. No trial is necessary.

Under Massachusetts law, contract interpretation generally poses a question of law for the court. Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981) (citing Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970). "Where the wording of a contract is unambiguous, the contract must be enforced according to its terms." Freelander, 357 Mass. at 516. Even where a contract is ambiguous, it is well established that summary judgment is nevertheless appropriate where the party resisting summary judgment does not support its avowed interpretation of the agreement with extrinsic evidence or where the evidence it offers is clearly outweighed by the movant's evidence. Although it may be possible to

5

interpret a contract in more than one manner, where the evidence supports only one interpretation, judgment may be entered as a matter of law. See Nadherny v. Roseland Property Company, Inc., 390 F.3d 44, 49 (1st Cir. 2004) ("Even when extrinsic evidence is considered, a judge may conclude that the evidence is 'so one-sided that no reasonable person could decide the contrary'" or "a judge may determine that the extrinsic evidence which is material is uncontested, and so appropriately enter judgment") (citation omitted); Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53 (1st Cir. 2001) ("summary judgment may lie against a party who fails adequately to support its proposed interpretation of a purportedly ambiguous contract term"); Vargas v. Cummings, 149 F.3d 29, 33 (1st Cir. 1998) ("Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations").

In connection with an earlier motion for summary judgment, Borrower argued and the Court held that there is a potential inherent ambiguity in the Letter Agreement in that (a) on the one hand, the Break-Up Fee clause states that it is to apply for a period of six months from execution, but (b) on the other hand, the next provision in the agreement provides that if the transaction does not close by July 31, 2003, the terms and conditions of the Letter Agreement are to expire automatically. Borrower contended in opposition to Lender's first summary judgment motion that its obligation to pay a Break-Up Fee, if any, terminated on July 31, 2003. The Court found an inherent ambiguity between these allegedly conflicting contract clauses.

6

Yet identifying an ambiguity is just the first step of the necessary inquiry. As the court discussed in Torres, 149 F.3d at 33, finding an ambiguity is the "initial step." "[T]he next step – involving an examination of extrinsic evidence – becomes essential." Id. Now that Borrower's deposition (and other depositions) have been completed, Lender avers that this second phase inquiry can be conducted and must result in judgment in its favor. Borrower has no extrinsic evidence to offer at trial in support of its claimed interpretation. Rather, all of the available evidence – including testimony about Borrower's intent upon executing the Letter Agreement, the circumstances surrounding the execution of the Letter Agreement and the nature and purpose of the Break-Up Fee provision in relation to the contract as a whole – unequivocally supports Lender's interpretation.

B.  Lender's Interpretation of the Contract is the Only
    Reasonable and Supported Interpretation

In resolving an alleged ambiguity in a contract, the Court should be guided by several basic principles. First, a contract must be construed in light of the circumstances surrounding its execution, the parties' purpose in entering into the contract and their reasonable expectations. As the court stated in Snow v. Fitian, 1998 Mass.App.Div. 227, 1998 WL 781173 *4-5 (Aug. 19, 1998), "[a] contract should be construed to give it effect as a rational business instrument in a manner which will carry out the intent of the parties" and considering "[t]he purpose of the overall transaction. . . ." See also RCI Northeast Services Div. v. Boston Edison Co., 822 F.2d 199, 203 (1st Cir. 1987) ("It is hornbook law that, [i]f the language of the contract is susceptible of more than one interpretation, the court should construe the contract in the light of the situation and relation of the parties at the time it was

made, and, if possible, accord it a reasonable and sensible meaning, consonant with its dominant purpose.") (citation omitted).

The court stated the matter quite well in Nadherny, 390 F.3d at 49 (citations omitted), in describing the process of contract construction:

> The district court correctly articulated all of these governing principles. It also correctly asked whether the proffered readings made sense – both in the sense of trying to accomplish something rational in light of how the parties are situated ... and in the light of the usage of the trade. ... Agreements, especially commercial arrangements, are designed to make sense. If one reading produces a plausible result ... that reading has a strong presumption in its favor as against another reading producing an unlikely result.

Second, a construction that gives effect to all contract terms is favored over one that essentially renders a contract term meaningless. In rejecting an asserted contract interpretation, the court in Federal Deposit Ins. Corp. v. Singh, 977 F.2d 18, 22 (1st Cir. 1992) (citations omitted) held:

> In an effort to stem this inexorable tide, appellants invite us to infer a construction that would render an express clause in the documents nugatory. Such an invitation flies in the teeth of Massachusetts law, which directs courts to give reasonable effect to each provision of an agreement wherever feasible. ... It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible.

Third, a party's conduct in performing a contract is the strongest evidence of the party's understanding of the contract. The Massachusetts Supreme Court recognized long ago that, when interpreting a contract, "[t]he interpretation placed upon the contract by the parties as evidenced by their conduct is entitled to great weight." Atwood v. Boston, 310 Mass. 70, 37 N.E.2d 131, 134 (1941).

Finally, where an alleged ambiguity is between a clause of general application and a clause with specific language, the more specific clause should govern. See Lawson v. F.D.I.C., 3 F.3d 11, 17 (1st Cir. 1993) ("... it is a familiar precept of contract interpretation that the specific controls the general ..."). As the court observed in In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332, 1357-58 (1st Cir. 1992), quoting Lembo v. Waters 1 Mass.App. 227, 294 N.E.2d 566, 569 (1973):

> The principles of interpretation applied by the Massachusetts courts conform to those of the leading commentators. Specific terms are given greater weight than general language. ... "If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former."

All four of these general construction principles argue forcefully in favor of an interpretation of the Letter Agreement that enforces the six month Break-Up Fee obligation. First, consider the commercial purpose of the transaction: an application for a mortgage loan under significant time pressure. As discussed in the Freitas Aff., it is obvious (and stated in the Letter Agreement) that in order to devote the significant resources necessary to underwrite the loan on such a short time table, Lender must necessarily give up consideration of other potentially profitable opportunities. Lender charges a Break-Up Fee in order to protect itself from being used as a stalking horse by its applicants and to prevent its competitors from piggy-backing onto its hard work by merely waiting for Lender to commit to a loan before making a marginally better offer to the borrower. Similarly, because Lender must set aside resources in anticipation of making a loan (and cannot lend those funds to other borrowers), Lender cannot commit its resources indefinitely, while its borrower

9

contemplates whether to proceed with the transaction. Thus, Lender includes a provision cutting off its obligation to proceed shortly after it has completed its due diligence. Here, because Borrower stated that it had to close by July 31, 2003, Lender cut off its obligation to proceed with the loan after that date, in the reasonable expectation that its due diligence would have been concluded and Borrower would have decided whether or not to proceed by that time.

Thus, under the circumstances, the purpose and intent of the parties in agreeing to the Break-Up Fee provision on the one hand and to a July 31, 2003 expiration date for the Letter Agreement on the other hand is unmistakably clear. Both provisions were intended to protect Lender from (a) having its hard work poached by other lenders and (b) having its funds sit idle when they could be used in profitable endeavors. An interpretation of the Letter Agreement that terminates the Break-Up Fee provision on July 31, 2003 rather than after six months, as provided by its terms, should be rejected because it completely ignores and in fact frustrates the entire purpose of the clause. If a borrower's obligation to pay a Break-Up Fee ended on the anticipated closing date for the loan, then the borrower could avoid the obligation merely by not showing up at the closing, or by delaying the closing until after the stated expiration date in its loan application. After Borrower had in good faith devoted its time and resources to considering the loan application and even if Borrower remained ready, willing and able to proceed, Borrower could be used as a stalking horse by any borrower. A borrower would merely have to wait until the stated contractual expiration date to accept alternative financing. The commercial purpose of the clause and the intent of

the parties in including it in their contract would be completely frustrated by such an interpretation.

Second, the foregoing analysis makes obvious that unless the Break-Up Fee obligation is enforced for the full six months, it cannot possibly achieve its intended effect. Thus, the Borrower's suggested interpretation renders the Break-Up Fee obligation without meaning. Borrower has not – because it cannot – explained the purpose and effect of the Break-Up Fee clause under its asserted interpretation of the Letter Agreement. Merely pointing to an apparent inconsistency between a clause with a six month duration and another clause with a different termination date does not warrant a trial on the issue. Borrower must explain how its interpretation gives effect to both clauses. Arguing that the shorter time period trumps the longer one is unavailing because such an interpretation renders one clause meaningless.

Third, the actions of the parties themselves, including Borrower, indicate that Borrower never believed that its Break-Up Fee obligation would end on July 31, 2003. Both parties continued to negotiate in good faith for weeks after the Letter Agreement allegedly expired. Moreover, Borrower has testified under oath that in executing the Letter Agreement he was not under the impression that the Break-Up Fee obligation would terminate on July 31, 2003. Freitas Aff. Exh. 4 at 40. He knew that if he decided to walk away from the transaction, a payment would be due Lender. Borrower further testified that, in August 2003, when he terminated his relationship with Lender, he did not think that he was excused from his Break-Up Fee obligation because the Letter Agreement had expired. Rather, he believed – incorrectly – that issuance of a binding loan commitment was a necessary prerequisite to

Lender's right to a Break-Up Fee. According to Borrower, because he terminated the agreement before such a commitment was issued, he was free to pursue alternative financing. Id. at 50-51.

Fourth, comparing the two allegedly ambiguous clauses, it is apparent that the one relied upon by Borrower is one of broad, general application whereas the operative clause is very definite and specific. Borrower relies on a clause that purports to terminate the agreement and all of the parties' rights and obligations thereunder, without mentioning any specific rights or obligations. The Break-Up Fee provision at issue, however, is highly specific, and governs only in the limited instances where Borrower does something expressly prohibited by that clause (which it has done here). Notwithstanding the broad language of the termination clause, in accordance with well established principles of Massachusetts contract construction, the specific provisions of the Break-Up Fee clause must prevail.

Finally, to the extent that the Borrower argues that the ambiguity should be resolved against Lender because Lender drafted the agreement, it bears noting that the doctrine of *contra preferentum* is relied upon only as a last resort, where the application of the above-described principles of construction fail to resolve the issue. Moreover, application of this doctrine is particularly inappropriate, where as here, both parties are sophisticated businesses dealing at arms length. See Principal Mutual Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 4 (1st Cir. 2000) ("An alternative default rule – that uncertain language be construed against the drafter . . . has been described as one of 'last resort' in Massachusetts . . . and it may be especially weak when the parties are sophisticated businesses.") (citation omitted); Sentinel Products Corp. v. Scritoria, N.V., 124 F.Supp.2d 115, 117 (D.Mass. 2000) ("The

doctrine of *contra preferentum* is on of last resort in Massachusetts and is especially tenuous 'when the parties are sophisticated businesses.' ") (citation omitted). Insofar as application of the preferred principles of contract construction discussed above fully resolve any alleged ambiguity, there is no need to apply this doctrine of last resort. Moreover, application of the doctrine is inappropriate because Borrower is a sophisticated business person.

Borrower cannot avoid summary judgment on the basis of an alleged contractual ambiguity if he has no extrinsic evidence to support his interpretation of the parties' contract. Here, Borrower has already testified under oath that he did not, upon executing the Letter Agreement, believe the interpretation his lawyer now urges the Court to accept. Borrower had no misunderstanding as to the nature or duration of his obligations under the Break-Up Fee clause; his claim otherwise is a recent construct. Under the circumstances, no reasonable fact finder could possibly adopt Borrower's interpretation of the Letter Agreement.

## POINT II

### BORROWER'S REMAINING "DEFENSES" FAIL TO RAISE A GENUINE ISSUE OF MATERIAL FACT

In opposition to Lender's first motion for summary judgment, Borrower raised two additional arguments, which the Court did not address given its determination that the Letter Agreement was ambiguous. While Lender interprets the Court's refusal to address those arguments as a tacit rejection, in the event they are repeated in opposition to this motion and the Court is inclined to consider them, Lender contends that both of them fail to raise a genuine issue of material fact for trial.

## A.   There Is No Evidence that Lender Lacked Good Faith

Borrower argued that by asking for a pledge of Borrower's interest in two other properties (15 Wiggins Avenue and 675 Indiantown Road) as additional security for the loan, Lender acted in bad faith. The basis for this argument was an alleged restriction on additional liens contained within existing first priority mortgage loans encumbering these properties. Borrower argued that Lender's request for such additional security was tantamount to a request that it breach its contracts with the senior lenders.

Borrower's argument is unsupported by any facts and consists solely of baseless accusations. Borrower himself initially proposed that Lender accept second liens on these properties as additional security for the loan. In conveying information about the Borrower and his request for financing to Lender, Bluestone listed four properties that could be used as additional collateral, including 15 Wiggins Avenue and 675 Indiantown Road. See Freitas Aff. Exhibit 2. In addition, Borrower testified that, although he could have asked these prior mortgagees to consent to the request for a subordinate lien, he did not do so. See Freitas Aff. Exhibit 4 at 49-50.[1] Borrower simply refused to pledge any interest in these properties. Borrower admits that Lender negotiated well into August 2003, even though it had the contractual right to walk away as of July 31, 2003. Finally, even the commitment letter that Borrower obtained from Commerce Bank listed 15 Wiggins Avenue as additional collateral for the loan. Thus, Lender was not alone, nor was it unreasonable, in asking for additional collateral for the loan. In short, there is no conduct from which Lender's bad faith could possibly be inferred.

---

[1] When asked whether he approached the mortgagees to ask if they would permit secondary financing, Borrower testified "I really don't know. I have no idea. I don't know."

14

B.  Neither Issuance of a Loan Commitment Nor Actual Damages Are Conditions Precedent to Lender's Entitlement to a Break-Up Fee

Borrower also argued that any obligation to pay a Break-Up Fee was conditioned upon (i) Lender's issuance of a firm loan commitment and (ii) actual damages. Such arguments are without merit. There is simply no legal authority for the argument that obligations in a loan application are unenforceable unless and until a binding loan commitment is issued. Moreover, the argument is belied by the unambiguous language of the Letter Agreement, which provided in relevant part:

> the Borrower hereby expressly agrees that, **for the six (6) month period commencing upon the execution of the Letter, but prior to its funding of the Loan, in the event the Borrower or an affiliate or controlled entity (a) obtains debt or equity financing for the Property from a source other than Lender, or (b) sells, assigns or otherwise conveys the Property or its interest therein Lender shall be deemed to have earned a Break-Up Fee**, and shall be entitled to be paid the same, in the amount of two percent (2%) of the Loan.

Freitas Aff. Exhibit 3 at 3 (emphasis added). The obligation commences upon execution of the Letter Agreement. There is no requirement that Lender first issue a binding loan commitment. Recovery of the Break-Up Fee is <u>not</u> conditioned upon issuance of a loan commitment; nor should any such condition be implied. According to Borrower, he was free to obtain competing financing up until the moment the Lender issued its commitment letter, notwithstanding that the Lender had expended significant time and effort in completing its due diligence and may have foregone other loan opportunities in anticipation of making the loan. This is exactly what the Break-Up Fee was intended to prevent. In fact, the Letter Agreement is clear on this point. In explaining the basis for the Break-Up Fee, it states: "Lender cannot, as a result of this underwriting and analysis, commit the resources to other

potential transactions and may be deprived of business opportunities thereby." Freitas Aff. Exh. 3 at 3.

Similarly, there is no legal requirement that a lender prove actual damages to recover liquidated damages for a borrower's breach of an agreement. As the Massachusetts Supreme Court has held, the only relevant inquiry in assessing the validity of a liquidated damages provision such as the one at issue here is whether "at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach." Kelly v. Marx, 428 Mass. 877, 878 (1999). The Break-Up Fee provision clearly meets this standard. Had Borrower not sought alternative financing, Lender would have received (a) a $150,000 commitment fee and $600,000 in interest for the one-year term of the loan. There is nothing at all disproportionate about a liquidated damages provision that requires payment of 13.3% of the lender's expected revenue (i.e., $100,000/$750,000) when a borrower uses the lender as a stalking horse and thereby obtains alternative financing, particularly where, as here, the lender cannot simply make another loan. As recited in the Letter Agreement, lending opportunities are extremely limited. By committing its resources to consideration of Borrower's loan, it was unable to pursue other transactions. It funds therefore stood a very good chance of remaining idle for an indeterminate, but potentially lengthy, time in the event Borrower refused to proceed with the transaction. The opportunity cost of foregoing other transactions and the resulting loss of productivity was very hard to predict. The 2% Break-Up Fee was certainly a reasonable estimate of those unpredictable damages.

## CONCLUSION

For all the foregoing reasons, Lender's motion should be granted in its entirety and the Court should award such other and further relief as it deems just and proper.

Dated: December 5, 2006

Respectfully submitted,
HUDSON REALTY CAPITAL, LLC

By its attorneys,

/s/ Scott A. Birnbaum
Scott A. Birnbaum (BBO # 543834)
Melissa M. Longo (BBO# 647649)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100

Daniel R. Milstein (*pro hac vice*)
GREENBERG TRAURIG, LLP
900 Third Avenue, 29th Floor
New York, New York 10022
(212) 605-1000

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 5, 2006.

/s/ *Scott A. Birnbaum*
_____
Scott A. Birnbaum