UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
HUDSON REALTY CAPITAL LLC,                      : Case No. 1:
                                                : 04-CV-10243 (MEL)
                    Plaintiff,                  :
                                                :
        - against -                             : STATEMENT OF
                                                : UNDISPUTED FACTS
25 WIGGINS AVENUE LLC and                       :
DR. LAXMAN DESAI,                               :
                                                :
                    Defendants.                 :
------------------------------------------------------------x

Plaintiff Hudson Realty Capital LLC ("Plaintiff" or "Lender"), by its undersigned counsel, hereby submits the following statement of undisputed facts pursuant to Local Rule 56.1:

1.  This case arises from a letter agreement (the "Letter Agreement") between Plaintiff and Defendant 25 Wiggins Avenue LLC ("Borrower") and its principal Laxman Desai, as guarantor ("Guarantor", and together with Borrower, the "Defendants") pursuant to which Lender, on a very fast track, conducted due diligence and underwriting in connection with an application by Borrower for a loan of up to $5 million to enable Defendant to acquire real property known as 25 Wiggins Avenue, Bedford, Massachusetts (the "Property"). The Letter Agreement provided that in exchange for Lender's commitment of resources to the consideration of the loan and the associated loss of opportunities to consider other loans, Borrower agreed that, in the event it either obtained alternative financing or relinquished its interest in the Property within six months of executing the

agreement, it would pay Lender a break-up fee equal to 2% of the anticipated $5 million loan. Affidavit of Perry Freitas (the "Frietas Aff.") ¶ 2.

2. Within six months of executing the agreement, Borrower did in fact apply for and receive a loan commitment from another lender, and Borrower did in fact relinquish its right to purchase the Property by exchanging it for a lease with an option to purchase. Borrower thereafter acquired the Property pursuant to the option agreement, utilizing financing from another lender. Freitas Aff. ¶ 3.

3. On or about June 23, 2003, Bluestone Realty Advisors, Inc. ("Bluestone", on Borrower's behalf, sent Richard Ortiz, of Newbridge Realty Capital, LLC, a letter informing Mr. Ortiz that Bluestone had been retained "to procure financing for their acquisition of 25 Wiggins Avenue in Bedford, MA (the "Property")." The Bluestone letter went on to inform Mr. Ortiz that Borrower was on a tight time frame, and consequently needed to have proposed loan terms within the week and due diligence had to be completed in time for a July 31, 2003 closing date. Id. ¶ 4 and Exhibit 1.

4. After discussions with Mr. Ortiz, on or about June 27, 2003, Bluestone provided additional information concerning the proposed transaction, including without limitation, documents describing and appraising additional properties that the Borrower offered to pledge, if needed, as additional security for the loan. One of the properties listed as potential additional collateral by the Borrower was 15 Wiggins Avenue, Bedford, Massachusetts. Id. ¶ 5 and Exhibit 2.

5. Newbridge Realty Capital, LLC and Lender frequently participate in making secured loans under accelerated time frames. Mr. Ortiz contacted Lender with respect to

Bluestone's query. Lender decided to try to accommodate Borrower's needs, as described by Bluestone in its letter. Id. ¶ 6.

6. On or about July 1, 2003, Lender sent to Borrower the Letter Agreement, pursuant to which it offered to consider providing the requested acquisition financing by conducting appropriate and expedited due diligence and underwriting. Laxman Desai signed the Letter Agreement on July 3, 2003, both on behalf of the borrower (which was to be an entity that he owned or controlled) and as the individual guarantor. Id. ¶ 7 and Exhibit 3.

7. The Letter Agreement expressly stated that it was not a loan or a loan commitment. Rather, it set forth the essential terms of a proposed loan of up to $5 million that Lender would consider making to "[a] single asset, bankruptcy remote entity . . . in which Dr. Laxman Desai . . . is the member, principal or partner. . . ." Id. Exhibit 3 at p. 1. Lender obligated itself to conduct the due diligence required in order to underwrite the loan, while Borrower and Guarantor obligated themselves to pay certain fees and expenses incurred by Lender in connection with its due diligence and preparation for closing. Id.

8. Among the fees required of, and in fact paid, by Borrower were a $5,000, non-refundable due diligence fee and a $10,000 fee "to be applied towards Lender's attorney's fees and disbursements in connection with this Loan." The Letter Agreement provided that Borrower and Guarantor were "responsible for paying all legal fees and disbursements associated with the preparation for and closing of the Loan . . . <u>regardless of whether a loan commitment is issued or the Loan closes</u>." Id. Exhibit 3 at p. 2 (emphasis added).

9. Lender's business is very competitive, and when it devotes the limited time and resources of its personnel to consider a loan, particularly where the loan is needed on a

short time table and the up-front effort is therefore intensive, Lender's ability to consider other potential loan opportunities is necessarily restricted. Lender is therefore very careful to include in its loan applications provisions which protect it from being used as a "stalking horse" by would-be borrowers who would use Lender's proposed loan terms as a bench mark from which to pursue better terms from Lender's competitors. Id. ¶ 8.

10.     The primary method by which Lender prevents borrowers from using Lender's proposed terms as a benchmark to obtain financing from Lender's competitors is by requiring its loan applicants to pay a "break-up fee" in the event they obtain alternative financing or sell or relinquish their rights in the property to be acquired after they sign a letter agreement with Lender. Id. ¶ 9. The Letter Agreement at issue in this case required the Borrower and Guarantor to pay 2% of the anticipated loan amount in the event the Borrower either obtained alternative financing for acquisition of the Property or conveyed its interest in the Property within six (6) months of the date of the Letter Agreement. In this regard, the Letter Agreement provided:

> The Borrower and Guarantor(s) hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited, and extremely competitive; (c) compensation to the Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit the resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry, in the event the Borrower does not complete this proposed transaction or obtains financing from a competitor of the Lender. Accordingly, the Borrower hereby expressly agrees that, **for the six (6) month period commencing upon the execution of the Letter, but prior to its funding of the Loan, in the event the Borrower or an affiliate or controlled**

4

> **entity (a) obtains debt or equity financing for the Property from a source other than Lender, or (b) sells, assigns or otherwise conveys the Property or its interest therein Lender shall be deemed to have earned a Break-Up Fee**, and shall be entitled to be paid the same, in the amount of two percent (2%) of the Loan.

Id. Exhibit 3 at p. 3 (Emphasis added).

11. Desai as Guarantor expressly agreed to pay any Break-Up Fee that might be due pursuant to the Letter Agreement as well as any costs incurred in connection with collecting same. In this regard, the Letter Agreement provided:

> Payment of all fees and expenses referred to in this Paragraph (Break-Up Fee), are guaranteed by the Borrower, Principal(s), and Guarantor(s), and each of them, each of whom indicate their acceptance of the terms of this paragraph by executing this Letter. The Borrower, Principal(s), and the Guarantor(s) hereby consent, on behalf of themselves, and all related or affiliated entities which have an interest in this transaction or which have a right or title in or to the Collateral, to the filing or recordation of a lis pendens or any other appropriate documentation to evidence a lien for the payment required, including all attorneys' fees and costs of collection pursuant to this Paragraph (Break-Up Fee).

Id.

12. In light of Borrower's representation that it needed to close by July 31, 2003, the Letter Agreement provided that the transaction would close on or before July 31, 2003, failing which the Letter Agreement would expire. Freitas Aff. ¶ 13.

13. At no time prior to or after executing the Letter Agreement did Defendant or any representative of Defendants ever express any doubt as to the meaning of the break-up fee provision in the Letter Agreement. Nor did Defendants or any representative of Defendants ever express the view that a break-up fee would not be due after July 31, 2003. Id. 16.

14.     Upon delivery of the signed Letter Agreement, Lender undertook its due diligence in good faith. Between executing the Letter Agreement and July 31, 2003, Lender engaged in ongoing negotiations with Borrower and its representatives regarding the terms of the proposed loan, including the collateral that would be pledged as additional security for the loan. Id. ¶ 17.

15.     Lender even continued negotiating with Borrower long after July 31, 2003. In fact, Borrower and Lender continued to negotiate and Lender continued to conduct due diligence throughout August. It was not until approximately August 25, 2003 that Borrower informed Lender that it would not continue to negotiate or consider obtaining financing from Lender. By letter dated August 27, 2003, Lender informed Borrower that it was still ready, willing and able to go forward with the proposed transaction. At no time did Borrower or any representative of Borrower contend that it viewed the Letter Agreement, or its break-up fee obligation, as having expired on July 31, 2003. Id. ¶ 18.

16.     To the contrary, at his June 29, 2005 deposition, Dr. Desai, the principal of Borrower, testified that he did not interpret the Letter Agreement as providing that his obligation to pay a break up fee would expire on July 31, 2003. When asked if he recalled the section of the Letter Agreement entitled "Break-Up Fee" when he signed the Letter Agreement, Borrower testified "Yes, I did." Freitas Aff. Exhibit 4 at 39.

17.     When asked what he understood it to mean, he testified: "I understood it the following way: if the loan is not consum[mat]ed by us, we have to pay some cost of separation." Id. Finally, when asked if he had "any understanding of what that six-month

period meant or whether it would expire on July 31, 2003," Borrower responded "[n]o." Id. at 40.

18.  Consistent with Borrower's admission that he did not perceive the Break-Up Fee provision to have terminated on July 31, 2003, Borrower did not cite expiration of the agreement as a basis for avoiding a Break-Up Fee obligation when Borrower terminated negotiations with Lender in August 2003.  Rather, Borrower testified only that, when he terminated negotiations, he did not think he had to pay a Break-Up Fee because Lender had not yet issued a binding loan commitment.  In this regard, Borrower testified:

> Q: But is it fair to say that whatever response was provided [to Lender's August 27, 2003 letter expressing willingness to proceed with the transaction] in late August or early September would have been your position with respect to why no break-up fee was owing?
>
> A: I had received no defined contract from them stating this amount of money, these other details, there is a date.  No commitment letter was provided.  So I assumed I was in no violation of any kind of agreement.
>
> Q: Your understanding that the break-up fee was not due, then, is because since Hudson hadn't committed to make a loan, you felt you had no obligation to pay break-up fees; is that accurate?
>
> A: That is accurate.

Id. at 50-51.

19.  Borrower's interest in the Property at the time the Letter Agreement was executed consisted of an agreement of purchase and sale dated March 13, 2003, between Opta Food Ingredients, Inc. (the Property's owner) and Toxikon Corporation (a corporation wholly owned by Borrower) (the "Purchase and Sale Agreement").  Freitas Aff. Exhibit 5.

Pursuant to the Purchase and Sale Agreement, Toxicon was to pay $4,850,000 for the Property. Id. at 2.

20.     In August 2003, Borrower directly informed Lender that it intended to accomplish its financial objective of acquiring the Property through means other than Lender's proposed financing. Rather than proceed with the acquisition pursuant to the Purchase and Sale Agreement, with financing from Lender pursuant to the Letter Agreement, Borrower re-structured its acquisition of the Property by exchanging the Purchase and Sale Agreement for a short-term lease with an option to buy the Property. Freitas Aff. ¶ 23.

21.     On or about September 22, 2003, Borrower, on behalf of Toxikon Corporation, executed a lease with Opta Food Ingredients, Inc. (the "Lease") with respect to the Property for a term that was to expire upon the earlier of "(a) 11:59 P.M. on September 13, 2004 or (b) the termination of that certain Option Agreement of even date herewith (the "Option Agreement"), between Lessor, as seller thereunder, and Laxman S. Desai, an individual ... and the controlling shareholder of Lessee, as purchaser thereunder (the "Purchaser")." Freitas Aff. Exhibit 6.

22.     Pursuant to the Lease, the Purchaser was to pay (b) base rent of $300,000.00 per year and (b) additional rent to compensate the seller for the real estate taxes, water and sewer charges and other charges imposed in connection with the Property. Id. at 2-3 (Sections 2-3). However, the Purchaser's obligation to pay base rent, so long as it was not in default of its other obligations under the Lease, was completely waived. Id. at 2-3 (Section 1). In other words, as long as it paid the owner's expenses, Borrower received one-year's

free rent, at the end of which time Borrower could exercise an option to purchase the Property for the exact same price as was provided for in the Purchase and Sale Agreement.

23. To effectuate that result, Borrower and the Seller also entered into an option agreement dated as of September 22, 2003 (the "Option Agreement"). Freitas Aff. Exhibit 7. As noted above, the purchase price for exercising the option to acquire the Property was, not surprisingly, the same price set forth in the Purchase and Sale Agreement, e.g., $4,850,000. The option was to be exercised, "if at all, by written notice to Seller (the "Option Notice") on or before 5:00 p.m. on September 22, 2004." Id. Section 1.2.

24. The Option Agreement specifically recited that "in consideration for the mutual promises, covenants and agreements" set forth therein, Borrower released the seller from the obligations set forth in the Purchase and Sale Agreement. In this regard, the Option Agreement provided:

> This Agreement contains all the terms and provisions between Seller, Purchaser and Toxikon relative to the Property and the matters set forth herein and no prior or contemporaneous agreement or understanding pertaining to the same shall be of any force or effect. This Agreement supercedes the Purchase Agreement and the Purchase Agreement shall hereafter have no force or effect. Each party hereby releases the other from any and all damages, claims, actions, causes of action and obligations under the Purchase Agreement or relating thereto.

Id. Section 3.1.

25. The Option Agreement recites that "Toxikon is unable to obtain the financing necessary to acquire the Property in accordance with the terms of the Purchase Agreement. . . ." Id. at 1. In fact, by letter dated August 27, 2003 (Freitas Aff. Exhibit 8), Lender had expressly informed Desai that "Lender hereby confirms that Lender is ready, willing and able

9

to fund the Loan (subject to Borrower's satisfaction of all conditions precedent to such funding imposed by the Lender under the Letter)." Freitas Aff. ¶ 28.

26. Desai admits that the terms of the Purchase and Sale Agreement were incorporated into the Option Agreement. In response to Lender's interrogatories in this case, Desai stated that "I understand that my interest in 25 Wiggins Avenue, Bedford, Massachusetts, is defined by the Option Agreement, amendments thereto, and a certain Purchase and Sale Agreement, the terms of which are incorporated in the Option Agreement, including a certain Lease Agreement between Opta Foods, as lessor, and Toxikon Corporation, as lessee." Freitas Aff. ¶ 29 and Exhibit 9 (see Answer to Interrogatory No. 10).

27. Borrower also obtained alternative financing for the acquisition of the Property pursuant to the Option Agreement. On or about December 10, 2003, Commerce Bank & Trust Company delivered to Desai a conditional commitment to provide a mortgage loan for the acquisition of the Property at an interest rate of 3.6% above the Federal Home Loan Bank 5/10 rate, "fixed at the time of closing" (the "Commerce Bank Commitment"). Borrower, individually and on behalf of Toxikon Corporation, executed the Commerce Bank Commitment on December 31, 2003, within six months of Lender's conditional commitment letter. Freitas Aff. ¶ 31 and Exhibit 10.

28.     As of October 31, 2006, Lender had incurred $64,806.44 in unreimbursed legal fees and other expenses in connection with preparing for the closing and in this action to collect the Break-Up Fee. Freitas Aff. ¶ 33.

Dated:  December 5, 2006

                                                       Respectfully submitted,
                                                       HUDSON REALTY CAPITAL, LLC

                                                       By its attorneys,

                                                       /s/ Scott A. Birnbaum
                                                       Scott A. Birnbaum (BBO # 543834)
                                                       Melissa M. Longo (BBO# 647649)
                                                       BIRNBAUM & GODKIN, LLP
                                                       280 Summer Street
                                                       Boston, MA 02210
                                                       (617) 307-6100

                                                       Daniel R. Milstein (*pro hac vice*)
                                                       GREENBERG TRAURIG, LLP
                                                       900 Third Avenue, 29th Floor
                                                       New York, New York 10022
                                                       (212) 605-1000

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 5, 2006.

                                                       */s/ Scott A. Birnbaum*

                                                       Scott A. Birnbaum