UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------------------------------x
HUDSON REALTY CAPITAL LLC,           :   Case No. 1:
                                                       :   04-CV-10243 (MEL)
                Plaintiff,      :
                                                       :
      - against -                    :   AFFIDAVIT OF
                                                       :   PERRY FREITAS IN
25 WIGGINS AVENUE LLC and       :   SUPPORT OF
DR. LAXMAN DESAI,                 :   MOTION FOR
                                                       :   SUMMARY JUDGMENT
                Defendants.    :
-----------------------------------------------------------------x

STATE OF NEW YORK    )
                                 ) ss.:
COUNTY OF NEW YORK  )

      PERRY FREITAS being duly sworn deposes and says:

      1.     I am a Director of Hudson Realty Capital LLC ("Plaintiff" or "Lender"), the plaintiff in the instant action. I am fully familiar with the facts and events of this case based on my review of the pertinent files and records maintained by Lender in connection with the transaction from which this action arises. I make this affidavit based upon personal knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

## SUMMARY OF THE CASE

      2.     This case arises from a letter agreement (the "Letter Agreement") between Plaintiff and Defendant 25 Wiggins Avenue LLC ("Borrower") and its principal Laxman Desai, as guarantor ("Guarantor", and together with Borrower, the "Defendants") pursuant to which Lender, on a very fast track, conducted due diligence and underwriting in

connection with an application by Borrower for a loan of up to $5 million to enable Defendant to acquire real property known as 25 Wiggins Avenue, Bedford, Massachusetts (the "Property"). The written agreement made explicitly clear that in exchange for Lender's commitment of resources to the consideration of the loan and the associated loss of opportunities to consider other loans, Borrower promised that it would not use Lender as a "stalking horse" to obtain other acquisition financing for the Property. To effectuate that purpose, Borrower agreed that, in the event it either obtained alternative financing or relinquished its interest in the Property within six months of executing the agreement, it would pay Lender a break-up fee equal to 2% of the anticipated $5 million loan.

3. It is undisputed that within six months of executing the agreement, Borrower did in fact apply for and receive a loan commitment from another lender, and Borrower did in fact relinquish its right to purchase the Property by exchanging it for a "phantom" lease with an option to purchase. Borrower thereafter acquired the Property pursuant to the option agreement, utilizing financing from another lender. Thus, by the plain terms of the agreement, Lender is entitled to receive its break-up fee.

A.   The Letter Agreement

4. On or about June 23, 2003, Bluestone Realty Advisors, Inc. ("Bluestone", on Borrower's behalf, sent Richard Ortiz, of Newbridge Realty Capital, LLC, a letter informing Mr. Ortiz that Bluestone had been retained "to procure financing for their acquisition of 25 Wiggins Avenue in Bedford, MA (the "Property")." A true and correct copy of Bluestone's June 23, 2003 letter is annexed hereto as **Exhibit 1**. The Bluestone letter went on to inform Mr. Ortiz that Borrower was on a tight time frame, and consequently needed to have

proposed loan terms within the week and due diligence had to be completed in time for a July 31, 2003 closing date.

5. After discussions with Mr. Ortiz, on or about June 27, 2003, Bluestone provided additional information concerning the proposed transaction, including without limitation, documents describing and appraising additional properties that the Borrower offered to pledge, if needed, as additional security for the loan. One of the properties listed as potential additional collateral by the Borrower was 15 Wiggins Avenue, Bedford, Massachusetts. A true and correct copy of Bluestone's June 27, 2003 communication is annexed hereto as **Exhibit 2**.

6. Newbridge Realty Capital, LLC and Lender frequently participate in making secured loans under accelerated time frames. Mr. Ortiz contacted Lender with respect to Bluestone's query. Lender decided to try to accommodate Borrower's needs, as described by Bluestone in its letter.

7. On or about July 1, 2003, Lender sent to Borrower the Letter Agreement pursuant to which it offered to consider providing the requested acquisition financing (the "Letter Agreement") by conducting appropriate and expedited due diligence and underwriting. Laxman Desai signed the Letter Agreement on July 3, 2003, both on behalf of the borrower (which was to be an entity that he owned or controlled) and as the individual guarantor. A true and correct copy of the executed Letter Agreement is annexed hereto as **Exhibit 3**.

8. The Letter Agreement expressly stated that it was not a loan or a loan commitment. Rather, it set forth the essential terms of a proposed loan of up to $5 million

that Lender would consider making to "[a] single asset, bankruptcy remote entity . . . in which Dr. Laxman Desai . . . is the member, principal or partner. . . ." Exhibit 3 at p. 1. Lender obligated itself to conduct the due diligence required in order to underwrite the loan, while Borrower and Guarantor obligated themselves to pay certain fees and expenses incurred by Lender in connection with its due diligence and preparation for closing.

9. Among the fees required of, and in fact paid, by Borrower were a $5,000, non-refundable due diligence fee and a $10,000 fee "to be applied towards Lender's attorney's fees and disbursements in connection with this Loan." The Letter Agreement provided that Borrower and Guarantor were "responsible for paying all legal fees and disbursements associated with the preparation for and closing of the Loan . . . <u>regardless of whether a loan commitment is issued or the Loan closes</u>." Exhibit 3 at p. 2 (emphasis added).

10. Lender's business is very competitive, and when it devotes the limited time and resources of its personnel to consider a loan, particularly where the loan is needed on a short time table and the up-front effort is therefore intensive, Lender's ability to consider other potential loan opportunities is necessarily restricted. Lender is therefore very careful to include in its loan applications provisions which protect it from being used as a "stalking horse" by would-be borrowers who would use Lender's proposed loan terms as a bench mark from which to pursue better terms from Lender's competitors.

11. The primary method by which Lender prevents borrowers from using Lender's proposed terms as a benchmark to obtain financing from Lender's competitors is by requiring its loan applicants to pay a "break-up fee" in the event they obtain alternative financing or sell or relinquish their rights in the property to be acquired after they sign a

letter agreement with Lender. The Letter Agreement at issue in this case included Lender's typical provision in this regard. It required the Borrower and Guarantor to pay 2% of the anticipated loan amount in the event the Borrower either obtained alternative financing for acquisition of the Property or conveyed its interest in the Property within six (6) months of the date of the Letter Agreement. In this regard, the Letter Agreement provided:

> The Borrower and Guarantor(s) hereby expressly agree and acknowledge that (a) Lender is devoting its personnel and financial resources to the consideration of this Loan; (b) in Lender's industry, business opportunities are limited, and extremely competitive; (c) compensation to the Lender, in the event Borrower obtains financing from a source other than Lender, would be extremely difficult to calculate; (d) Lender cannot, as a result of this underwriting and analysis, commit the resources to other potential transactions and may be deprived of business opportunities thereby; and (e) Lender may suffer negative impact in the industry, in the event the Borrower does not complete this proposed transaction or obtains financing from a competitor of the Lender. Accordingly, the Borrower hereby expressly agrees that, **for the six (6) month period commencing upon the execution of the Letter, but prior to its funding of the Loan, in the event the Borrower or an affiliate or controlled entity (a) obtains debt or equity financing for the Property from a source other than Lender, or (b) sells, assigns or otherwise conveys the Property or its interest therein Lender shall be deemed to have earned a Break-Up Fee**, and shall be entitled to be paid the same, in the amount of two percent (2%) of the Loan.

Id. at 3 (Emphasis added).

12.    Desai as Guarantor expressly agreed to pay any Break-Up Fee that might be due pursuant to the Letter Agreement as well as any costs incurred in connection with collecting same. In this regard, the Letter Agreement provided:

> Payment of all fees and expenses referred to in this Paragraph (Break-Up Fee), are guaranteed by the Borrower, Principal(s), and Guarantor(s), and each of them, each of whom indicate their acceptance of the terms of this paragraph by executing this Letter. The Borrower, Principal(s), and the Guarantor(s) hereby consent, on

> behalf of themselves, and all related or affiliated entities which have an interest in this transaction or which have a right or title in or to the Collateral, to the filing or recordation of a lis pendens or any other appropriate documentation to evidence a lien for the payment required, including all attorneys' fees and costs of collection pursuant to this Paragraph (Break-Up Fee).

Id.

13.     In light of Borrower's representation that it needed to close by July 31, 2003 (a representation that proved untrue, as the parties continued to negotiate well into August), the Letter Agreement provided that the transaction would close on or before July 31, 2003, failing which the Letter Agreement would expire.

14.     The foregoing termination provision did not, and it was not intended to, terminate the Borrower's six-month promise not to obtain alternative financing or to convey its interest in the Property. If that were the case, then Lender would have absolutely no protection from being used as a stalking horse. Lender would be required to devote significant resources to conducting due diligence and would forego considering other profitable transactions while doing so, all on a short time frame to accommodate its borrower's needs, and upon Lender fulfilling, in good faith, its obligations, the borrower would merely have to wait a few days or a week for the closing date to pass, and then it could freely utilize Lender's offer as a benchmark to pursue other financing. Moreover, its competitors could simply wait for Lender to complete its due diligence, then without having to expend any of their own resources, could "poach" Lender's efforts by offering slightly better financing terms. It is to prevent this from happening that, as is typical in the industry, Lender requires its applicants to deal exclusively with it for an agreed-period of time, in this case six months. Lenders must be assured that they can protect themselves from being used

as a stalking horse; otherwise no lender would ever want to be the first to consider a loan application and the availability of credit to potential borrowers would be greatly reduced.

15. If borrowers could avoid their contractual obligations simply by refusing to close, the break-up fee provision would be utterly meaningless. It is not reasonable to interpret a loan application in such a way that an essential protection for the lender is rendered meaningless.

16. At no time prior to or after executing the Letter Agreement did Defendant or any representative of Defendants ever express any doubt as to the meaning of the break-up fee provision in the Letter Agreement. Nor did Defendants or any representative of Defendants ever express the view that a break-up fee would not be due after July 31, 2003.

B.   Lender Performed Its Obligations in Good Faith

17. Upon delivery of the signed Letter Agreement, Lender undertook its due diligence in good faith. Between executing the Letter Agreement and July 31, 2003, Lender engaged in ongoing negotiations with Borrower and its representatives regarding the terms of the proposed loan, including the collateral that would be pledged as additional security for the loan.[1]

18. Lender even continued negotiating with Borrower long after July 31, 2003. In fact, Borrower and Lender continued to negotiate and Lender continued to conduct due diligence throughout August. It was not until approximately August 25, 2003 that Borrower

---

[1] During the course of the due diligence, Lender learned that the approval of an existing mortgagee would be necessary before Borrower could pledge its interest in 15 Wiggins Avenue as security for the loan. Yet, upon information and belief, Borrower never asked such mortgagee for its consent. Instead, Borrower insisted that Lender accept or find other security. Lender attempted to work in good faith with Borrower to arrive at a mutually agreeable solution, such as pledging different property as additional security for the loan.

informed Lender that it would not continue to negotiate or consider obtaining financing from Lender. By letter dated August 27, 2003, Lender informed Borrower that it was still ready, willing and able to go forward with the proposed transaction. At no time did Borrower or any representative of Borrower contend that it viewed the Letter Agreement, or its break-up fee obligation, as having expired on July 31, 2003.

19. To the contrary, at his June 29, 2005 deposition, Dr. Desai, the principal of Borrower, testified that he did <u>not</u> interpret the Letter Agreement as providing that his obligation to pay a break up fee would expire on July 31, 2003. A true and correct copy of the transcript of Borrower's deposition is annexed hereto as **Exhibit 4**. When asked if he recalled the section of the Letter Agreement entitled "Break-Up Fee" when he signed the Letter Agreement, Borrower testified "Yes, I did." <u>See</u> Exhibit 4 at 39. When asked what he understood it to mean, he testified: "I understood it the following way: if the loan is not consum[mat]ed by us, we have to pay some cost of separation." <u>Id</u>. Finally, when asked if he had "any understanding of what that six-month period meant or whether it would expire on July 31, 2003," Borrower responded "[n]o." <u>Id</u>. at 40.

20. Consistent with Borrower's admission that he did not perceive the Break-Up Fee provision to have terminated on July 31, 2003, Borrower did not cite expiration of the agreement as a basis for avoiding a Break-Up Fee obligation when Borrower terminated negotiations with Lender in August 2003. Rather, Borrower testified <u>only</u> that, when he terminated negotiations, he did not think he had to pay a Break-Up Fee because Lender had not yet issued a binding loan commitment. In this regard, Borrower testified:

> Q: But is it fair to say that whatever response was provided [to Lender's August 27, 2003 letter expressing willingness to proceed with the transaction] in late August or early September would have been your position with respect to why no break-up fee was owing?
>
> A: I had received no defined contract from them stating this amount of money, these other details, there is a date. No commitment letter was provided. So I assumed I was in no violation of any kind of agreement.
>
> Q: Your understanding that the break-up fee was not due, then, is because since Hudson hadn't committed to make a loan, you felt you had no obligation to pay break-up fees; is that accurate?
>
> A: That is accurate.

Exhibit 4 at 50-51.

C. <u>A Break-Up Fee Is Due and Owing</u>

21.  As set forth in the Letter Agreement, a Break-Up Fee would be deemed earned if, within six months of July 3, 2003, the Borrower either (a) obtained alternative financing for acquisition of the Property or (b) conveyed its interest in the Property. In fact, Borrower <u>both</u> obtained alternative financing <u>and</u> conveyed its interest in the Property within six months of July 3, 2003, thereby incurring an obligation to pay the Break-Up Fee.

22.  Borrower's interest in the Property at the time the Letter Agreement was executed consisted of an agreement of purchase and sale dated March 13, 2003, between Opta Food Ingredients, Inc. (the Property's owner) and Toxikon Corporation (a corporation wholly owned by Borrower) (the "<u>Purchase and Sale Agreement</u>"). A true and correct copy of the Purchase and Sale Agreement is annexed hereto as **Exhibit 5**. Pursuant to the Purchase and Sale Agreement, Toxicon was to pay $4,850,000 for the Property. <u>See</u> Exh. 5 at 2.

23. In August 2003, Borrower directly informed Lender that it intended to accomplish its financial objective of acquiring the Property through means other than Lender's proposed financing. Rather than proceed with the acquisition pursuant to the Purchase and Sale Agreement, with financing from Lender pursuant to the Letter Agreement, Borrower re-structured its acquisition of the Property by exchanging the Purchase and Sale Agreement for a short-term lease with an option to buy the Property.

24. On or about September 22, 2003, Borrower, on behalf of Toxikon Corporation, executed a lease with Opta Food Ingredients, Inc. (the "Lease") with respect to the Property for a term that was to expire upon the earlier of "(a) 11:59 P.M. on September 13, 2004 or (b) the termination of that certain Option Agreement of even date herewith (the "Option Agreement"), between Lessor, as seller thereunder, and Laxman S. Desai, an individual ... and the controlling shareholder of Lessee, as purchaser thereunder (the "Purchaser")." A true and correct copy of the Lease is annexed hereto as **Exhibit 6**. (See Lease at 2.)

25. Pursuant to the Lease, the Purchaser was to pay (b) base rent of $300,000.00 per year and (b) additional rent to compensate the seller for the real estate taxes, water and sewer charges and other charges imposed in connection with the Property. Id. at 2-3 (Sections 2-3). However, the Purchaser's obligation to pay base rent, so long as it was not in default of its other obligations under the Lease, was completely waived. Id. at 2-3 (Section 1). In other words, as long as it paid the owner's expenses, Borrower received one-year's free rent, at the end of which time, as set forth below in paragraph 26, Borrower could

exercise an option to purchase the Property for the exact same price as was provided for in the Purchase and Sale Agreement.

26.     To effectuate that result, Borrower and the Seller also entered into an option agreement dated as of September 22, 2003 (the "Option Agreement"). A true and correct copy of the Option Agreement is annexed hereto as **Exhibit 7**. As noted above, the purchase price for exercising the option to acquire the Property was, not surprisingly, the same price set forth in the Purchase and Sale Agreement, e.g., $4,850,000. The option was to be exercised, "if at all, by written notice to Seller (the "Option Notice") on or before 5:00 p.m. on September 22, 2004." See Exh. 7 Section 1.2.

27.     The Option Agreement specifically recited that "in consideration for the mutual promises, covenants and agreements" set forth therein, Borrower released the seller from the obligations set forth in the Purchase and Sale Agreement. In this regard, the Option Agreement provided:

> This Agreement contains all the terms and provisions between Seller, Purchaser and Toxikon relative to the Property and the matters set forth herein and no prior or contemporaneous agreement or understanding pertaining to the same shall be of any force or effect. This Agreement supercedes the Purchase Agreement and the Purchase Agreement shall hereafter have no force or effect. Each party hereby releases the other from any and all damages, claims, actions, causes of action and obligations under the Purchase Agreement or relating thereto.

Id. Section 3.1.

28.     It is worthy of note that the Option Agreement recites, self-servingly but inaccurately, that "Toxikon is unable to obtain the financing necessary to acquire the Property in accordance with the terms of the Purchase Agreement. . . ." Id. at 1. In fact, by

letter dated August 27, 2003 (a copy of which is annexed hereto as **Exhibit 8**), Lender had expressly informed Desai that "Lender hereby confirms that Lender is ready, willing and able to fund the Loan (subject to Borrower's satisfaction of all conditions precedent to such funding imposed by the Lender under the Letter)."

29. It is also worthy of note that Desai admits that the terms of the Purchase and Sale Agreement were incorporated into the Option Agreement. In response to Lender's interrogatories in this case, Desai stated that "I understand that my interest in 25 Wiggins Avenue, Bedford, Massachusetts, is defined by the Option Agreement, amendments thereto, and a certain Purchase and Sale Agreement, the terms of which are incorporated in the Option Agreement, including a certain Lease Agreement between Opta Foods, as lessor, and Toxikon Corporation, as lessee." A true and correct copy of Defendant's Answers to Plaintiff's First Set of Interrogatories is annexed hereto as **Exhibit 9**. (See Answer to Interrogatory No. 10.)

30. Thus, within six months of executing the Letter Agreement on July 3, 2003, Borrower transferred his interest in the Property by purportedly abandoning the Purchase and Sale Agreement. That alone would give rise to the Break-Up Fee. But Borrower, evidently to conceal its transactional sophistry, simply changed the façade of the transfer and entered into the Lease and Option Agreement in place and stead of the Purchase and Sale Agreement. However, the financial terms of the acquisition remained the same as under the Purchase and Sale Agreement.

31. In addition to conveying its interest in the Property, which is sufficient in and of itself to render the Break-Up Fee due and owing, Borrower also obtained alternative

financing for the acquisition of the Property pursuant to the Option Agreement. On or about December 10, 2003, Commerce Bank & Trust Company delivered to Desai a conditional commitment to provide a mortgage loan for the acquisition of the Property at an interest rate of 3.6% above the Federal Home Loan Bank 5/10 rate, "fixed at the time of closing" (the "Commerce Bank Commitment"). Borrower, individually and on behalf of Toxikon Corporation, executed the Commerce Bank Commitment on December 31, 2003, within six months of Lender's conditional commitment letter. A true and correct copy of the Commerce Bank Commitment is annexed hereto as **Exhibit 10**.

D. Lender Has Incurred Unreimbursed Costs and Legal Fees

32. As discussed above, Dr. Desai as Guarantor, guaranteed the payment of (a) Lender's legal fees in connection with preparing for the closing, (b) the Break-Up Fee and (c) Lender's legal fees and expenses incurred in collecting the Break-Up Fee.

33. As of October 31, 2006, Lender had incurred $64,806.44 in unreimbursed legal fees and other expenses in connection with preparing for the closing and in this action to collect the Break-Up Fee.

34.  Under the circumstances described herein, Lender is entitled to summary judgment as to Borrower's and Guarantor's liability for the Break-Up Fee of $100,000 (2% of $5,000,000) and for Lender's legal fees and expenses in an amount to be determined at trial, but no less than the $64,806.44 incurred through October 31, 2006.

_____
PERRY FREITAS

Sworn to before me this
5th day of December, 2006

_____
NOTARY PUBLIC

**Nadine A. DePass**
**Notary** Public, State of New York
No. 01DE6046174
Qualified in New York County
Commission Expires 9-05-2010

14