# EXHIBIT 4

**In The Matter Of:**

*Hudson Reality Capital, LLC v.*
*Dr. Laxman Desai*

---

*Laxman Desai*
*Vol. 1, June 29, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA 02110*
*(617) 426-2432*

*Original File DESAI.V1, 53 Pages*
*Min-U-Script® File ID: 0862484273*

**Word Index included with this Min-U-Script®**

00001

Volume I
Pages 1 to 53
Exhibits: P8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HUDSON REALTY CAPITAL, LLC, :
Plaintiff, :
vs. : Civil Action No.
: 1:04-cv-10243
DR. LAXMAN DESAI, : (MEL)
Defendant. :

DEPOSITION OF LAXMAN DESAI, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Daniel P. Wolfe, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Birnbaum & Godkin, LLP, 280 Summer Street, 5th Floor, Boston, Massachusetts, on Wednesday, June 29, 2005, commencing at 10:10 a.m.

PRESENT:

Solomon and Weinberg LLP
(by Cory Mitchell Gray, Esq.)
Two University Plaza, Hackensack, NJ 07601,
for the Plaintiff.

Robert G. Cohen, Esq.
188 Oaks Road, Framingham, MA 01702,
for the Defendant.

Page 2

INDEX

| EXAMINATIONS | PAGE |
|---|---|
| LAXMAN DESAI | |
| DIRECT EXAMINATION BY MR. GRAY | 3 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| P8 | Letter from Patrick Bisceglia of Bluestone Realty Advisors to Richard Ortiz of Newbridge Realty Advisors dated 6/23/03 | 26 |

Page 3

PROCEEDINGS

LAXMAN DESAI

a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GRAY:

Q: Good morning, Dr. Desai.
A: Good morning.
Q: As you know, my name is Cory Gray. I am a lawyer with Solomon and Weinberg, and we represent Hudson Realty Capital in this action in which you are a defendant. You are aware of that, I'm sure?
A: Yes.
Q: Have you been deposed before today?
A: I have. With Hudson Realty?
Q: No. Have you ever been in a deposition before ever?
A: I have been.
Q: How many times?
A: A few times. I don't really know.
Q: Cost of business.

Page 4

A: It's a cost of business.
Q: So you are familiar with the process. You know I will be asking you questions. Since you are under oath, you have the obligation to answer my questions fully, truthfully, and completely. You are aware of that?
A: I am aware.
MR. COHEN: I may object for the record, Dr. Laxman, but you have to answer the questions anyway. And we will reserve all objections, except to the form of the question, until the time of trial. Motions to strike also.
MR. GRAY: That's right.
Q: I will say your lawyer may object from time to time. But unless he instructs you not to answer to preserve an attorney-client privilege, you should answer my questions. Do you understand that?
A: I do.
Q: If I ask you a question that you do not understand, that is incomprehensible or based on an unfactual premise, please let me know, and I will try to correct it so you can answer. Will you do that?
A: I will.

Page 5

Q: Lastly, make sure all your answers are verbal so the court reporter can take them down.
A: Okay.
Q: Dr. Desai, when did you or Toxikon — and when I say "you" in this deposition, I will mean both of you unless I otherwise specify. Okay? When did you first decide to pursue the purchase of 25 Wiggins Avenue?
A: Sometime — you mean the sale or purchase at 25 Wiggins Avenue?
Q: Yes.
A: Sometime in the early part of 2003.
Q: What made 25 Wiggins attractive to you?
A: It is in our backyard. It is a logical expansion geographically.
Q: When you say your backyard, that's because Toxikon already had facilities at 15 Wiggins Avenue?
A: Correct.
Q: Whose decision was it to pursue the acquisition of 25 Wiggins Avenue? Your personal decision?
A: This was my personal decision.
Q: What did you do, when you decided to pursue that acquisition, to further that acquisition?

Page 6

A: We made an offer to the company which owned 25 Wiggins Avenue sometime in March of, if I can recollect correctly — I may not be exactly sure about the timing, but sometime early 2003 when it became available to us.
Q: How did you learn that it was available?
A: There was a real estate agent. I don't know which company he was representing from — he was representing SunOpta. He contacted one of the staff members who works for me, and she brought that information to me. In the meantime we were already searching to move to a different facility. I had no idea this thing was becoming available to us. It was a surprise to me at that particular time.
Q: A pleasant surprise?
A: I would say so, yes. In terms of convenience, it is favorable.
Q: What is the name of your staff who brought this information to you?
A: Her name is Nancy DiGiulio, D-i-G-i-u-l-i-o.
Q: What was her title or position at the time?
A: She is a vice-president of operations.
Q: Is she still with Toxikon?

Page 7

A: She is still with Toxikon.
Q: Does she still hold that title?
A: She does still hold the title.
Q: Did you have personal involvement in negotiating the terms of the acquisition with SunOpta, or did you leave that to someone else to do for you?
A: It was done in a collective way and I was aware of it, but I did not personally negotiate any of it.
Q: I assume — correct me if I am wrong — that the major decisions with respect to the terms were yours to make, though, right?
A: Right.
Q: Who was the lead person from Toxikon doing the negotiation?
A: Nancy DiGiulio.
Q: I assume from the record that Ms. DiGiulio and someone from SunOpta ultimately were able to agree upon terms?
A: Yes. We agreed upon some terms, and finally it was up to me to say "yes" or "no."
Q: I gather you said "yes."
A: Yes.

Page 8

Q: I would like to show you a document that we have marked previously in the last two days as Exhibit P2 and ask you to look at that document, please, Doctor.
MR. COHEN: What number is that?
MR. GRAY: P2. It is the purchase and sale.
A: (Reviewing document) I'm sorry. I'm taking time.
Q: That's quite all right.
A: Yes.
Q: You have had a chance to review P2?
A: This?
Q: Yes, this agreement of purchase and sale.
A: I'm sure I must have had time to, right.
Q: I meant now.
A: Yes, I did.
Q: You leafed through it page by page?
A: Whatever I could possibly do, yes.
Q: Could you turn to Page 30 of the document.
A: Yes.
Q: Is that your signature on Page 30?
A: That is my signature.
Q: To the best of your knowledge, is this a

Page 9

true and correct copy of the agreement of purchase and sale between Toxikon and Opta Foods?
A: This signature is a true copy.
Q: Did you see anything else as you leafed through it that didn't appear to you to be a genuine page from the agreement?
A: No.
Q: So as of March 13, 2003, Toxikon and Opta had agreed that Opta would sell 25 Wiggins Avenue to Toxikon and Toxikon would buy that property from Opta Foods, correct?
A: Yes.
Q: What did you next do to further this agreement of purchase and sale?
A: I had asked my controller to look for the possible financing with several lenders.
Q: Is that Dexter Williams?
A: His name is Dexter Williams, correct.
Q: Is Dexter Williams still with Toxikon?
A: He is still with Toxikon.
Q: Did you tell him what lenders to contact?
A: No.
Q: Do you know what lenders he did contact, if any?

Page 10

A: If I recollect right, the logical way of contacting was the bank we were working with, Commerce Bank at that particular time, and also we had relationships with the Eastern Bank. That's all that comes to my mind.
Q: Do you know whether Mr. Williams did in fact contact either or both of Commerce Bank and Eastern Bank in March or April of 2003 to see if they would provide the financing necessary to effectuate the agreement of purchase and sale?
A: Yes, he did contact them.
Q: He told you that he did?
A: Yes, he told me.
Q: Did he tell you he made a loan application to either of them with respect to the acquisition of 25 Wiggins?
A: He had made loan applications to both of them.
Q: Do you know what the result of those applications was?
A: Eastern Bank, during the course of the last negotiation, backed out without giving any reasons. And my memory is not clear, but I can go with my hunch. Commerce Bank was toiling with the idea.

Page 11

There was no commitment at that particular time.
Q: When you say "at that particular time," what time are you referring to?
A: March, April or May. Around that time.
Q: Did you have personal involvement with the negotiations with either Eastern Bank or Commerce Bank?
A: Peripherally. I was not intimately involved with it.
Q: Mr. Williams kept you advised?
A: If they needed any kind of explanation how I support the loan, what I do, and what is the future of the company I own, Toxikon. There were some questions asked to me which were reasonable, and I was present at that particular time. After that I left all the details to my controller as well as my operation VP, Nancy DiGiulio.
Q: Do you recall, with respect to Eastern Bank, ever being told any reason that they backed away from the possibility of making this acquisition loan for 25 Wiggins?
A: Details are murky to me. I don't know. But it was all a done deal. But we never got a letter of commitment when the day had come. So

Page 12

there was no sufficient reasons given negatively or positively. So at the end, the time ran over, and I wasn't quite sure what transpired at that time.
Q: When you said "terms" — I believe you said terms had been agreed to, meaning that the bank and Mr. Williams had agreed upon terms, but the bank never issued a commitment letter; is that accurate?
A: Correct.
Q: Do you recall what collateral the bank was requiring to support the acquisition loan? When I say "the bank," I mean Eastern Bank.
A: I'm not sure of the details. They are not clear to me. But the question was I had to give a personal guarantee, plus collateral was 25 Wiggins Avenue.
Q: Do you recall whether any other real estate collateral was to be provided?
A: I do not recall that.
Q: Does Toxikon have a file with respect to its loan application to Eastern Bank?
A: They must have this.
Q: I am going to ask through counsel that that file be produced to us. How about with respect to Commerce Bank? You said they were toiling with the

idea. Had terms not finally been agreed to by Commerce Bank in or about May of 2003?

A: We had a long working relationship, and it wasn't clear to me. By the time the terms of the purchase was getting closer, they didn't come through.

Q: Did you ever have any personal discussions with anyone at Commerce Bank as to why it wasn't coming through?

A: I did everything through my controller. I had little contact.

Q: Did you ever discuss with Mr. Azia, then of Commerce Bank and now of Digital Financial Credit, why Commerce Bank wasn't moving more quickly on the application?

A: I did meet with him. He was the representative of the Commerce Bank at that time, and he did express the insufficient collateral at that particular given time, but he was trying to look into it. The matter was still open-ended.

Q: When Mr. Azia told you that in the bank's view there was at that time insufficient collateral, do you recall what collateral he was referring to?

A: It was 25 Wiggins Avenue only.

Q: So was it your understanding that Mr. Azia and Commerce Bank were looking to perhaps get other collateral pledged to support the loan if they were to make it at all?

A: We discussed about those collaterals, but it is not clear to me what transpired. That was a few years ago.

Q: Do you recall any of the specifics of the collateral that were in those discussions?

A: I do own — I did own some of the property in Florida and some property in Maine. I was willing to pledge those which were not under the covenants, restrictions from the bank.

Q: And the main property was the Sandy Point property?

A: Correct.

Q: Were there more than one Florida property? Was there more than one Florida property that was under discussion?

A: There were four properties.

Q: Do you recall which properties those were?

A: Oh, God.

Q: Not a memory test. Just if you recall.

A: There is 106 Coastal Way, was one property

where the lab was. 675 Indian Town Road where the commercial building was. And I had two pieces of land and a house on it at the Jupiter Farms. And the exact address of those farms, they were too long to remember.

Q: In your discussions with Mr. Azia the Commerce Bank was expressing that they may be looking to these other pieces of collateral to support the loan on 25 Wiggins?

A: I really did not get clear demands as to what actually they wanted until my terms with the Opta Food came to an end.

Q: Do you recall when, under the agreement of purchase and sale, Toxikon was originally required to close the acquisition?

A: Somewhere in July, if I remember right. I got 90 days or something from — I think somewhere in July of 2003.

Q: '03?

A: Yes. This is very vague for me.

Q: In or about late May or early June of 2003 when Eastern Bank had not come through and Commerce Bank had not come through, did you have discussions with Mr. Williams about where Toxikon was going to

get the financing to close his acquisition?

A: I did have discussions with him, and we were trying to find some local assistance to work out the deal because I had put a significant amount of down payment toward the Opta Food with the promise of Eastern Bank is going to close the deal.

Q: You may have said this. I apologize if you did. When did you learn that Eastern Bank was just not going forward?

A: The exact time is not clear to me. And it must have been close to the closing date of the SunOpta. But that timing is very much vague in my mind.

Q: Who were you or other representatives of Toxikon dealing with from SunOpta at the time?

A: In terms of transactions?

Q: Yes.

A: It was mainly dealt with by Nancy DiGiulio and Dexter Williams.

Q: Who at SunOpta were they dealing with?

A: There was a guy who is no longer there at that particular time. I don't know what his name was. But if you can drop some names, I can tell you who it was. He was the gentleman we were dealing

 Min-U-Script® Doris O. Wong Associates (617) 426-2432

with. He was a friend of the Realtor who was representing his property to us. I don't know what his name was. And he was the controller from SunOpta at that time. It was not called "SunOpta." It was called "Opta Food" at that time.

Q: Yes. We have been using them interchangeably today. But you are quite right, it was Opta Foods. Did you have any sense, from talking to Nancy or Dexter, whether Opta Foods would default you and make you forfeit your down payment if you weren't able to close timely?

A: That was obvious, and it was mentioned to me that some measures have to be taken; otherwise, we forfeit all the deposit.

Q: I assume Toxikon was represented by counsel at the time, a lawyer?

A: An attorney at that particular time, Robert Cohen, my attorney. He is general counsel for the company. And we used Choate Hall because Robert Cohen was busy with his court cases.

Q: To the extent it would not disclose any attorney-client privilege — and you can obviously confer if you need to — were your lawyers in touch with Opta Foods' lawyers with respect to getting an

extension; and if so, what did they tell you about those discussions?

MR. GRAY: Do you want to have a talk first, or are you okay with that?

MR. COHEN: No.

You can answer the question. I don't have any problem with the question.

A: It wasn't the attorneys. It was I who spoke with then a new controller, Peter Franggos — the name comes to me — and Dr. McEvily, who is the president of — don't ask me how to spell it. Take a shot. I met with those gentlemen and worked out some feasible way. They were not interested in extending the purchase and sale, but they gave me an incentive to continue to be a tenant there, paid some serious money towards it and gave me 90 days, or I don't know how long they gave me, to find some other suitor to help us buy the place.

Q: Do you recall when that meeting took place?

A: It must have been at the end of the term, agreements of closing. I believe it is end of May. End of June, I'm sorry, somewhere.

Q: Did those discussions — rephrase that. Towards the end of June did Toxikon and Opta begin

to enter into a series of extension agreements that extended Toxikon's time to perform under the purchase and sale agreement?

A: They gave us, to continue to foster the possibility of acquiring the company —

(Discussion off the record)

A: We continued to have some dialogue and tried to come up with things that is suitable for them. Then SunOpta was owned by Stake Technology, which is a Canadian company. I had not spoken to anybody in — Canadians or Canadian company or their chief honchos over there. I worked everything through Dr. McEvily and Mr. Franggos. We came to an understanding and they gave me certain time possibilities to see whether this could materialize into a final sale. It wasn't the best deal, but I bought into it.

Q: If it wasn't the best deal, why did you buy into it?

A: Because buying into it would be less expensive than losing all the deposit, serious money I had put down. So that was the reason.

Q: Yesterday in his deposition Mr. Franggos expressed the opinion that they were, "they" being

Opta Food, committed to allowing Toxikon or you to purchase the property as you were the only viable buyer they were aware of. Did they ever express that to you at the time?

A: No.

Q: Had you ever learned that before today?

A: No. Because they were represented — we never negotiated anything with them. All the transactions, real estate transactions, I was forced to deal with some company, I don't know, something starting with "T," Trammell Crowe.

Q: Trammell Crowe?

A: Trammell Crowe, something like that.

Q: That was the broker on the deal?

A: That was the broker on the deal. And we were not allowed to go in between the situation. And they were represented by an attorney. An attorney was always in the forefront along with the Realtors. Only the details of this relationship to extend was directly negotiated between SunOpta individuals — those names I mentioned before.

Q: With you?

A: With me.

Q: I am going to ask you to look at documents

Page 21

that have been previously marked as P1 and P3 and ask you, first, if you recognize those documents.
A: Of course I can't read all of the — I am becoming aware of my nightmare here. Bear with me.
(Reviewing document) This P3, I have seen this before.
Q: With respect to P3, Doctor, while you have that open, would you turn to Page 30 and tell me whether that's your signature on that page, a copy of your signature on that page.
A: It is my signature.
Q: To the best of your knowledge, is this an accurate and true copy of the option agreement dated as of September 22, 2003?
A: Yes.
Q: Thank you. Now you could turn to P1, if you would.
A: (Reviewing document) Okay.
Q: You can anticipate my question. On Page 29, is that a copy of your signature there?
A: It is my signature.
Q: To the best of your knowledge, is P1 a true and correct copy of the lease entered into as of September 22, 2003, between Opta Foods and Toxikon?

Page 22

A: Yes.
Q: Are these two exhibits that you have just reviewed, the lease and the option agreement, the documents by which the parties memorialized your agreement that you reached with Peter Franggos and Dr. McEvily by way of making an alternate way for Toxikon to acquire 25 Wiggins Avenue?
MR. COHEN: Do you understand the question?
THE WITNESS: No, I did not understand the question.
Q: Okay, that's fine. Let me know when you don't. It was a little convoluted. Are these the two documents, P1 and P3, that Toxikon and Opta signed in order to give effect to the agreement that you had reached with Peter and Dr. McEvily?
A: That was the only way not to lose the deposit on the property.
Q: So these are the documents that you signed to make effective or make enforceable the deal you struck with Mr. Franggos and Mr. McEvily?
A: Correct.
Q: Do you recall when you and Mr. Franggos and Dr. McEvily first started to talk about structuring the transaction in the way that P1 and P3 show it to

Page 23

be structured?
A: There were several extensions. I asked and got them from them. They were kind enough to provide me two or three or four. I don't know how many extensions I got from them. And I realized at that particular last extension they were not willing to extend any further. At that particular time it was mutually came to a decision that they would go along with these kind of arrangements. Arrangements were created by them. It wasn't by me or by Toxikon or any of my side of the transaction.
Q: But Toxikon did have counsel review these documents and ultimately did agree to go forward in this way, correct?
A: Counsel only supported my thoughts to go along with it.
Q: And ultimately your counsel did review both these documents, P1 and P3?
A: Yes.
Q: Ultimately, as we know, you did sign them, correct?
A: Correct.
Q: Do you recall why the option agreement, which was P3, gives you personally the option to

Page 24

purchase the property rather than Toxikon?
A: I wanted to buy the property personally, not through the company. I always bought all my properties with a personal option and I leased to the company.
Q: The reason I ask is the original agreement of purchase and sale which has been marked as P2 —
A: That was a mistake.
MR. COHEN: Wait for the question.
Q: It does show Toxikon as the purchaser. And can you tell me why that was?
A: That shouldn't have been. Generally my intention is to secure the buildings under my name. If it was there, it was done erroneously.
Q: The option agreement, if you would just take a look at that too, also recites — I will just point to it here about halfway down — contains a line about Toxikon not being able to obtain the financing necessary to acquire the property. Do you see that?
A: Yes, I see it.
Q: Do you know how that representation came to be inserted in this document?
A: No, I don't. But I think Toxikon or myself

Page 25

are so intermingled — I own it 100 percent. So it is being used probably in place of one or the other. I can't explain.

Q: With respect more to the substance than the fact that it refers to Toxikon, is it an accurate representation that Toxikon was unable, as of September 22, 2003, to obtain financing to acquire the property?

A: Correct, it was unable.

Q: As we both know, at some point Hudson Realty Capital became involved as a potential lender. Before we get to that, let me ask you, other than Commerce Bank and Eastern Bank were any other potential lenders ever contacted by or on behalf of you or Toxikon with respect to the 25 Wiggins acquisition?

A: At that particular time nobody was contacted.

Q: Is it fair to say that the lease and option agreement, P1 and P3, were signed up so that you could preserve your ability to obtain 25 Wiggins Avenue which you would otherwise possibly have lost because of your inability to obtain financing?

A: Yes.

Page 26

MR. GRAY: I would like to have marked as Exhibit P8 a copy of a letter from Bluestone Realty Advisors, Inc., with attachments addressed to Richard Ortiz of Newbridge Realty Advisors, LLC.

(Document marked as Defendant's Exhibit P8 for identification)

Q: Doctor, I would like you to take a look at Exhibit P8 and tell me, have you ever seen it before today?

A: Yes, I have seen it.

Q: When did you first see it?

A: Somewhere in June.

Q: June of 2003?

A: Yes.

Q: Can you tell me how Bluestone Realty Advisors, Inc., came to be involved in this transaction?

A: Actually, details escape me, but they contacted me from White Plains, I believe, New York. I had known them before. We were actively seeking financing from different sources, and he came in the picture and contacted us with this letter.

Q: This letter, P8, is a letter from Mr. Bisceglia to Newbridge. It is not to Toxikon,

Page 27

correct?

A: Correct.

Q: So did Mr. Bisceglia or somebody from Bluestone telephone Toxikon?

A: He got in touch, I'm not sure, with Nancy or myself or Dexter, and the details were given to him. I generally did not get involved in all these details and whatnot. I am not a detail person. Then this information must have been presented to us.

Q: Did you ever come to know how Bluestone learned of the fact that Toxikon was looking for alternative financing?

A: I don't know.

Q: Do you know whether Bluestone contacted any other potential lenders — obviously this letter is addressed to Newbridge — but other than Hudson Realty?

A: I am not aware of it.

Q: To the best of your knowledge, were the only potential lenders ever contacted by or on behalf of Toxikon Commerce Bank, Eastern Bank, and Hudson Realty Capital? Let me give it a time frame.

MR. COHEN: If you know.

Page 28

Q: Before December 31, 2003. So I will keep it all in 2003 for now.

A: I am not aware if any other than these people were contacted. I don't think so.

Q: At some point Hudson Realty Capital sent to you through Bluestone a conditional commitment letter; is that accurate? Let's call it a letter of July 1, 2003, that several parties signed. Is that accurate?

MR. COHEN: Just refer to it as "the letter."

MR. GRAY: We will get to it.

A: If I see the letter, I would be able to say.

Q: I am going to place before you what has been previously marked as Exhibit P7 and ask if you recognize that letter.

A: Yes.

Q: Is that a letter that Hudson sent to you?

A: Yes. They had faxed it to us.

Q: Did you actually sign that and is that your signature on Page 4?

A: It is my signature. I signed it.

Q: What did you understand this letter to be

Page 29

at the time you signe d it?
A: A loan to secure 25 Wiggins Avenue property.
Q: By this letter, was, in your view, Hudson obligating itself to underwrite the loan, if not to make the loan?
A: This was a proposal given to me.
Q: What did you understand Hudson's obligations under the proposal to be, if any?
A: It is a letter of understanding. I didn't find anything beyond that.
Q: Did you have this letter reviewed by any counsel before you signed it?
A: I do not recolle ct. I don't know.
Q: After you signed and returned this letter to Hudson, did you have further personal contact with the individuals at or on behalf of Hudson?
A: During the whole transaction, one gentleman came — I don't know his name — came to check the property. That was the only time I spent some time with him. Otherwise I do not know anybody, I have not spoken to anybody at Hudson Realty.
Q: Do you remember that person's name?
A: No.

Page 30

Q: I will try a few. Sandy Herrick?
A: That may be the name.
Q: Do you remember the contents of any of the discussions you had with this person, whether it was Sandy or someone else, during your site visit?
A: I don't know what kind of discussions we had. The only thing I know that he wanted is to see some properties nearby which he had in mind to see. I took him to one or two properties. Other than that, I do not recollect any discussions of any sort with him.
Q: To the best of your recollection, you didn't have any personal discussions thereafter with anyone at Hudson?
A: I never had before. I never had after. Sandy Herrick I think is his name. But that was the end of it. I work everything through my staff at Toxikon.
Q: Who at Toxikon had primary contact with Hudson people?
A: Nancy DiGiulio. May I make a statement? We actually had very little interactions. We worked everything through this Bluestone agent.
Q: So Nancy primarily had contact, as you

Page 31

understand it, with the Bluestone people, not directly with the Hudson people?
A: That is my understanding, because he was the middleman and we never really had to go anything through — everything has to go through — they want to control the whole transaction.
Q: Did Nancy nonetheless report back to you on the discussions that she had with Bluestone regarding the potential Hudson loan?
A: Yes.
Q: What do you recall her telling you in, let's call it, early July 2003?
A: They needed documents. I don't have all the details in my mind. Whatever they asked, we provided them. And she keeps me pretty much informed, not that memory is that great, to keep everything together. Then there were issues of evaluation of the property, and they were hiring some real estate agents to come in, see what it's worth, the 25 Wiggins. Then beyond any other due diligence they had to do, she kept me informed about being complying to what the needs are.
Q: Do you know whether Nancy had discussions with Bluestone regarding the timing of the closing

Page 32

and the time criticality of the closing?
A: It was very, very clear what the timing or essence of the timing was because no extension was going to be granted beyond that.
Q: When you say "beyond that," you mean beyond that last extension?
A: Correct.
Q: Do you recall when that last extension expired?
A: I believe sometime end of July.
Q: Is it around that time — I think that's what you said, but is it around that time that you met with Mr. Franggos and Dr. McEvily to restructure the transaction?
A: It is a little later, because the time pretty much expired at that particular time and I was out of the country. And when I came back is when I met with these two individuals from Opta Food.
Q: So even though, to the best of your recollection, Toxikon's time to close the acquisition had expired, Opta didn't default Toxikon and take the down payment?
A: They did not.

Q: Instead they entered into the lease and option agreement?
A: We took some time to come to terms. And meetings of the mind, they agreed not to foreclose this transaction.
Q: Do you know whether Nancy ever passed that information on to Bluestone?
A: Yes, she did.
Q: To the best of your recollection, Bluestone was advised at some point that a different structure for the deal was going to go forward?
A: I am not aware of it because the different structures were up in the air. Pretty much called it a day.
Q: With Bluestone?
A: With Bluestone. Bluestone representing Hudson Realty as well.
Q: Do you recall when you returned to the United States in the summer of 2003?
A: Probably early — a few days after — I think in early August somewhere, August 2nd or 3rd, 1st. It wasn't too far off from that time.
Q: How long after you returned do you recall meeting with Mr. Franggos and Dr. McEvily?

A: I really don't know, but I think it was immediate.
Q: I would assume this would be a fairly high priority issue?
A: It was high priority. A significant amount was at stake.
(Recess taken)
BY MR. GRAY:
Q: So after your meeting with Mr. Franggos and Dr. McEvily, did Toxikon and/or you continue to pursue financing both with Hudson and with Commerce Bank?
A: With Hudson, we were pursuing. And not having had any commitment from Commerce, it was hanging loose. They didn't say "no," they didn't say "yes" at that particular time.
Q: And was it Mr. DiGiulio who continued to have primary contact with Bluestone or Hudson?
A: Ms. DiGiulio was the primary contact with Hudson — not Hudson — Bluestone and/or Hudson.
Q: Do you recall when it was that you decided, if it was you in fact who decided, that you weren't going to be able to get financing through Hudson?
A: The time expired and I didn't have any

commitment letter of the conditions or the details of the money, of payment schedules. Nothing was done or not even — barely mentioned they were going to fund. Just the words have no meaning in it. I've never had anything in writing to enforce my commitment to SunOpta.
Q: You said the time expired. You mean the time of the July 1, 2003, letter that we marked earlier as P7?
A: Correct.
Q: So in the discussions that followed July 31, 2003, what was your understanding of the nature of those discussions? Was it in furtherance of pursuing the July 1, 2003, possible financing?
A: We got no commitment from them other than some kind of a proposal. The bar was moving. Collateral, they were asking the whole thing, which I could not provide. It continued and continued. At one point the time has come and gone.
Q: Do you recall ever being informed of what collateral Hudson was seeking that you could not provide?
A: Yes. During the course of their July due diligence or asking for documents, they were asking

for two properties which were under restrictions with the covenants which was 15 Wiggins Avenue and 675 Indian Town Road in Florida.
Q: And you could not provide either of those as collateral due to restrictive covenants contained in the mortgage documents for those properties?
A: I was restricted by the covenants.
Q: Did you or anyone at Toxikon ever offer alternative collateral or tell Hudson, through Bluestone, that those properties could not be provided as collateral?
A: As I said before, I did have several properties which I offered as collateral. But they insisted on these two properties on a continuing basis.
Q: And you learned that Hudson had such an insistence through whom?
A: Through our agent.
Q: Bluestone?
A: Yes, Bluestone.
Q: Did you tell Hudson or did you ask anyone to tell Hudson on or around July 31, 2003, when a financing commitment had not yet issued, that you were no longer pursuing the July 1, 2003, letter?

Page 37

A: We fostered everything through our agent, Bisceglia or Bluestone. He was the money man. It was over. I just needed the money, no matter where it is. Even if somebody said, "Look, here is a commitment letter, here is what it is," I could have still negotiated that.
Q: So do you know if Mr. Bisceglia told Hudson that you were no longer interested in pursuing the financing through Hudson on or around July 31, 2003?
A: Exact dates I don't know. But again, I think he was informed.
Q: What is the basis of your thinking that Hudson was so informed?
A: Because he was my agent.
Q: I think maybe we are missing each other. I'm sorry. You believe Toxikon told Mr. Bisceglia that it was no longer interested in pursuing financing through Hudson in late July or early August of '03?
A: Mainly because there was no commitment letter by that time. The time had come and gone. There was no commitment letter. So it was more than clear that the deal was not going to go through. And we communicated that one to Bluestone, Mr.

Page 38

Bisceglia, whatever his name is. But all the deals probably could be provided by Nancy. She is the one which was handling all the issues. And you have to forgive me. I don't recollect all the details.
Q: But it is your understanding through Nancy that she told Mr. Bisceglia in late July or early August that Toxikon would not pursue Hudson's financing?
A: Yes. That was told, correct.
Q: Do you have any understanding of whether Mr. Bisceglia passed that position on to Hudson at or about that time?
A: I do not know.
Q: Do you recall Toxikon ever being sent a letter from Hudson or its counsel demanding payment of a break-up fee that it claimed to be due under the July 1, 2003, letter?
A: Sometime later, yes. I am aware of that.
Q: Do you remember how, if at all, Toxikon responded to that letter?
A: I really don't know.
MR. COHEN: I guess that explains why we are all here today.
MR. GRAY: Something explains it, Bob.

Page 39

Maybe that's part.
Q: Doctor, if you would turn to Page 3 of P7. Page 3 of that document, sir.
A: Yes.
Q: The section entitled "Break-Up Fee."
A: Yes.
Q: At or about the time you signed this letter, do you recall reading that section?
A: Yes, I did.
Q: Did you have an understanding of what that meant at the time you signed the letter?
A: I understood the following way: If the loan is not consumed by us, we have to pay some cost of separation.
Q: And those costs are defined in that paragraph?
A: That is defined in the paragraph "Break-Up Fee."
Q: It says, in part — I will try to find it for you, where it begins "Accordingly." There we are. "Accordingly, the Borrower hereby expressly agrees that, for the six-month period commencing upon the execution of the Letter, but prior to its funding of the Loan," and it goes on from there.

Page 40

Did you have any understanding of what that six-month period meant or whether it would expire on July 31, 2003?
A: No.
Q: In or about late August of 2003, did you have any personal discussions with Mr. Bisceglia the purpose of which was to instruct Mr. Bisceglia to tell Hudson that Toxikon was not going to go forward with financing of Hudson?
A: I recollect having spoken to him, but I don't know what the contents and what the details were. They were all I had instructed Nancy DiGiulio to do since she was familiar with all the goings on there and to deal — it is not a question of termination or anything. We never had a commitment, a defined commitment letter with all the details, if I remember right, even at the later stage in August as well.
Q: My question is premised, in part, on an affidavit that you have provided in this case in which you mention that on August 25 you spoke to Mr. Bisceglia to tell him to tell Hudson that Toxikon was not interested in obtaining a loan from Hudson. So that was the premise of my question.

Page 41

A: I don't know exactly the timing. But I'm sure I must have spoken to him.

Q: From and after August, say early August when you and Mr. Franggos and Dr. McEvily reached an agreement to go forward in an alternate method of acquisition, did Toxikon contact other potential lenders to enable Toxikon to close or you to close your option to purchase the property as evidenced by Exhibit P3?

A: I had a breathing time at that particular time. I don't know exactly what we did. I'm sure we might have contacted some of the people. The details escape me. I don't know when.

Q: Was it primarily Nancy or Dexter's responsibility to do that?

A: Primarily I had us, our controller, and also we were assisted by Nancy to deal with it.

Q: Have you ever come to learn any of the lenders that Mr. Williams contacted in the post August 1, 2003, time frame to pursue financing to close the option other than Commerce Bank and Digital Financial Credit?

A: None that I am aware of.

Q: I would like to show you a document that

Page 42

has been marked previously Exhibit P4 and ask initially, have you seen that before?

A: Yes, I have seen it.

Q: In testimony this morning Mr. Anctil from Commerce Bank said it was ready, willing, and able to close under this December 10, 2003, commitment letter. Do you know why you and Toxikon did not utilize this commitment to close on the acquisition of the property in December of 2003?

A: It was — if I can recollect correctly, it was presented to me the last day of December. It was a rush job, and there was an error in the proposal and the $15 million was added on and I did not want to pursue it. It was an error on the part of, if I recollect back, Commerce Bank. And they knew very well they should never have added that one.

Q: Would you explain that in a little more detail to me, please.

A: They have used 15 Wiggins Avenue as a collateral here as well. So I just didn't want to go through that.

Q: I apologize, but I am not following you, Doctor. They added additional collateral that you

Page 43

couldn't pledge. Is that the point?

A: 15 Wiggins.

Q: 15 Wiggins Realty Trust.

A: It is —

Q: It is a trust, and you couldn't pledge it?

A: I couldn't pledge it in the different covenants. That was the error here. By mistake I had signed it here. And it was — I didn't go through, and further negotiations took place after this.

Q: Do you remember the substance of those negotiations?

A: They came back. They were still going into the — it was a circus, and overall it was like a horse-trading, what they wanted, what they don't want, all the bankers. When money is plenty to lend and there are not enough borrowers, they act differently and vice versa. You know what I am talking about. The person who was our contact was Mark Azia, was the person who was — he was our point of contact. And things were still up in the air. Details escape me. But there were — some other offer was brought again later in the picture sometime.

Page 44

Q: Let me show you what we previously marked in the depositions of the past day and a half as Exhibit P5 and ask if you have seen that document before today.

A: This came later. This came later in the picture. I have seen it.

Q: Do you recall ever signing and sending back a commitment letter at or around that time to Commerce Bank?

A: No.

Q: Is that the subsequent commitment letter that you recalled receiving in your testimony a few minutes ago?

A: Correct.

Q: Is there a reason, to the best of your recollection, that you did not utilize the financing evidenced by this commitment letter to close the acquisition of 25 Wiggins?

A: There was a reason. The contact banker from Commerce Bank had changed his position, post, to Digital Federal, and I had a good working relationship with him only at Commerce. It was comforting for me to see that Digital Credit Union was willing to give me a better deal and I had a

Page 45

contact person whom I could trust. That is the reason I did not want to go with Commerce Bank.

Q: I have not been provided previously in this litigation with copies of the closing documents from the Digital Federal loan. But to the extent you can recall, Doctor — and I am going to ask your counsel to produce them — do you recall what collateral was pledged for that loan?

A: Collateral was 25 Wiggins, per my personal guarantee, and Sandy Point in Maine.

Q: Did Digital Federal provide take-out financing that took out the first mortgage on Sandy Point, or are they in second position on Sandy Point, do you recall?

A: They took a second position.

Q: Other than your comfort level with Mr. Azia, was there anything that was superior about Digital Federal Credit's financing offer to Commerce's financing offer?

A: The conditions, terms were more agreeable. Some points are less than Commerce. Most importantly for me is the familiarity and trust that you develop during the course of the times. I am an old-timer in that sense. But that played a big

Page 46

role.

Q: Commerce, at the time of the closing of the Digital Federal Credit loan, had an outstanding credit line or credit facility to Toxikon, is that right, an accounts receivable financing?

A: Something like that, yes.

Q: Do you recall when it was that Toxikon got that line from Commerce Bank?

A: When we started working with Commerce Bank.

Q: Do you remember when that was?

A: Early 2000, probably, or late, early — somewhere in 2000, 2001.

Q: Dr. Desai, did you think that Nancy and Dexter had acted with the appropriate urgency in April and May of 2003 to get financing to close the original purchase and sale agreement?

A: I am very sure. They have been working with me for many years, and I have no doubt about that.

Q: As the date came for closing that in either late June, early July, and there was no financing lined up, were you at all unhappy that they hadn't been able to get financing lined up?

A: I primarily do not blame anybody.

Page 47

Actually, it's my responsibility. I am the loser. And they all gained. Finally it comes to that. I was very convinced at a personal level of comfort, so to speak, with the Eastern Bank which I had been dealing with the last 20-some years. I had no reason to doubt why it wasn't coming through unless otherwise they told me so.

Q: Did you have a contact at that time at Eastern Bank that you spoke to personally?

A: I had two people, but I don't remember the names. Sorry.

Q: Which office or branch did you deal with?

A: Boston branch. It is downtown somewhere.

MR. GRAY: Let's take a couple of more minutes.

(Recess taken)

BY MR. GRAY:

Q: With respect to pursuing the financing from Hudson, do you recall whether Bluestone or Nancy or Dexter ever proposed to Hudson that they take different collateral other than 15 Wiggins and Indian Town Road, which you said you could not pledge?

A: No matter what we gave them, they were

Page 48

totally insisting upon these collateral which would not be given. Every collateral was given to them. And I think that they were not satisfied with anything that I was giving. They knew right from the beginning what my options or deficiency or inability to fund the property. It was falling on deaf ears. And they knew almost everything that I owned. They knew. And I was willing to pledge everything that was there. It was not sufficient. But they were going after these two pieces which I could not possibly give them. If it was open and free, I had no reason not to provide it.

Q: With respect to the 15 Wiggins Avenue Realty Trust, who was the trustee of that trust?

A: 15? Trustee? I don't know who is the trustees, because I think it was originally —

MR. COHEN: While he is thinking, why don't we go off the record.

MR. GRAY: That's fine.

(Discussion off the record)

MR. GRAY: Let's strike that question. I will ask a different question.

Q: What was the disability, to the best you can recall, that prevented you from being able to

pledge any interest in 15 Wiggins Avenue as collateral?

A: There were restrictions that the bank posed and that I have a contractual agreement with those companies who was a mortgagee or mortgagor. That's what I was told by those banks. I did contact them, and that was given to me. It was kept open. They were aware of it, all the things. It was told up-front to both Commerce and Hudson Realty, Bluestone. They all had my total obituaries, if you want to say that one. They had everything there.

Q: To the best of your recollection, the disability on both 15 Wiggins and Indian Town Road was a prohibition by the existing mortgagees on any secondary financing on the property?

A: That's correct.

Q: Do you have that understanding from actually looking at the documents or from being told that by someone or both?

A: I believe it's both.

Q: Do you have any recollection of who informed you of that fact?

A: Mostly by my controller and my accountant.

Q: Do you know whether anyone ever approached

the mortgagees on those properties to ask if they would permit some secondary financing or pledge of that interest despite the fact that their mortgage prohibited it?

A: I really don't know. I have no idea. I don't know.

Q: Just to go back briefly to the Hudson demand letter of late August 27. And again, I reference your affidavit for that date. I don't have the letter with me. Do you recall whether you or Toxikon ever responded that no break-up fee was due because the letter agreement had expired?

A: It's vague for me. I really don't know how it was handled afterwards, what response was provided.

Q: But it is fair to say that whatever response was provided in late August or early September would have been your position with respect to why no break-up fee was owing?

A: I had received no defined contract from them stating this amount of money, these other details, this is a date. No commitment letter was provided. So I assumed I was in no violation of any kind of agreement.

Q: Your understanding that the break-up fee was not due, then, is because since Hudson hadn't committed to make a loan, you felt you had no obligation to pay break-up fees; is that accurate?

A: That is accurate.

MR. GRAY: I think that's my last question for the day. Thank you, sir.

MR. COHEN: I have no questions for you.

(Whereupon, the deposition was concluded at 11:50 a.m.)

CERTIFICATE

I, Laxman Desai, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at __, this ____ day of ________, 2005.

On this ____ day of ______________, 20___, before me, the undersigned Notary Public, personally appeared ______________________ and proved to me through satisfactory evidence of identification, which was ______________________, to be the person whose name is signed above.

Notary Public

My commission expires: ____________________

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Daniel P. Wolfe, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 29th day of June, 2005, at 10:00 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this day of July, 2005.

Notary Public
My commission expires 9/18/09

## $

**$15 million** 42:13

## 0

**03** 15:19; 37:19

## 1

**1** 28:8; 35:8, 14; 36:24; 38:17; 41:20
**10** 42:6
**100** 25:1
**106** 14:24
**11:50** 51:10
**13** 9:8
**15** 5:17; 36:2; 42:20; 43:2, 3; 47:21; 48:13, 15; 49:1, 13
**1st** 33:22

## 2

**20-some** 47:5
**2000** 46:11, 12
**2001** 46:12
**2003** 5:12; 6:4; 9:8; 10:8; 13:2; 15:18, 21; 21:14, 24; 25:7; 26:13; 28:1, 2, 8; 31:12; 33:19; 35:8, 12, 14; 36:22, 24; 37:9; 38:17; 40:3, 5; 41:20; 42:6, 9; 46:15
**22** 21:14, 24; 25:7
**25** 5:7, 10, 13, 20; 6:2; 9:9; 10:16; 11:21; 12:14; 13:24; 15:9; 22:7; 25:15, 21; 29:2; 31:20; 40:21; 44:18; 45:9
**27** 50:8
**29** 21:20
**2nd** 33:21

## 3

**3** 39:2, 3
**30** 8:20, 22; 21:8
**31** 28:1; 35:12; 36:22; 37:9; 40:3
**3rd** 33:21

## 4

**4** 28:22

## 6

**675** 15:1; 36:3

## 9

**90** 15:17; 18:16

## A

**a.m** 51:10
**ability** 25:21
**able** 7:19; 17:11; 24:18; 28:13; 34:23; 42:5; 46:23; 48:24
**Accordingly** 39:20, 21
**accountant** 49:23
**accounts** 46:5
**accurate** 12:7; 21:13; 25:5; 28:7, 9; 51:4, 5
**acquire** 22:7; 24:19; 25:7
**acquiring** 19:5
**acquisition** 5:20, 24, 24; 7:5; 10:15; 11:20; 12:10; 15:15; 16:1; 25:16; 32:22; 41:6; 42:8; 44:18
**act** 43:17
**acted** 46:14
**action** 3:14
**actively** 26:20
**actually** 15:11; 26:18; 28:21; 30:22; 47:1; 49:18
**added** 42:13, 16, 24
**additional** 42:24
**address** 15:4
**addressed** 26:3; 27:17
**advised** 11:10; 33:10
**Advisors** 26:3, 4, 16
**affidavit** 40:20; 50:9
**afterwards** 50:14
**again** 37:10; 43:23; 50:8
**agent** 6:7; 30:23; 36:18; 37:1, 14
**agents** 31:19
**ago** 14:7; 44:13
**agree** 7:20; 23:13
**agreeable** 45:20
**agreed** 7:21; 9:9; 12:5, 6; 13:1; 33:4
**agreement** 8:14; 9:1, 6, 14; 10:10; 15:13; 19:3; 21:13; 22:3, 5, 14; 23:23; 24:6, 15; 25:20; 33:2; 41:5; 46:16; 49:4; 50:12, 24
**agreements** 18:21; 19:1
**agrees** 39:22
**air** 33:13; 43:22
**allowed** 20:16
**allowing** 20:1
**almost** 48:7
**along** 20:18; 23:9, 16
**alternate** 22:6; 41:5
**alternative** 27:13; 36:9
**always** 20:18; 24:3
**amount** 16:4; 34:5; 50:21
**Anctil** 42:4
**and/or** 34:10, 20
**anticipate** 21:19
**apologize** 16:7; 42:23
**appear** 9:5
**application** 10:14; 12:20; 13:15
**applications** 10:17, 20
**approached** 49:24
**appropriate** 46:14
**April** 10:8; 11:4; 46:15
**Around** 11:4; 32:11, 12; 36:22; 37:9; 44:8
**arrangements** 23:9, 9
**assistance** 16:3
**assisted** 41:17
**assume** 7:11, 18; 17:15; 34:3
**assumed** 50:23
**attachments** 26:3
**attorney** 17:17, 18; 20:17, 18
**attorney-client** 4:16; 17:22
**attorneys** 18:8
**attractive** 5:13
**August** 33:21, 21; 37:19; 38:7; 40:5, 17, 21; 41:3, 3, 20; 50:8, 17
**available** 6:5, 6, 13
**Avenue** 5:8, 10, 17, 20; 6:2; 9:9; 12:15; 13:24; 22:7; 25:22; 29:2; 36:2; 42:20; 48:13; 49:1
**aware** 3:15; 4:6, 7; 7:9; 20:3; 21:4; 27:19; 28:3; 33:12; 38:18; 41:23; 49:8
**away** 11:20
**Azia** 13:12, 21; 14:1; 15:6; 43:20; 45:17

## B

**back** 31:7; 32:17; 42:15; 43:13; 44:7; 50:7
**backed** 10:22; 11:19
**backyard** 5:14, 16
**bank** 10:2, 3, 4, 7, 8, 21, 24; 11:6, 7, 19; 12:5, 6, 9, 11, 11, 20, 24; 13:2, 8, 13, 14, 17; 14:2, 13; 15:7, 22, 23; 16:6, 8; 25:13, 13; 27:22, 22; 34:12; 41:21; 42:5, 15; 44:9, 20; 45:2; 46:8, 9; 47:4, 9; 49:3
**bank's** 13:21
**banker** 44:19
**bankers** 43:16
**banks** 49:6
**bar** 35:16
**barely** 35:3
**based** 4:20
**basis** 36:15; 37:12
**Bear** 21:4
**became** 6:5; 25:11
**becoming** 6:13; 21:4
**begin** 18:24
**beginning** 48:5
**begins** 39:20
**behalf** 25:15; 27:22; 29:17
**best** 8:24; 19:16, 18; 21:12, 22; 27:20; 30:12; 32:20; 33:9; 44:15; 48:23; 49:12
**better** 44:24
**beyond** 29:11; 31:20; 32:4, 5, 5
**big** 45:24
**Bisceglia** 26:24; 27:3; 37:2, 7, 16; 38:1, 6, 11; 40:6, 7, 22
**blame** 46:24
**Bluestone** 26:2, 15; 27:4, 11, 15; 28:6; 30:23; 31:1, 8, 24; 33:7, 9, 15, 16, 16; 34:18, 20; 36:10, 19, 20; 37:2, 24; 47:19; 49:10
**Bob** 38:24
**Borrower** 39:21
**borrowers** 43:17
**Boston** 47:13
**both** 5:6; 10:7, 17; 23:17; 25:10; 34:11; 49:9, 13, 19, 20
**bought** 19:17; 24:3
**branch** 47:12, 13
**break-up** 38:16; 39:5, 17; 50:11, 19; 51:1, 4
**breathing** 41:10
**briefly** 50:7
**broker** 20:14, 15
**brought** 6:10, 18; 43:23
**building** 15:2
**buildings** 24:13
**business** 3:24; 4:1
**busy** 17:20
**buy** 9:10; 18:18; 19:18; 24:2
**buyer** 20:3
**buying** 19:20

## C

**call** 28:7; 31:12
**called** 3:3; 17:4, 5; 33:13
**came** 15:12; 19:13; 23:8; 24:22; 26:16, 21; 29:19, 19; 32:17; 43:13; 44:5, 5; 46:20
**can** 4:22; 5:2; 6:2; 10:23; 16:23, 23; 17:22; 18:6; 21:19; 24:11; 26:15; 42:10; 45:5; 48:24
**Canadian** 19:10, 11
**Canadians** 19:11
**Capital** 3:14; 25:11; 27:23; 28:5
**case** 40:20
**cases** 17:20
**certain** 19:14
**chance** 8:12
**changed** 44:20
**check** 29:19
**chief** 19:12
**Choate** 17:19
**circus** 43:14
**claimed** 38:16
**clear** 10:23; 12:13; 13:4; 14:6; 15:10; 16:10; 32:2; 37:23
**close** 15:15; 16:1, 6, 11; 17:11; 32:21; 41:7, 7, 21; 42:6, 8; 44:17; 46:15
**closer** 13:5
**closing** 16:11; 18:21; 31:24; 32:1; 45:4; 46:2, 20
**Coastal** 14:24
**COHEN** 4:8; 8:5; 17:18, 20; 18:5; 22:8; 24:9; 27:24; 28:10; 38:22; 48:17; 51:8
**collateral** 12:9, 14, 17; 13:18, 22, 23; 14:3, 9; 15:8; 35:17, 21; 36:5, 9, 11, 13; 42:21, 24; 45:7, 9; 47:21; 48:1, 2; 49:2
**collaterals** 14:5
**collective** 7:8
**comfort** 45:16; 47:3
**comforting** 44:23
**coming** 13:9; 47:6
**commencing** 39:22
**Commerce** 10:3, 7, 24; 11:6; 12:24; 13:2, 8, 13, 14, 17; 14:2; 15:7, 22; 25:13; 27:22; 34:11, 14; 41:21; 42:5, 15; 44:9, 20, 22; 45:2, 21; 46:2, 8, 9; 49:9
**Commerce's** 45:19
**commercial** 15:2
**commitment** 11:1, 24; 12:7; 28:6; 34:14; 35:1, 6, 15; 36:23; 37:5, 20, 22; 40:15, 16; 42:6, 8; 44:8, 11, 17; 50:22
**committed** 20:1; 51:3
**communicated** 37:24
**companies** 49:5
**company** 6:1, 8; 11:13; 17:19; 19:5, 10, 11; 20:10; 24:3, 5
**completely** 4:5
**complying** 31:22
**concluded** 51:10
**conditional** 28:6
**conditions** 35:1; 45:20
**confer** 17:23
**consumed** 39:13
**contact** 9:21, 23; 10:7,

11; 13:11; 29:16; 30:19, 24; 34:18, 19; 41:6; 43:19, 21; 44:19; 45:1; 47:8; 49:6
**contacted** 6:9; 25:14, 18; 26:19, 22; 27:15, 21; 28:4; 41:12, 19
**contacting** 10:2
**contained** 36:5
**contains** 24:17
**contents** 30:3; 40:11
**continue** 18:15; 19:4; 34:10
**continued** 19:7; 34:17; 35:18, 18
**continuing** 36:14
**contract** 50:20
**contractual** 49:4
**control** 31:6
**controller** 9:15; 11:16; 13:10; 17:3; 18:9; 41:16; 49:23
**convenience** 6:17
**convinced** 47:3
**convoluted** 22:12
**copies** 45:4
**copy** 9:1, 3; 21:9, 13, 20, 23; 26:2
**correctly** 6:3; 42:10
**Cory** 3:12
**Cost** 3:24; 4:1; 39:13
**costs** 39:15
**counsel** 3:3; 12:22; 17:15, 18; 23:12, 15, 17; 29:13; 38:15; 45:6
**country** 32:17
**couple** 47:14
**course** 10:21; 21:3; 35:23; 45:23
**court** 5:2; 17:20
**covenants** 14:13; 36:2, 5, 7; 43:7
**created** 23:10
**Credit** 13:13; 41:22; 44:23; 46:3, 4, 4
**Credit's** 45:18
**criticality** 32:1
**Crowe** 20:11, 12, 13

## D

**D-i-G-i-u-l-i-o** 6:21
**date** 16:11; 46:20; 50:9, 22
**dated** 21:13
**dates** 37:10
**day** 11:24; 33:14; 42:11; 44:2; 51:7
**days** 8:2; 15:17; 18:16; 33:20
**deaf** 48:7
**deal** 11:23; 16:4, 6; 19:16, 18; 20:10, 14, 15; 22:19; 33:11; 37:23; 40:14; 41:17; 44:24; 47:12
**dealing** 16:15, 20, 24; 47:5
**deals** 38:1
**dealt** 16:18
**December** 28:1; 42:6, 9, 11
**decide** 5:7
**decided** 5:23; 34:21, 22
**decision** 5:19, 21, 22; 23:8
**decisions** 7:12
**default** 17:10; 32:22
**defendant** 3:15
**Defendant's** 26:5
**deficiency** 48:5
**defined** 39:15, 17; 40:16; 50:20
**demand** 50:8
**demanding** 38:15
**demands** 15:10
**deposed** 3:17
**deposit** 17:14; 19:21; 22:17
**deposition** 3:19; 5:5; 19:23; 51:9
**depositions** 44:2
**DESAI** 3:2, 10; 5:4; 46:13
**despite** 50:3
**detail** 27:8; 42:19
**details** 11:16, 22; 12:12; 20:19; 26:18; 27:6, 8; 31:14; 35:1; 38:4; 40:11, 16; 41:13; 43:22; 50:22
**develop** 45:23
**Dexter** 9:17, 18, 19; 16:19; 17:9; 27:6; 46:14; 47:20
**Dexter's** 41:14
**dialogue** 19:7
**different** 6:12; 26:21; 33:10, 12; 43:6; 47:21; 48:22
**differently** 43:18
**Digital** 13:13; 41:22; 44:21, 23; 45:5, 11, 18; 46:3
**DiGiulio** 6:20; 7:17, 18; 11:17; 16:18; 30:21; 34:17, 19; 40:12
**diligence** 31:21; 35:24
**DIRECT** 3:8
**directly** 20:20; 31:2
**disability** 48:23; 49:13
**disclose** 17:21
**discuss** 13:12
**discussed** 14:5
**discussion** 14:19; 19:6; 48:20
**discussions** 13:7; 14:9; 15:6, 23; 16:2; 18:2, 23; 30:4, 6, 10, 13; 31:8, 23; 35:11, 13; 40:6
**Doctor** 8:4; 21:7; 26:7; 39:2; 42:24; 45:6
**document** 8:1, 3, 8, 20; 21:5, 18; 24:23; 26:5; 39:3; 41:24; 44:3
**documents** 20:24; 21:2; 22:4, 13, 18; 23:13, 18; 31:13; 35:24; 36:6; 45:4; 49:18
**done** 7:8; 11:23; 24:14; 35:3
**doubt** 46:18; 47:6
**down** 5:2; 16:5; 17:10; 19:22; 24:17; 32:23
**downtown** 47:13
**Dr** 3:10; 4:9; 5:4; 18:10; 19:13; 22:6, 15, 23; 32:13; 33:24; 34:10; 41:4; 46:13
**driver's** 3:5
**drop** 16:23
**due** 31:20; 35:23; 36:5; 38:16; 50:12; 51:2
**duly** 3:6
**during** 10:21; 29:18; 30:5; 35:23; 45:23

## E

**earlier** 35:9
**early** 5:12; 6:4; 15:21; 31:12; 33:20, 21; 37:18; 38:6; 41:3; 46:11, 11, 21; 50:17
**ears** 48:7
**Eastern** 10:4, 8, 21; 11:6, 18; 12:11, 20; 15:22; 16:6, 8; 25:13; 27:22; 47:4, 9
**effect** 22:14
**effective** 22:19
**effectuate** 10:10
**either** 10:7, 15; 11:6; 36:4; 46:20
**else** 7:6; 9:4; 30:5
**enable** 41:7
**end** 12:2; 15:12; 18:20, 21, 22, 24; 30:17; 32:10
**enforce** 35:5
**enforceable** 22:19
**enough** 23:3; 43:17
**enter** 19:1
**entered** 21:23; 33:1
**entitled** 39:5
**erroneously** 24:14
**error** 42:12, 14; 43:7
**escape** 26:18; 41:13; 43:22
**essence** 32:3
**estate** 6:7; 12:16; 20:9; 31:19
**evaluation** 31:18
**even** 32:20; 35:3; 37:4; 40:17
**evidenced** 41:8; 44:17
**exact** 15:4; 16:10; 37:10
**exactly** 6:3; 41:1, 11
**examination** 3:3, 8
**examined** 3:6
**except** 4:10
**execution** 39:23
**Exhibit** 8:3; 26:2, 6, 8; 28:16; 41:9; 42:1; 44:3
**exhibits** 22:2
**existing** 49:14
**expansion** 5:15
**expensive** 19:21
**expire** 40:2
**expired** 32:9, 16, 22; 34:24; 35:7; 50:12
**explain** 25:3; 42:18
**explains** 38:22, 24
**explanation** 11:11
**express** 13:18; 20:3
**expressed** 19:24
**expressing** 15:7
**expressly** 39:21
**extend** 20:20; 23:7
**extended** 19:2
**extending** 18:14
**extension** 18:1; 19:1; 23:6; 32:3, 6, 8
**extensions** 23:2, 5
**extent** 17:21; 45:5

## F

**facilities** 5:17
**facility** 6:12; 46:4
**fact** 10:7; 25:5; 27:12; 34:22; 49:22; 50:3
**fair** 25:19; 50:16
**fairly** 34:3
**falling** 48:6
**familiar** 4:2; 40:13
**familiarity** 45:22
**far** 33:22
**Farms** 15:3, 4
**favorable** 6:17
**faxed** 28:20
**feasible** 18:13
**Federal** 44:21; 45:5, 11, 18; 46:3
**fee** 38:16; 39:5, 18; 50:11, 19; 51:1
**fees** 51:4
**felt** 51:3
**few** 3:23; 14:7; 30:1; 33:20; 44:12
**file** 12:19, 23
**final** 19:16
**finally** 7:22; 13:1; 47:2
**Financial** 13:13; 41:22
**financing** 9:16; 10:9; 16:1; 24:19; 25:7, 23; 26:21; 27:13; 34:11, 23; 35:14; 36:23; 37:9, 18; 38:8; 40:9; 41:20; 44:16; 45:12, 18, 19; 46:5, 15, 21, 23; 47:18; 49:15; 50:2
**find** 16:3; 18:17; 29:11; 39:19
**fine** 22:11; 48:19
**first** 3:6; 5:7; 18:4; 21:2; 22:23; 26:11; 45:12
**Florida** 14:11, 17, 18; 36:3
**followed** 35:11
**following** 39:12; 42:23
**follows** 3:7
**Food** 15:12; 16:5; 17:5; 20:1; 32:19
**Foods** 9:2, 11; 17:8, 9, 24; 21:24
**forced** 20:9
**foreclose** 33:4
**forefront** 20:18
**forfeit** 17:10, 14
**forgive** 38:4
**form** 4:11
**forward** 16:9; 23:13; 33:11; 40:8; 41:5
**foster** 19:4
**fostered** 37:1
**four** 14:20; 23:4
**frame** 27:23; 41:20
**Franggos** 18:9; 19:13, 23; 22:5, 20, 22; 32:13; 33:24; 34:9; 41:4
**free** 48:12
**friend** 17:1
**fully** 4:5
**fund** 35:4; 48:6
**funding** 39:24
**further** 5:24; 9:13; 23:7; 29:16; 43:9
**furtherance** 35:13
**future** 11:13

## G

**gained** 47:2
**gather** 7:23
**gave** 18:14, 16, 17; 19:4, 14; 47:24
**general** 17:18
**Generally** 24:12; 27:7
**gentleman** 16:24; 29:18
**gentlemen** 18:12
**genuine** 9:5
**geographically** 5:15
**given** 12:1; 13:19; 27:6; 29:7; 48:2, 2; 49:7
**gives** 23:24
**giving** 10:22; 48:4
**God** 14:22
**goes** 39:24
**goings** 40:13
**Good** 3:10, 11; 44:21
**granted** 32:4

**GRAY** 3:9, 12; 4:13; 8:6; 18:3; 26:1; 28:12; 34:8; 38:24; 47:14, 17; 48:19, 21; 51:6
**great** 31:16
**guarantee** 12:14; 45:10
**guess** 38:22
**guy** 16:21

**H**

**half** 44:2
**halfway** 24:17
**Hall** 17:19
**handled** 50:14
**handling** 38:3
**hanging** 34:15
**help** 18:18
**hereby** 39:21
**Herrick** 30:1, 16
**high** 34:3, 5
**hiring** 31:18
**hold** 7:2, 3
**honchos** 19:12
**horse-trading** 43:15
**house** 15:3
**Hudson** 3:14, 18; 25:10; 27:17, 23; 28:5, 19; 29:4, 16, 17, 22; 30:14, 20; 31:2, 9; 33:17; 34:11, 13, 18, 20, 20, 20, 23; 35:21; 36:9, 16, 21, 22; 37:7, 9, 13, 18; 38:11, 15; 40:8, 9, 22, 23; 47:19, 20; 49:9; 50:7; 51:2
**Hudson's** 29:8; 38:7
**hunch** 10:24

**I**

**idea** 6:13; 10:24; 13:1; 50:5
**identification** 26:6
**identified** 3:4
**immediate** 34:2
**importantly** 45:22
**inability** 25:23; 48:6
**Inc** 26:3, 16
**incentive** 18:15
**incomprehensible** 4:20
**Indian** 15:1; 36:3; 47:22; 49:13
**individuals** 20:21; 29:17; 32:18
**information** 6:11, 19; 27:9; 33:7
**informed** 31:16, 21; 35:20; 37:11, 13; 49:22
**initially** 42:2
**inserted** 24:23
**insisted** 36:14
**insistence** 36:17
**insisting** 48:1
**Instead** 33:1
**instruct** 40:7
**instructed** 40:12
**instructs** 4:15
**insufficient** 13:18, 22
**intention** 24:13
**interactions** 30:22
**interchangeably** 17:7
**interest** 49:1; 50:3
**interested** 18:13; 37:8, 17; 40:23
**intermingled** 25:1
**intimately** 11:8
**into** 13:20; 19:1, 16, 17, 19, 20; 21:23; 33:1; 43:13
**involved** 11:9; 25:11; 26:16; 27:7
**involvement** 7:4; 11:5
**issue** 34:4
**issued** 12:7; 36:23
**issues** 31:17; 38:3

**J**

**job** 42:12
**July** 15:16, 18; 28:8; 31:12; 32:10; 35:8, 11, 14, 23; 36:22, 24; 37:9, 18; 38:6, 17; 40:3; 46:21
**June** 15:21; 18:22, 24; 26:12, 13; 46:21
**Jupiter** 15:3

**K**

**keep** 28:1; 31:16
**keeps** 31:15
**kept** 11:10; 31:21; 49:7
**kind** 11:11; 23:3, 9; 30:6; 35:16; 50:24
**knew** 42:16; 48:4, 7, 8
**knowledge** 8:24; 21:12, 22; 27:20
**known** 26:20

**L**

**lab** 15:1
**land** 15:3
**last** 8:2; 10:21; 23:6; 32:6, 8; 42:11; 47:5; 51:6
**Lastly** 5:1
**late** 15:21; 37:18; 38:6; 40:5; 46:11, 21; 50:8, 17
**later** 32:15; 38:18; 40:17; 43:23; 44:5, 5
**lawyer** 3:13; 4:14; 17:16
**lawyers** 17:23, 24
**LAXMAN** 3:2; 4:9
**lead** 7:15
**leafed** 8:18; 9:4
**learn** 6:6; 16:8; 41:18
**learned** 20:6; 27:12; 36:16
**lease** 21:23; 22:3; 25:19; 33:1
**leased** 24:4
**leave** 7:6
**left** 11:16
**lend** 43:16
**lender** 25:12
**lenders** 9:16, 21, 23; 25:14; 27:16, 21; 41:7, 19
**less** 19:20; 45:21
**letter** 11:24; 12:7; 26:2, 22, 23, 23; 27:16; 28:7, 7, 11, 13, 17, 19, 24; 29:4, 10, 12, 15; 35:1, 8; 36:24; 37:5, 21, 22; 38:15, 17, 20; 39:8, 11, 23; 40:16; 42:7; 44:8, 11, 17; 50:8, 10, 12, 22
**level** 45:16; 47:3
**license** 3:5
**line** 24:18; 46:4, 8
**lined** 46:22, 23
**litigation** 45:4
**little** 13:11; 22:12; 30:22; 32:15; 42:18
**LLC** 26:4
**loan** 10:14, 17; 11:12, 21; 12:10, 20; 14:3; 15:9; 29:2, 5, 6; 31:9; 39:13, 24; 40:23; 45:5, 8; 46:3; 51:3
**local** 16:3
**logical** 5:14; 10:1
**long** 13:3; 15:4; 18:17; 33:23
**longer** 16:21; 36:24; 37:8, 17
**look** 8:3; 9:15; 13:20; 20:24; 24:16; 26:7; 37:4
**looking** 14:2; 15:8; 27:12; 49:18
**loose** 34:15
**lose** 22:16
**loser** 47:1
**losing** 19:21
**lost** 25:22

**M**

**main** 14:14
**Maine** 14:11; 45:10
**mainly** 16:18; 37:20
**major** 7:12
**making** 11:20; 22:6
**man** 37:2
**many** 3:22; 23:5; 46:18
**March** 6:2; 9:8; 10:8; 11:4
**Mark** 43:20
**marked** 8:2; 21:1; 24:7; 26:1, 5; 28:16; 35:8; 42:1; 44:1
**materialize** 19:15
**matter** 13:20; 37:3; 47:24
**may** 4:8, 14; 6:3; 11:4; 13:2; 15:7, 21; 16:7; 18:21; 30:2, 21; 46:15
**maybe** 37:15; 39:1
**McEvily** 18:10; 19:13; 22:6, 15, 20, 23; 32:13; 33:24; 34:10; 41:4
**mean** 5:5, 9; 12:11; 32:5; 35:7
**meaning** 12:5; 35:4
**meant** 8:16; 39:11; 40:2
**meantime** 6:11
**measures** 17:13
**meet** 13:16
**meeting** 18:19; 33:24; 34:9
**meetings** 33:4
**members** 6:10
**memorialized** 22:4
**memory** 10:23; 14:23; 31:16
**mention** 40:21
**mentioned** 17:12; 20:21; 35:3
**met** 18:12; 32:13, 18
**method** 41:5
**middleman** 31:4
**might** 41:12
**mind** 10:5; 16:13; 30:8; 31:14; 33:4
**minutes** 44:13; 47:15
**missing** 37:15
**mistake** 24:8; 43:7
**money** 18:16; 19:21; 35:2; 37:2, 3; 43:16; 50:21
**more** 13:14; 14:17, 18; 25:4; 37:22; 42:18; 45:20; 47:14
**morning** 3:10, 11; 42:4
**mortgage** 36:6; 45:12; 50:3
**mortgagee** 49:5
**mortgagees** 49:14; 50:1
**mortgagor** 49:5
**Most** 45:21
**Mostly** 49:23
**Motions** 4:12
**move** 6:12
**moving** 13:14; 35:16
**much** 16:12; 31:15; 32:16; 33:13
**murky** 11:22
**must** 8:15; 12:21; 16:11; 18:20; 27:9; 41:2
**mutually** 23:8
**myself** 24:24; 27:6

**N**

**name** 3:12; 6:18, 20; 9:18; 16:22; 17:3; 18:10; 24:13; 29:19, 23; 30:2, 16; 38:1
**names** 16:23; 20:21; 47:11
**Nancy** 6:20; 7:17; 11:17; 16:18; 17:9; 27:5; 30:21, 24; 31:7, 23; 33:6; 38:2, 5; 40:12; 41:14, 17; 46:13; 47:19
**nature** 35:12
**nearby** 30:8
**necessary** 10:9; 24:19
**need** 17:23
**needed** 11:11; 31:13; 37:3
**needs** 31:22
**negatively** 12:1
**negotiate** 7:9
**negotiated** 20:8, 20; 37:6
**negotiating** 7:5
**negotiation** 7:16; 10:22
**negotiations** 11:6; 43:9, 12
**new** 18:9; 26:19
**Newbridge** 26:4, 24; 27:17
**next** 9:13
**nightmare** 21:4
**nobody** 25:17
**None** 41:23
**nonetheless** 31:7
**Notary** 3:6
**number** 8:5

**O**

**oath** 4:4
**obituaries** 49:10
**object** 4:8, 14
**objections** 4:10
**obligating** 29:5
**obligation** 4:4; 51:4
**obligations** 29:9
**obtain** 24:18; 25:7, 21, 23
**obtaining** 40:23
**obvious** 17:12
**obviously** 17:22; 27:16
**off** 19:6; 33:22; 48:18, 20
**offer** 6:1; 36:8; 43:23; 45:18, 19
**offered** 36:13
**office** 47:12
**old-timer** 45:24
**one** 6:9; 14:17, 18, 24; 25:2; 29:18; 30:9; 35:19; 37:24; 38:2; 42:17; 49:11
**only** 13:24; 20:2, 19; 22:16; 23:15; 27:21; 29:20; 30:7; 44:22
**open** 21:8; 48:11; 49:7
**open-ended** 13:20
**operation** 11:17

**operations** 6:23
**opinion** 19:24
**Opta** 9:2, 8, 9, 11; 15:12; 16:5; 17:5, 8, 9, 24; 18:24; 20:1; 21:24; 22:13; 32:18, 22
**option** 21:13; 22:3; 23:23, 24; 24:4, 15; 25:19; 33:2; 41:8, 21
**options** 48:5
**order** 22:14
**original** 24:6; 46:16
**originally** 15:14; 48:16
**Ortiz** 26:4
**otherwise** 5:6; 17:13; 25:22; 29:21; 47:7
**out** 10:22; 16:4; 18:12; 32:17; 45:12
**outstanding** 46:3
**over** 12:2; 19:12; 37:3
**overall** 43:14
**owing** 50:19
**own** 11:13; 14:10, 10; 25:1
**owned** 6:1; 19:9; 48:8

## P

**P1** 21:1, 16, 22; 22:13, 24; 23:18; 25:20
**P2** 8:3, 6, 12; 24:7
**P3** 21:1, 5, 7; 22:13, 24; 23:18, 24; 25:20; 41:9
**P4** 42:1
**P5** 44:3
**P7** 28:16; 35:9; 39:2
**P8** 26:2, 6, 8, 23
**page** 8:18, 18, 20, 22; 9:6; 21:8, 9, 10, 19; 28:22; 39:2, 3
**paid** 18:15
**paragraph** 39:16, 17
**part** 5:12; 39:1, 19; 40:19; 42:14
**particular** 6:14; 10:3; 11:1, 2, 15; 13:19; 16:22; 17:17; 23:6, 7; 25:17; 32:16; 34:16; 41:10
**parties** 22:4; 28:8
**passed** 33:6; 38:11
**past** 44:2
**pay** 39:13; 51:4
**payment** 16:5; 17:10; 32:23; 35:2; 38:15
**people** 28:4; 30:20; 31:1, 2; 41:12; 47:10
**per** 45:9
**percent** 25:1
**perform** 19:2
**perhaps** 14:2
**period** 39:22; 40:2
**Peripherally** 11:8
**permit** 50:2
**person** 7:15; 27:8; 30:4; 43:19, 20; 45:1
**person's** 29:23
**personal** 5:20, 22; 7:4; 11:5; 12:14; 13:7; 24:4; 29:16; 30:13; 40:6; 45:9; 47:3
**personally** 7:9; 23:24; 24:2; 47:9
**Peter** 18:9; 22:5, 15
**picture** 26:22; 43:23; 44:6
**pieces** 15:2, 8; 48:10
**place** 18:18, 19; 25:2; 28:15; 43:9
**Plains** 26:19
**Plaintiff** 3:4
**played** 45:24
**pleasant** 6:15
**please** 4:21; 8:4; 42:19
**pledge** 14:12; 43:1, 5, 6; 47:23; 48:8; 49:1; 50:2
**pledged** 14:3; 45:8
**plenty** 43:16
**plus** 12:14
**Point** 14:14; 24:17; 25:10; 28:5; 33:10; 35:19; 43:1, 21; 45:10, 13, 14
**points** 45:21
**posed** 49:3
**position** 6:22; 38:11; 44:20; 45:13, 15; 50:18
**positively** 12:2
**possibilities** 19:15
**possibility** 11:20; 19:5
**possible** 9:16; 35:14
**possibly** 8:19; 25:22; 48:11
**post** 41:19; 44:20
**potential** 25:11, 14; 27:16, 21; 31:9; 41:6
**premise** 4:21; 40:24
**premised** 40:19
**present** 11:15
**presented** 27:9; 42:11
**preserve** 4:16; 25:21
**president** 18:11
**pretty** 31:15; 32:16; 33:13
**prevented** 48:24
**previously** 8:2; 21:1; 28:16; 42:1; 44:1; 45:3
**primarily** 30:24; 41:14, 16; 46:24
**primary** 30:19; 34:18, 19
**prior** 39:23
**priority** 34:4, 5
**privilege** 4:16; 17:22
**probably** 25:2; 33:20; 38:2; 46:11
**problem** 18:7
**PROCEEDINGS** 3:1
**process** 4:2
**produce** 45:7
**produced** 12:23
**production** 3:5
**prohibited** 50:4
**prohibition** 49:14
**promise** 16:6
**properties** 14:20, 21; 24:4; 30:8, 9; 36:1, 6, 10, 13, 14; 50:1
**property** 9:10; 14:10, 11, 14, 15, 17, 18, 24; 17:2; 20:2; 22:17; 24:1, 2, 19; 25:8; 29:3, 20; 31:18; 41:8; 42:9; 48:6; 49:15
**proposal** 29:7, 9; 35:16; 42:13
**proposed** 47:20
**provide** 10:9; 23:4; 35:18, 22; 36:4; 45:11; 48:12
**provided** 12:17; 31:15; 36:11; 38:2; 40:20; 45:3; 50:15, 17, 23
**Public** 3:6
**purchase** 5:7, 9; 8:6, 14; 9:1, 14; 10:10; 13:5; 15:14; 18:14; 19:3; 20:2; 24:1, 7; 41:8; 46:16
**purchaser** 24:10
**purpose** 40:7
**pursue** 5:7, 19, 23; 34:11; 38:7; 41:20; 42:14
**pursuing** 34:13; 35:14; 36:24; 37:8, 17; 47:18
**put** 16:4; 19:22

## Q

**quickly** 13:14
**quite** 8:10; 12:3; 17:7

## R

**ran** 12:2
**rather** 24:1
**reached** 22:5, 15; 41:4
**read** 21:3
**reading** 39:8
**ready** 42:5
**real** 6:7; 12:16; 20:9; 31:19
**realized** 23:5
**really** 3:23; 15:10; 31:4; 34:1; 38:21; 50:5, 13
**Realtor** 17:1
**Realtors** 20:19
**Realty** 3:14, 18; 25:11; 26:2, 4, 15; 27:18, 23; 28:5; 29:22; 33:17; 43:3; 48:14; 49:9
**reason** 11:19; 19:22; 24:6; 44:15, 19; 45:2; 47:6; 48:12
**reasonable** 11:14
**reasons** 10:22; 12:1
**recall** 11:18; 12:9, 16, 18; 13:23; 14:8, 21, 23; 15:13; 18:19; 22:22; 23:23; 31:11; 32:8; 33:18, 23; 34:21; 35:20; 38:14; 39:8; 44:7; 45:6, 7, 14; 46:7; 47:19; 48:24; 50:10
**recalled** 44:12
**receivable** 46:5
**received** 50:20
**receiving** 44:12
**Recess** 34:7; 47:16
**recites** 24:16
**recognize** 21:2; 28:17
**recollect** 6:3; 10:1; 29:14; 30:10; 38:4; 40:10; 42:10, 15
**recollection** 30:12; 32:21; 33:9; 44:16; 49:12, 21
**record** 4:8; 7:18; 19:6; 48:18, 20
**refer** 28:10
**reference** 50:9
**referring** 11:3; 13:23
**refers** 25:5
**regarding** 31:9, 24
**relationship** 13:3; 20:19; 44:22
**relationships** 10:4
**remember** 15:5, 16; 29:23; 30:3; 38:19; 40:17; 43:11; 46:10; 47:10
**rephrase** 18:23
**report** 31:7
**reporter** 5:2
**represent** 3:13
**representation** 24:22; 25:6
**representative** 13:17
**representatives** 16:14
**represented** 17:15; 20:7, 17
**representing** 6:8, 9; 17:2; 33:16
**required** 15:14
**requiring** 12:10
**reserve** 4:10
**respect** 7:12; 10:15; 11:18; 12:19, 23; 17:24; 21:7; 25:4, 15; 47:18; 48:13; 50:18
**responded** 38:20; 50:11
**response** 50:14, 17
**responsibility** 41:15; 47:1
**restricted** 36:7
**restrictions** 14:13; 36:1; 49:3
**restrictive** 36:5
**restructure** 32:13
**result** 10:19
**returned** 29:15; 33:18, 23
**review** 8:12; 23:12, 17
**reviewed** 22:3; 29:12
**Reviewing** 8:8; 21:5, 18
**Richard** 26:4
**right** 4:13; 7:13, 14; 8:10, 15; 10:1; 15:16; 17:7; 40:17; 46:5; 48:4
**Road** 15:1; 36:3; 47:22; 49:13
**Robert** 17:17, 19
**role** 46:1
**rush** 42:12

## S

**sale** 5:9; 8:7, 14; 9:2, 14; 10:10; 15:14; 18:14; 19:3, 16; 24:7; 46:16
**Sandy** 14:14; 30:1, 5, 16; 45:10, 12, 13
**satisfactorily** 3:4
**satisfied** 48:3
**schedules** 35:2
**searching** 6:12
**second** 45:13, 15
**secondary** 49:15; 50:2
**section** 39:5, 8
**secure** 24:13; 29:2
**seeking** 26:20; 35:21
**sell** 9:9
**sending** 44:7
**sense** 17:8; 45:24
**sent** 28:5, 19; 38:14
**separation** 39:14
**September** 21:14, 24; 25:7; 50:18
**series** 19:1
**serious** 18:16; 19:21
**several** 9:16; 23:2; 28:8; 36:12
**shot** 18:12
**show** 8:1; 22:24; 24:10; 41:24; 44:1
**side** 23:11
**sign** 23:20; 28:21
**signature** 8:22, 23; 9:3; 21:9, 10, 11, 20, 21; 28:22, 23
**signed** 22:14, 18; 25:20; 28:8, 23; 29:1, 13, 15; 39:7, 11; 43:8
**significant** 16:4; 34:5
**signing** 44:7
**site** 30:5
**situation** 20:16
**six-month** 39:22; 40:2
**Solomon** 3:13
**somebody** 27:3; 37:4
**someone** 7:6, 19; 30:5; 49:19
**Sometime** 5:9, 12; 6:2, 4;

32:10; 38:18; 43:24
**Somewhere** 15:16, 17; 18:22; 26:12; 33:21; 46:12; 47:13
**sorry** 8:8; 18:22; 37:16; 47:11
**sort** 30:10
**sources** 26:21
**speak** 47:4
**specifics** 14:8
**specify** 5:6
**spell** 18:11
**spent** 29:20
**spoke** 18:9; 40:21; 47:9
**spoken** 19:10; 29:22; 40:10; 41:2
**staff** 6:10, 18; 30:17
**stage** 40:17
**Stake** 19:9; 34:6
**started** 22:23; 46:9
**starting** 20:11
**statement** 30:21
**States** 33:19
**stating** 50:21
**still** 6:24; 7:1, 2, 3; 9:19, 20; 13:20; 37:6; 43:13, 21
**strike** 4:12; 48:21
**struck** 22:20
**structure** 33:10
**structured** 23:1
**structures** 33:13
**structuring** 22:23
**subsequent** 44:11
**substance** 25:4; 43:11
**sufficient** 12:1; 48:9
**suitable** 19:8
**suitor** 18:18
**summer** 33:19
**SunOpta** 6:9; 7:6, 19; 16:12, 15, 20; 17:4, 4; 19:9; 20:20; 35:6
**superior** 45:17
**support** 11:12; 12:10; 14:3; 15:9
**supported** 23:15
**sure** 3:15; 5:1; 6:3; 8:15; 12:3, 12; 27:5; 41:2, 11; 46:17
**surprise** 6:14, 15
**sworn** 3:6

## T

**T** 20:11
**take-out** 45:11
**talk** 18:3; 22:23
**talking** 17:9; 43:19
**Technology** 19:9
**telephone** 27:4
**telling** 31:11
**tenant** 18:15
**term** 18:20
**termination** 40:15
**terms** 6:16; 7:5, 12, 20, 21; 12:4, 5, 6; 13:1, 4; 15:11; 16:16; 33:3; 45:20
**test** 14:23
**testified** 3:7
**testimony** 42:4; 44:12
**thereafter** 30:13
**thinking** 37:12; 48:17
**though** 7:13; 32:20
**thoughts** 23:15
**three** 23:4
**timely** 17:11
**times** 3:22, 23; 45:23
**timing** 6:4; 16:12; 31:24; 32:2, 3; 41:1
**title** 6:22; 7:2, 3
**today** 3:17; 17:7; 20:6; 26:9; 38:23; 44:4
**together** 31:17
**toiling** 10:24; 12:24
**told** 10:12, 13; 11:19; 13:21; 37:7, 16; 38:6, 9; 47:7; 49:6, 8, 18
**took** 18:19; 30:9; 33:3; 43:9; 45:12, 15
**total** 49:10
**totally** 48:1
**touch** 17:23; 27:5
**toward** 16:5
**towards** 18:16, 24
**Town** 15:1; 36:3; 47:22; 49:13
**Toxikon** 5:4, 17; 6:24; 7:1, 15; 9:2, 8, 10, 10, 19, 20; 11:13; 12:19; 15:14, 24; 16:15; 17:15; 18:24; 20:1; 21:24; 22:7, 13; 23:10, 12; 24:1, 10, 18, 24; 25:5, 6, 15; 26:24; 27:4, 12, 22; 30:18, 19; 32:22; 34:10; 36:8; 37:16; 38:7, 14, 19; 40:8, 22; 41:6, 7; 42:7; 46:4, 7; 50:11
**Toxikon's** 19:2; 32:21
**Trammell** 20:11, 12, 13
**transaction** 22:24; 23:11; 26:17; 29:18; 31:6; 32:14; 33:5
**transactions** 16:16; 20:9, 9
**transpired** 12:3; 14:6
**trial** 4:12
**tried** 19:8
**true** 9:1, 3; 21:13, 22
**Trust** 43:3, 5; 45:1, 22; 48:14, 14
**trustee** 48:14, 15
**trustees** 48:16
**truthfully** 4:5
**try** 4:22; 30:1; 39:19
**trying** 13:19; 16:3
**turn** 8:20; 21:8, 16; 39:2
**two** 8:2; 15:2; 22:2, 13; 23:4; 30:9; 32:18; 36:1, 14; 47:10; 48:10

## U

**ultimately** 7:19; 23:13, 17, 20
**unable** 25:6, 9
**under** 4:4; 14:12, 19; 15:13; 19:2; 24:13; 29:9; 36:1; 38:16; 42:6
**understood** 39:12
**underwrite** 29:5
**unfactual** 4:21
**unhappy** 46:22
**Union** 44:23
**United** 33:19
**unless** 4:15; 5:6; 47:6
**up** 7:22; 19:8; 25:20; 33:13; 43:21; 46:22, 23
**up-front** 49:9
**upon** 7:20, 21; 12:6; 39:23; 48:1
**urgency** 46:14
**used** 17:19; 25:2; 42:20
**using** 17:6
**utilize** 42:8; 44:16

## V

**vague** 15:20; 16:12; 50:13
**verbal** 5:2
**versa** 43:18
**viable** 20:2
**vice** 43:18
**vice-president** 6:23
**view** 13:22; 29:4
**violation** 50:23
**visit** 30:5
**VP** 11:17

## W

**Wait** 24:9
**way** 7:8; 10:1; 14:24; 18:13; 22:6, 6, 16, 24; 23:14; 39:12
**Weinberg** 3:13
**weren't** 17:11; 34:22
**whatnot** 27:8
**Whereupon** 51:9
**White** 26:19
**whole** 29:18; 31:6; 35:17
**Whose** 5:19
**Wiggins** 5:8, 10, 13, 17, 20; 6:2; 9:9; 10:16; 11:21; 12:14; 13:24; 15:9; 22:7; 25:16, 21; 29:2; 31:20; 36:2; 42:20; 43:2, 3; 44:18; 45:9; 47:21; 48:13; 49:1, 13
**Williams** 9:17, 18, 19; 10:6; 11:10; 12:6; 15:24; 16:19; 41:19
**willing** 14:12; 23:6; 42:5; 44:24; 48:8
**without** 10:22
**witness** 3:3; 22:9
**words** 35:4
**work** 16:3; 30:17
**worked** 18:12; 19:12; 30:22
**working** 10:2; 13:3; 44:21; 46:9, 17
**works** 6:10
**worth** 31:20
**writing** 35:5
**wrong** 7:11

## Y

**years** 14:7; 46:18; 47:5
**Yesterday** 19:23
**York** 26:19