1

Volume I
Pages 1 to 53
Exhibits:  P8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
HUDSON REALTY CAPITAL, LLC,      :
            Plaintiff,           :
                                 :
        vs.                      :   Civil Action No.
                                 :   1:04-cv-10243
DR. LAXMAN DESAI,                :   (MEL)
            Defendant.           :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF LAXMAN DESAI, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Birnbaum & Godkin,
LLP, 280 Summer Street, 5th Floor, Boston,
Massachusetts, on Wednesday, June 29, 2005,
commencing at 10:10 a.m.

PRESENT:

    Solomon and Weinberg LLP
        (by Cory Mitchell Gray, Esq.)
        Two University Plaza, Hackensack, NJ 07601,
        for the Plaintiff.

    Robert G. Cohen, Esq.
        188 Oaks Road, Framingham, MA 01702,
        for the Defendant.

                * * * * *

2

1                          I N D E X

2    EXAMINATIONS                                    PAGE

3    LAXMAN DESAI

4     DIRECT EXAMINATION                               3
        BY MR. GRAY
5

6
                         *  *  *  *
7
                    E X H I B I T S
8

9

     NO.                  DESCRIPTION              PAGE
10
     P8      Letter from Patrick Bisceglia           26
11           of Bluestone Realty Advisors to
             Richard Ortiz of Newbridge
12           Realty Advisors dated 6/23/03

13

14                       *  *  *  *

15

16

17

18

19

20

21

22

23

24

3

1              P R O C E E D I N G S
2                   LAXMAN DESAI
3    a witness called for examination by counsel for the
4    Plaintiff, having been satisfactorily identified by
5    the production of his driver's license and being
6    first duly sworn by the Notary Public, was examined
7    and testified as follows:
8                 DIRECT EXAMINATION
9        BY MR. GRAY:
10       Q.   Good morning, Dr. Desai.
11       A.   Good morning.
12       Q.   As you know, my name is Cory Gray.  I am a
13   lawyer with Solomon and Weinberg, and we represent
14   Hudson Realty Capital in this action in which you
15   are a defendant.  You are aware of that, I'm sure?
16       A.   Yes.
17       Q.   Have you been deposed before today?
18       A.   I have.  With Hudson Realty?
19       Q.   No.  Have you ever been in a deposition
20   before ever?
21       A.   I have been.
22       Q.   How many times?
23       A.   A few times.  I don't really know.
24       Q.   Cost of business.

4

1     A.    It's a cost of business.

2     Q.    So you are familiar with the process.  You

3 know I will be asking you questions.  Since you are

4 under oath, you have the obligation to answer my

5 questions fully, truthfully, and completely.  You

6 are aware of that?

7     A.    I am aware.

8        MR. COHEN:  I may object for the record,

9 Dr. Laxman, but you have to answer the questions

10 anyway.  And we will reserve all objections, except

11 to the form of the question, until the time of

12 trial.  Motions to strike also.

13       MR. GRAY:  That's right.

14    Q.    I will say your lawyer may object from time

15 to time.  But unless he instructs you not to answer

16 to preserve an attorney-client privilege, you should

17 answer my questions.  Do you understand that?

18    A.    I do.

19    Q.    If I ask you a question that you do not

20 understand, that is incomprehensible or based on an

21 unfactual premise, please let me know, and I will

22 try to correct it so you can answer.  Will you do

23 that?

24    A.    I will.

5

1      Q.    Lastly, make sure all your answers are
2   verbal so the court reporter can take them down.
3      A.    Okay.
4      Q.    Dr. Desai, when did you or Toxikon -- and
5   when I say "you" in this deposition, I will mean
6   both of you unless I otherwise specify.  Okay?  When
7   did you first decide to pursue the purchase of 25
8   Wiggins Avenue?
9      A.    Sometime -- you mean the sale or purchase
10  at 25 Wiggins Avenue?
11     Q.    Yes.
12     A.    Sometime in the early part of 2003.
13     Q.    What made 25 Wiggins attractive to you?
14     A.    It is in our backyard.  It is a logical
15  expansion geographically.
16     Q.    When you say your backyard, that's because
17  Toxikon already had facilities at 15 Wiggins Avenue?
18     A.    Correct.
19     Q.    Whose decision was it to pursue the
20  acquisition of 25 Wiggins Avenue?  Your personal
21  decision?
22     A.    This was my personal decision.
23     Q.    What did you do, when you decided to pursue
24  that acquisition, to further that acquisition?

6

1      A.    We made an offer to the company which owned

2   25 Wiggins Avenue sometime in March of, if I can

3   recollect correctly -- I may not be exactly sure

4   about the timing, but sometime early 2003 when it

5   became available to us.

6      Q.    How did you learn that it was available?

7      A.    There was a real estate agent. I don't

8   know which company he was representing from -- he

9   was representing SunOpta. He contacted one of the

10   staff members who works for me, and she brought that

11   information to me. In the meantime we were already

12   searching to move to a different facility. I had no

13   idea this thing was becoming available to us. It

14   was a surprise to me at that particular time.

15      Q.    A pleasant surprise?

16      A.    I would say so, yes. In terms of

17   convenience, it is favorable.

18      Q.    What is the name of your staff who brought

19   this information to you?

20      A.    Her name is Nancy DiGiulio,

21   D-i-G-i-u-l-i-o.

22      Q.    What was her title or position at the time?

23      A.    She is a vice-president of operations.

24      Q.    Is she still with Toxikon?

7

1    A.    She is still with Toxikon.

2    Q.    Does she still hold that title?

3    A.    She does still hold the title.

4    Q.    Did you have personal involvement in

5    negotiating the terms of the acquisition with

6    SunOpta, or did you leave that to someone else to do

7    for you?

8    A.    It was done in a collective way and I was

9    aware of it, but I did not personally negotiate any

10   of it.

11   Q.    I assume -- correct me if I am wrong --

12   that the major decisions with respect to the terms

13   were yours to make, though, right?

14   A.    Right.

15   Q.    Who was the lead person from Toxikon doing

16   the negotiation?

17   A.    Nancy DiGiulio.

18   Q.    I assume from the record that Ms. DiGiulio

19   and someone from SunOpta ultimately were able to

20   agree upon terms?

21   A.    Yes.  We agreed upon some terms, and

22   finally it was up to me to say "yes" or "no."

23   Q.    I gather you said "yes."

24   A.    Yes.

8

1      Q.    I would like to show you a document that we

2    have marked previously in the last two days as

3    Exhibit P2 and ask you to look at that document,

4    please, Doctor.

5            MR. COHEN:   What number is that?

6            MR. GRAY:   P2.   It is the purchase and

7    sale.

8      A.    (Reviewing document)   I'm sorry.   I'm

9    taking time.

10     Q.    That's quite all right.

11     A.    Yes.

12     Q.    You have had a chance to review P2?

13     A.    This?

14     Q.    Yes, this agreement of purchase and sale.

15     A.    I'm sure I must have had time to, right.

16     Q.    I meant now.

17     A.    Yes, I did.

18     Q.    You leafed through it page by page?

19     A.    Whatever I could possibly do, yes.

20     Q.    Could you turn to Page 30 of the document.

21     A.    Yes.

22     Q.    Is that your signature on Page 30?

23     A.    That is my signature.

24     Q.    To the best of your knowledge, is this a

9

1   true and correct copy of the agreement of purchase

2   and sale between Toxikon and Opta Foods?

3       A.    This signature is a true copy.

4       Q.    Did you see anything else as you leafed

5   through it that didn't appear to you to be a genuine

6   page from the agreement?

7       A.    No.

8       Q.    So as of March 13, 2003, Toxikon and Opta

9   had agreed that Opta would sell 25 Wiggins Avenue to

10  Toxikon and Toxikon would buy that property from

11  Opta Foods, correct?

12      A.    Yes.

13      Q.    What did you next do to further this

14  agreement of purchase and sale?

15      A.    I had asked my controller to look for the

16  possible financing with several lenders.

17      Q.    Is that Dexter Williams?

18      A.    His name is Dexter Williams, correct.

19      Q.    Is Dexter Williams still with Toxikon?

20      A.    He is still with Toxikon.

21      Q.    Did you tell him what lenders to contact?

22      A.    No.

23      Q.    Do you know what lenders he did contact, if

24  any?

10

1      A.    If I recollect right, the logical way of
2  contacting was the bank we were working with,
3  Commerce Bank at that particular time, and also we
4  had relationships with the Eastern Bank.  That's all
5  that comes to my mind.
6      Q.    Do you know whether Mr. Williams did in
7  fact contact either or both of Commerce Bank and
8  Eastern Bank in March or April of 2003 to see if
9  they would provide the financing necessary to
10 effectuate the agreement of purchase and sale?
11     A.    Yes, he did contact them.
12     Q.    He told you that he did?
13     A.    Yes, he told me.
14     Q.    Did he tell you he made a loan application
15 to either of them with respect to the acquisition of
16 25 Wiggins?
17     A.    He had made loan applications to both of
18 them.
19     Q.    Do you know what the result of those
20 applications was?
21     A.    Eastern Bank, during the course of the last
22 negotiation, backed out without giving any reasons.
23 And my memory is not clear, but I can go with my
24 hunch.  Commerce Bank was toiling with the idea.

11

1    There was no commitment at that particular time.

2        Q.    When you say "at that particular time,"

3    what time are you referring to?

4        A.    March, April or May.  Around that time.

5        Q.    Did you have personal involvement with the

6    negotiations with either Eastern Bank or Commerce

7    Bank?

8        A.    Peripherally.  I was not intimately

9    involved with it.

10       Q.    Mr. Williams kept you advised?

11       A.    If they needed any kind of explanation how

12   I support the loan, what I do, and what is the

13   future of the company I own, Toxikon.  There were

14   some questions asked to me which were reasonable,

15   and I was present at that particular time.  After

16   that I left all the details to my controller as well

17   as my operation VP, Nancy DiGiulio.

18       Q.    Do you recall, with respect to Eastern

19   Bank, ever being told any reason that they backed

20   away from the possibility of making this acquisition

21   loan for 25 Wiggins?

22       A.    Details are murky to me.  I don't know.

23   But it was all a done deal.  But we never got a

24   letter of commitment when the day had come.  So

12

1   there was no sufficient reasons given negatively or

2   positively.  So at the end, the time ran over, and I

3   wasn't quite sure what transpired at that time.

4        Q.   When you said "terms" -- I believe you said

5   terms had been agreed to, meaning that the bank and

6   Mr. Williams had agreed upon terms, but the bank

7   never issued a commitment letter; is that accurate?

8        A.   Correct.

9        Q.   Do you recall what collateral the bank was

10  requiring to support the acquisition loan?  When I

11  say "the bank," I mean Eastern Bank.

12       A.   I'm not sure of the details.  They are not

13  clear to me.  But the question was I had to give a

14  personal guarantee, plus collateral was 25 Wiggins

15  Avenue.

16       Q.   Do you recall whether any other real estate

17  collateral was to be provided?

18       A.   I do not recall that.

19       Q.   Does Toxikon have a file with respect to

20  its loan application to Eastern Bank?

21       A.   They must have this.

22       Q.   I am going to ask through counsel that that

23  file be produced to us.  How about with respect to

24  Commerce Bank?  You said they were toiling with the

13

1    idea.   Had terms not finally been agreed to by

2    Commerce Bank in or about May of 2003?

3        A.   We had a long working relationship, and it

4    wasn't clear to me.  By the time the terms of the

5    purchase was getting closer, they didn't come

6    through.

7        Q.   Did you ever have any personal discussions

8    with anyone at Commerce Bank as to why it wasn't

9    coming through?

10       A.   I did everything through my controller.  I

11   had little contact.

12       Q.   Did you ever discuss with Mr. Azia, then of

13   Commerce Bank and now of Digital Financial Credit,

14   why Commerce Bank wasn't moving more quickly on the

15   application?

16       A.   I did meet with him.  He was the

17   representative of the Commerce Bank at that time,

18   and he did express the insufficient collateral at

19   that particular given time, but he was trying to

20   look into it.  The matter was still open-ended.

21       Q.   When Mr. Azia told you that in the bank's

22   view there was at that time insufficient collateral,

23   do you recall what collateral he was referring to?

24       A.   It was 25 Wiggins Avenue only.

14

1     Q.   So was it your understanding that Mr. Azia

2  and Commerce Bank were looking to perhaps get other

3  collateral pledged to support the loan if they were

4  to make it at all?

5     A.   We discussed about those collaterals, but

6  it is not clear to me what transpired.  That was a

7  few years ago.

8     Q.   Do you recall any of the specifics of the

9  collateral that were in those discussions?

10     A.   I do own -- I did own some of the property

11  in Florida and some property in Maine.  I was

12  willing to pledge those which were not under the

13  covenants, restrictions from the bank.

14     Q.   And the main property was the Sandy Point

15  property?

16     A.   Correct.

17     Q.   Were there more than one Florida property?

18  Was there more than one Florida property that was

19  under discussion?

20     A.   There were four properties.

21     Q.   Do you recall which properties those were?

22     A.   Oh, God.

23     Q.   Not a memory test.  Just if you recall.

24     A.   There is 106 Coastal Way, was one property

15

1    where the lab was.  675 Indian Town Road where the

2    commercial building was.  And I had two pieces of

3    land and a house on it at the Jupiter Farms.  And

4    the exact address of those farms, they were too long

5    to remember.

6        Q.    In your discussions with Mr. Azia the

7    Commerce Bank was expressing that they may be

8    looking to these other pieces of collateral to

9    support the loan on 25 Wiggins?

10       A.    I really did not get clear demands as to

11   what actually they wanted until my terms with the

12   Opta Food came to an end.

13       Q.    Do you recall when, under the agreement of

14   purchase and sale, Toxikon was originally required

15   to close the acquisition?

16       A.    Somewhere in July, if I remember right.  I

17   got 90 days or something from -- I think somewhere

18   in July of 2003.

19       Q.    '03?

20       A.    Yes.  This is very vague for me.

21       Q.    In or about late May or early June of 2003

22   when Eastern Bank had not come through and Commerce

23   Bank had not come through, did you have discussions

24   with Mr. Williams about where Toxikon was going to

16

1  get the financing to close his acquisition?

2      A.   I did have discussions with him, and we

3  were trying to find some local assistance to work

4  out the deal because I had put a significant amount

5  of down payment toward the Opta Food with the

6  promise of Eastern Bank is going to close the deal.

7      Q.   You may have said this.  I apologize if you

8  did.  When did you learn that Eastern Bank was just

9  not going forward?

10      A.   The exact time is not clear to me.  And it

11  must have been close to the closing date of the

12  SunOpta.  But that timing is very much vague in my

13  mind.

14      Q.   Who were you or other representatives of

15  Toxikon dealing with from SunOpta at the time?

16      A.   In terms of transactions?

17      Q.   Yes.

18      A.   It was mainly dealt with by Nancy DiGiulio

19  and Dexter Williams.

20      Q.   Who at SunOpta were they dealing with?

21      A.   There was a guy who is no longer there at

22  that particular time.  I don't know what his name

23  was.  But if you can drop some names, I can tell you

24  who it was.  He was the gentleman we were dealing

17

1   with.  He was a friend of the Realtor who was

2   representing his property to us.  I don't know what

3   his name was.  And he was the controller from

4   SunOpta at that time.  It was not called "SunOpta."

5   It was called "Opta Food" at that time.

6       Q.   Yes.  We have been using them

7   interchangeably today.  But you are quite right, it

8   was Opta Foods.  Did you have any sense, from

9   talking to Nancy or Dexter, whether Opta Foods would

10  default you and make you forfeit your down payment

11  if you weren't able to close timely?

12      A.   That was obvious, and it was mentioned to

13  me that some measures have to be taken; otherwise,

14  we forfeit all the deposit.

15      Q.   I assume Toxikon was represented by counsel

16  at the time, a lawyer?

17      A.   An attorney at that particular time, Robert

18  Cohen, my attorney.  He is general counsel for the

19  company.  And we used Choate Hall because Robert

20  Cohen was busy with his court cases.

21      Q.   To the extent it would not disclose any

22  attorney-client privilege -- and you can obviously

23  confer if you need to -- were your lawyers in touch

24  with Opta Foods' lawyers with respect to getting an

18

1    extension; and if so, what did they tell you about
2    those discussions?
3           MR. GRAY:  Do you want to have a talk
4    first, or are you okay with that?
5           MR. COHEN:  No.
6           You can answer the question.  I don't have
7    any problem with the question.
8       A.    It wasn't the attorneys.  It was I who
9    spoke with then a new controller, Peter Franggos --
10   the name comes to me -- and Dr. McEvily, who is the
11   president of -- don't ask me how to spell it.  Take
12   a shot.  I met with those gentlemen and worked out
13   some feasible way.  They were not interested in
14   extending the purchase and sale, but they gave me an
15   incentive to continue to be a tenant there, paid
16   some serious money towards it and gave me 90 days,
17   or I don't know how long they gave me, to find some
18   other suitor to help us buy the place.
19      Q.    Do you recall when that meeting took place?
20      A.    It must have been at the end of the term,
21   agreements of closing.  I believe it is end of May.
22   End of June, I'm sorry, somewhere.
23      Q.    Did those discussions -- rephrase that.
24   Towards the end of June did Toxikon and Opta begin

19

1    to enter into a series of extension agreements that

2    extended Toxikon's time to perform under the

3    purchase and sale agreement?

4        A.    They gave us, to continue to foster the

5    possibility of acquiring the company --

6            (Discussion off the record)

7        A.    We continued to have some dialogue and

8    tried to come up with things that is suitable for

9    them.  Then SunOpta was owned by Stake Technology,

10   which is a Canadian company.  I had not spoken to

11   anybody in -- Canadians or Canadian company or their

12   chief honchos over there.  I worked everything

13   through Dr. McEvily and Mr. Franggos.  We came to an

14   understanding and they gave me certain time

15   possibilities to see whether this could materialize

16   into a final sale.  It wasn't the best deal, but I

17   bought into it.

18       Q.    If it wasn't the best deal, why did you buy

19   into it?

20       A.    Because buying into it would be less

21   expensive than losing all the deposit, serious money

22   I had put down.  So that was the reason.

23       Q.    Yesterday in his deposition Mr. Franggos

24   expressed the opinion that they were, "they" being

20

1    Opta Food, committed to allowing Toxikon or you to

2    purchase the property as you were the only viable

3    buyer they were aware of.  Did they ever express

4    that to you at the time?

5        A.   No.

6        Q.   Had you ever learned that before today?

7        A.   No.  Because they were represented -- we

8    never negotiated anything with them.  All the

9    transactions, real estate transactions, I was forced

10   to deal with some company, I don't know, something

11   starting with "T," Trammell Crowe.

12       Q.   Trammell Crowe?

13       A.   Trammell Crowe, something like that.

14       Q.   That was the broker on the deal?

15       A.   That was the broker on the deal.  And we

16   were not allowed to go in between the situation.

17   And they were represented by an attorney.  An

18   attorney was always in the forefront along with the

19   Realtors.  Only the details of this relationship to

20   extend was directly negotiated between SunOpta

21   individuals -- those names I mentioned before.

22       Q.   With you?

23       A.   With me.

24       Q.   I am going to ask you to look at documents

21

1  that have been previously marked as P1 and P3 and

2  ask you, first, if you recognize those documents.

3       A.    Of course I can't read all of the -- I am

4  becoming aware of my nightmare here.  Bear with me.

5  (Reviewing document)    This P3, I have seen this

6  before.

7       Q.    With respect to P3, Doctor, while you have

8  that open, would you turn to Page 30 and tell me

9  whether that's your signature on that page, a copy

10 of your signature on that page.

11      A.    It is my signature.

12      Q.    To the best of your knowledge, is this an

13 accurate and true copy of the option agreement dated

14 as of September 22, 2003?

15      A.    Yes.

16      Q.    Thank you.  Now you could turn to P1, if

17 you would.

18      A.    (Reviewing document)    Okay.

19      Q.    You can anticipate my question.  On Page

20 29, is that a copy of your signature there?

21      A.    It is my signature.

22      Q.    To the best of your knowledge, is P1 a true

23 and correct copy of the lease entered into as of

24 September 22, 2003, between Opta Foods and Toxikon?

22

1      A.    Yes.

2      Q.    Are these two exhibits that you have just

3   reviewed, the lease and the option agreement, the

4   documents by which the parties memorialized your

5   agreement that you reached with Peter Franggos and

6   Dr. McEvily by way of making an alternate way for

7   Toxikon to acquire 25 Wiggins Avenue?

8          MR. COHEN:  Do you understand the question?

9          THE WITNESS:  No, I did not understand the

10   question.

11     Q.    Okay, that's fine.  Let me know when you

12   don't.  It was a little convoluted.  Are these the

13   two documents, P1 and P3, that Toxikon and Opta

14   signed in order to give effect to the agreement that

15   you had reached with Peter and Dr. McEvily?

16     A.    That was the only way not to lose the

17   deposit on the property.

18     Q.    So these are the documents that you signed

19   to make effective or make enforceable the deal you

20   struck with Mr. Franggos and Mr. McEvily?

21     A.    Correct.

22     Q.    Do you recall when you and Mr. Franggos and

23   Dr. McEvily first started to talk about structuring

24   the transaction in the way that P1 and P3 show it to

23

1    be structured?

2        A.    There were several extensions.  I asked and

3    got them from them.  They were kind enough to

4    provide me two or three or four.  I don't know how

5    many extensions I got from them.  And I realized at

6    that particular last extension they were not willing

7    to extend any further.  At that particular time it

8    was mutually came to a decision that they would go

9    along with these kind of arrangements.  Arrangements

10   were created by them.  It wasn't by me or by Toxikon

11   or any of my side of the transaction.

12       Q.    But Toxikon did have counsel review these

13   documents and ultimately did agree to go forward in

14   this way, correct?

15       A.    Counsel only supported my thoughts to go

16   along with it.

17       Q.    And ultimately your counsel did review both

18   these documents, P1 and P3?

19       A.    Yes.

20       Q.    Ultimately, as we know, you did sign them,

21   correct?

22       A.    Correct.

23       Q.    Do you recall why the option agreement,

24   which was P3, gives you personally the option to

24

1  purchase the property rather than Toxikon?

2      A.    I wanted to buy the property personally,

3  not through the company.  I always bought all my

4  properties with a personal option and I leased to

5  the company.

6      Q.    The reason I ask is the original agreement

7  of purchase and sale which has been marked as P2 --

8      A.    That was a mistake.

9          MR. COHEN:  Wait for the question.

10     Q.    It does show Toxikon as the purchaser.  And

11 can you tell me why that was?

12     A.    That shouldn't have been.  Generally my

13 intention is to secure the buildings under my name.

14 If it was there, it was done erroneously.

15     Q.    The option agreement, if you would just

16 take a look at that too, also recites -- I will just

17 point to it here about halfway down -- contains a

18 line about Toxikon not being able to obtain the

19 financing necessary to acquire the property.  Do you

20 see that?

21     A.    Yes, I see it.

22     Q.    Do you know how that representation came to

23 be inserted in this document?

24     A.    No, I don't.  But I think Toxikon or myself

25

1   are so intermingled -- I own it 100 percent.  So it

2   is being used probably in place of one or the other.

3   I can't explain.

4        Q.    With respect more to the substance than the

5   fact that it refers to Toxikon, is it an accurate

6   representation that Toxikon was unable, as of

7   September 22, 2003, to obtain financing to acquire

8   the property?

9        A.    Correct, it was unable.

10       Q.    As we both know, at some point Hudson

11  Realty Capital became involved as a potential

12  lender.  Before we get to that, let me ask you,

13  other than Commerce Bank and Eastern Bank were any

14  other potential lenders ever contacted by or on

15  behalf of you or Toxikon with respect to the 25

16  Wiggins acquisition?

17       A.    At that particular time nobody was

18  contacted.

19       Q.    Is it fair to say that the lease and option

20  agreement, P1 and P3, were signed up so that you

21  could preserve your ability to obtain 25 Wiggins

22  Avenue which you would otherwise possibly have lost

23  because of your inability to obtain financing?

24       A.    Yes.

26

1         MR. GRAY:  I would like to have marked as

2    Exhibit P8 a copy of a letter from Bluestone Realty

3    Advisors, Inc., with attachments addressed to

4    Richard Ortiz of Newbridge Realty Advisors, LLC.

5                   (Document marked as Defendant's

6                   Exhibit P8 for identification)

7         Q.   Doctor, I would like you to take a look at

8    Exhibit P8 and tell me, have you ever seen it before

9    today?

10        A.   Yes, I have seen it.

11        Q.   When did you first see it?

12        A.   Somewhere in June.

13        Q.   June of 2003?

14        A.   Yes.

15        Q.   Can you tell me how Bluestone Realty

16   Advisors, Inc., came to be involved in this

17   transaction?

18        A.   Actually, details escape me, but they

19   contacted me from White Plains, I believe, New York.

20   I had known them before.  We were actively seeking

21   financing from different sources, and he came in the

22   picture and contacted us with this letter.

23        Q.   This letter, P8, is a letter from Mr.

24   Bisceglia to Newbridge.  It is not to Toxikon,