27

1    correct?

2        A.    Correct.

3        Q.    So did Mr. Bisceglia or somebody from

4    Bluestone telephone Toxikon?

5        A.    He got in touch, I'm not sure, with Nancy

6    or myself or Dexter, and the details were given to

7    him.  I generally did not get involved in all these

8    details and whatnot.  I am not a detail person.

9    Then this information must have been presented to

10   us.

11       Q.    Did you ever come to know how Bluestone

12   learned of the fact that Toxikon was looking for

13   alternative financing?

14       A.    I don't know.

15       Q.    Do you know whether Bluestone contacted any

16   other potential lenders -- obviously this letter is

17   addressed to Newbridge -- but other than Hudson

18   Realty?

19       A.    I am not aware of it.

20       Q.    To the best of your knowledge, were the

21   only potential lenders ever contacted by or on

22   behalf of Toxikon Commerce Bank, Eastern Bank, and

23   Hudson Realty Capital?  Let me give it a time frame.

24            MR. COHEN:  If you know.

28

1       Q.   Before December 31, 2003.  So I will keep
2    it all in 2003 for now.
3       A.   I am not aware if any other than these
4    people were contacted.  I don't think so.
5       Q.   At some point Hudson Realty Capital sent to
6    you through Bluestone a conditional commitment
7    letter; is that accurate?  Let's call it a letter of
8    July 1, 2003, that several parties signed.  Is that
9    accurate?
10          MR. COHEN:  Just refer to it as "the
11   letter."
12          MR. GRAY:  We will get to it.
13      A.   If I see the letter, I would be able to
14   say.
15      Q.   I am going to place before you what has
16   been previously marked as Exhibit P7 and ask if you
17   recognize that letter.
18      A.   Yes.
19      Q.   Is that a letter that Hudson sent to you?
20      A.   Yes.  They had faxed it to us.
21      Q.   Did you actually sign that and is that your
22   signature on Page 4?
23      A.   It is my signature.  I signed it.
24      Q.   What did you understand this letter to be

29

1    at the time you signed it?

2        A.    A loan to secure 25 Wiggins Avenue

3    property.

4        Q.    By this letter, was, in your view, Hudson

5    obligating itself to underwrite the loan, if not to

6    make the loan?

7        A.    This was a proposal given to me.

8        Q.    What did you understand Hudson's

9    obligations under the proposal to be, if any?

10       A.    It is a letter of understanding.  I didn't

11   find anything beyond that.

12       Q.    Did you have this letter reviewed by any

13   counsel before you signed it?

14       A.    I do not recollect.  I don't know.

15       Q.    After you signed and returned this letter

16   to Hudson, did you have further personal contact

17   with the individuals at or on behalf of Hudson?

18       A.    During the whole transaction, one gentleman

19   came -- I don't know his name -- came to check the

20   property.  That was the only time I spent some time

21   with him.  Otherwise I do not know anybody, I have

22   not spoken to anybody at Hudson Realty.

23       Q.    Do you remember that person's name?

24       A.    No.

30

1    Q.    I will try a few.  Sandy Herrick?

2    A.    That may be the name.

3    Q.    Do you remember the contents of any of the

4    discussions you had with this person, whether it was

5    Sandy or someone else, during your site visit?

6    A.    I don't know what kind of discussions we

7    had.  The only thing I know that he wanted is to see

8    some properties nearby which he had in mind to see.

9    I took him to one or two properties.  Other than

10   that, I do not recollect any discussions of any sort

11   with him.

12   Q.    To the best of your recollection, you

13   didn't have any personal discussions thereafter with

14   anyone at Hudson?

15   A.    I never had before.  I never had after.

16   Sandy Herrick I think is his name.  But that was the

17   end of it.  I work everything through my staff at

18   Toxikon.

19   Q.    Who at Toxikon had primary contact with

20   Hudson people?

21   A.    Nancy DiGiulio.  May I make a statement?

22   We actually had very little interactions.  We worked

23   everything through this Bluestone agent.

24   Q.    So Nancy primarily had contact, as you

1   understand it, with the Bluestone people, not

2   directly with the Hudson people?

3       A.   That is my understanding, because he was

4   the middleman and we never really had to go anything

5   through -- everything has to go through -- they want

6   to control the whole transaction.

7       Q.   Did Nancy nonetheless report back to you on

8   the discussions that she had with Bluestone

9   regarding the potential Hudson loan?

10      A.   Yes.

11      Q.   What do you recall her telling you in,

12  let's call it, early July 2003?

13      A.   They needed documents.  I don't have all

14  the details in my mind.  Whatever they asked, we

15  provided them.  And she keeps me pretty much

16  informed, not that memory is that great, to keep

17  everything together.  Then there were issues of

18  evaluation of the property, and they were hiring

19  some real estate agents to come in, see what it's

20  worth, the 25 Wiggins.  Then beyond any other due

21  diligence they had to do, she kept me informed about

22  being complying to what the needs are.

23      Q.   Do you know whether Nancy had discussions

24  with Bluestone regarding the timing of the closing

32

1  and the time criticality of the closing?

2      A.   It was very, very clear what the timing or

3  essence of the timing was because no extension was

4  going to be granted beyond that.

5      Q.   When you say "beyond that," you mean beyond

6  that last extension?

7      A.   Correct.

8      Q.   Do you recall when that last extension

9  expired?

10      A.   I believe sometime end of July.

11      Q.   Is it around that time -- I think that's

12  what you said, but is it around that time that you

13  met with Mr. Franggos and Dr. McEvily to restructure

14  the transaction?

15      A.   It is a little later, because the time

16  pretty much expired at that particular time and I

17  was out of the country.  And when I came back is

18  when I met with these two individuals from Opta

19  Food.

20      Q.   So even though, to the best of your

21  recollection, Toxikon's time to close the

22  acquisition had expired, Opta didn't default Toxikon

23  and take the down payment?

24      A.   They did not.

33

1      Q.    Instead they entered into the lease and

2   option agreement?

3      A.    We took some time to come to terms.  And

4   meetings of the mind, they agreed not to foreclose

5   this transaction.

6      Q.    Do you know whether Nancy ever passed that

7   information on to Bluestone?

8      A.    Yes, she did.

9      Q.    To the best of your recollection, Bluestone

10  was advised at some point that a different structure

11  for the deal was going to go forward?

12     A.    I am not aware of it because the different

13  structures were up in the air.  Pretty much called

14  it a day.

15     Q.    With Bluestone?

16     A.    With Bluestone.  Bluestone representing

17  Hudson Realty as well.

18     Q.    Do you recall when you returned to the

19  United States in the summer of 2003?

20     A.    Probably early -- a few days after -- I

21  think in early August somewhere, August 2nd or 3rd,

22  1st.  It wasn't too far off from that time.

23     Q.    How long after you returned do you recall

24  meeting with Mr. Franggos and Dr. McEvily?

34

1    A.   I really don't know, but I think it was
2  immediate.

3    Q.   I would assume this would be a fairly high
4  priority issue?

5    A.   It was high priority.  A significant amount
6  was at stake.

7        (Recess taken)

8    BY MR. GRAY:

9    Q.   So after your meeting with Mr. Franggos and
10  Dr. McEvily, did Toxikon and/or you continue to
11  pursue financing both with Hudson and with Commerce
12  Bank?

13    A.   With Hudson, we were pursuing.  And not
14  having had any commitment from Commerce, it was
15  hanging loose.  They didn't say "no," they didn't
16  say "yes" at that particular time.

17    Q.   And was it Mr. DiGiulio who continued to
18  have primary contact with Bluestone or Hudson?

19    A.   Ms. DiGiulio was the primary contact with
20  Hudson -- not Hudson -- Bluestone and/or Hudson.

21    Q.   Do you recall when it was that you decided,
22  if it was you in fact who decided, that you weren't
23  going to be able to get financing through Hudson?

24    A.   The time expired and I didn't have any

35

1    commitment letter of the conditions or the details

2    of the money, of payment schedules.  Nothing was

3    done or not even -- barely mentioned they were going

4    to fund.  Just the words have no meaning in it.

5    I've never had anything in writing to enforce my

6    commitment to SunOpta.

7        Q.    You said the time expired.  You mean the

8    time of the July 1, 2003, letter that we marked

9    earlier as P7?

10        A.    Correct.

11        Q.    So in the discussions that followed July

12    31, 2003, what was your understanding of the nature

13    of those discussions?  Was it in furtherance of

14    pursuing the July 1, 2003, possible financing?

15        A.    We got no commitment from them other than

16    some kind of a proposal.  The bar was moving.

17    Collateral, they were asking the whole thing, which

18    I could not provide.  It continued and continued.

19    At one point the time has come and gone.

20        Q.    Do you recall ever being informed of what

21    collateral Hudson was seeking that you could not

22    provide?

23        A.    Yes.  During the course of their July due

24    diligence or asking for documents, they were asking

1  for two properties which were under restrictions

2  with the covenants which was 15 Wiggins Avenue and

3  675 Indian Town Road in Florida.

4      Q.    And you could not provide either of those

5  as collateral due to restrictive covenants contained

6  in the mortgage documents for those properties?

7      A.    I was restricted by the covenants.

8      Q.    Did you or anyone at Toxikon ever offer

9  alternative collateral or tell Hudson, through

10  Bluestone, that those properties could not be

11  provided as collateral?

12      A.    As I said before, I did have several

13  properties which I offered as collateral.  But they

14  insisted on these two properties on a continuing

15  basis.

16      Q.    And you learned that Hudson had such an

17  insistence through whom?

18      A.    Through our agent.

19      Q.    Bluestone?

20      A.    Yes, Bluestone.

21      Q.    Did you tell Hudson or did you ask anyone

22  to tell Hudson on or around July 31, 2003, when a

23  financing commitment had not yet issued, that you

24  were no longer pursuing the July 1, 2003, letter?

37

1      A.    We fostered everything through our agent,

2   Bisceglia or Bluestone.  He was the money man.  It

3   was over.  I just needed the money, no matter where

4   it is.  Even if somebody said, "Look, here is a

5   commitment letter, here is what it is," I could have

6   still negotiated that.

7      Q.    So do you know if Mr. Bisceglia told Hudson

8   that you were no longer interested in pursuing the

9   financing through Hudson on or around July 31, 2003?

10      A.    Exact dates I don't know.  But again, I

11   think he was informed.

12      Q.    What is the basis of your thinking that

13   Hudson was so informed?

14      A.    Because he was my agent.

15      Q.    I think maybe we are missing each other.

16   I'm sorry.  You believe Toxikon told Mr. Bisceglia

17   that it was no longer interested in pursuing

18   financing through Hudson in late July or early

19   August of '03?

20      A.    Mainly because there was no commitment

21   letter by that time.  The time had come and gone.

22   There was no commitment letter.  So it was more than

23   clear that the deal was not going to go through.

24   And we communicated that one to Bluestone, Mr.

38

1  Bisceglia, whatever his name is.  But all the deals

2  probably could be provided by Nancy.  She is the one

3  which was handling all the issues.  And you have to

4  forgive me.  I don't recollect all the details.

5      Q.    But it is your understanding through Nancy

6  that she told Mr. Bisceglia in late July or early

7  August that Toxikon would not pursue Hudson's

8  financing?

9      A.    Yes.  That was told, correct.

10     Q.    Do you have any understanding of whether

11 Mr. Bisceglia passed that position on to Hudson at

12 or about that time?

13     A.    I do not know.

14     Q.    Do you recall Toxikon ever being sent a

15 letter from Hudson or its counsel demanding payment

16 of a break-up fee that it claimed to be due under

17 the July 1, 2003, letter?

18     A.    Sometime later, yes.  I am aware of that.

19     Q.    Do you remember how, if at all, Toxikon

20 responded to that letter?

21     A.    I really don't know.

22         MR. COHEN:  I guess that explains why we

23 are all here today.

24         MR. GRAY:  Something explains it, Bob.

39

1  Maybe that's part.
2      Q.   Doctor, if you would turn to Page 3 of P7.
3  Page 3 of that document, sir.
4      A.   Yes.
5      Q.   The section entitled "Break-Up Fee."
6      A.   Yes.
7      Q.   At or about the time you signed this
8  letter, do you recall reading that section?
9      A.   Yes, I did.
10     Q.   Did you have an understanding of what that
11 meant at the time you signed the letter?
12     A.   I understood the following way:  If the
13 loan is not consumed by us, we have to pay some cost
14 of separation.
15     Q.   And those costs are defined in that
16 paragraph?
17     A.   That is defined in the paragraph "Break-Up
18 Fee."
19     Q.   It says, in part -- I will try to find it
20 for you, where it begins "Accordingly."  There we
21 are.  "Accordingly, the Borrower hereby expressly
22 agrees that, for the six-month period commencing
23 upon the execution of the Letter, but prior to its
24 funding of the Loan," and it goes on from there.

40

1  Did you have any understanding of what that
2  six-month period meant or whether it would expire on
3  July 31, 2003?

4      A.   No.

5      Q.   In or about late August of 2003, did you
6  have any personal discussions with Mr. Bisceglia the
7  purpose of which was to instruct Mr. Bisceglia to
8  tell Hudson that Toxikon was not going to go forward
9  with financing of Hudson?

10     A.   I recollect having spoken to him, but I
11 don't know what the contents and what the details
12 were.  They were all I had instructed Nancy DiGiulio
13 to do since she was familiar with all the goings on
14 there and to deal -- it is not a question of
15 termination or anything.  We never had a commitment,
16 a defined commitment letter with all the details, if
17 I remember right, even at the later stage in August
18 as well.

19     Q.   My question is premised, in part, on an
20 affidavit that you have provided in this case in
21 which you mention that on August 25 you spoke to Mr.
22 Bisceglia to tell him to tell Hudson that Toxikon
23 was not interested in obtaining a loan from Hudson.
24 So that was the premise of my question.

41

1      A.   I don't know exactly the timing.  But I'm

2    sure I must have spoken to him.

3      Q.   From and after August, say early August

4    when you and Mr. Franggos and Dr. McEvily reached an

5    agreement to go forward in an alternate method of

6    acquisition, did Toxikon contact other potential

7    lenders to enable Toxikon to close or you to close

8    your option to purchase the property as evidenced by

9    Exhibit P3?

10      A.   I had a breathing time at that particular

11    time.  I don't know exactly what we did.  I'm sure

12    we might have contacted some of the people.  The

13    details escape me.  I don't know when.

14      Q.   Was it primarily Nancy or Dexter's

15    responsibility to do that?

16      A.   Primarily I had us, our controller, and

17    also we were assisted by Nancy to deal with it.

18      Q.   Have you ever come to learn any of the

19    lenders that Mr. Williams contacted in the post

20    August 1, 2003, time frame to pursue financing to

21    close the option other than Commerce Bank and

22    Digital Financial Credit?

23      A.   None that I am aware of.

24      Q.   I would like to show you a document that

42

1    has been marked previously Exhibit P4 and ask

2    initially, have you seen that before?

3        A.    Yes, I have seen it.

4        Q.    In testimony this morning Mr. Anctil from

5    Commerce Bank said it was ready, willing, and able

6    to close under this December 10, 2003, commitment

7    letter.  Do you know why you and Toxikon did not

8    utilize this commitment to close on the acquisition

9    of the property in December of 2003?

10       A.    It was -- if I can recollect correctly, it

11   was presented to me the last day of December.  It

12   was a rush job, and there was an error in the

13   proposal and the $15 million was added on and I did

14   not want to pursue it.  It was an error on the part

15   of, if I recollect back, Commerce Bank.  And they

16   knew very well they should never have added that

17   one.

18       Q.    Would you explain that in a little more

19   detail to me, please.

20       A.    They have used 15 Wiggins Avenue as a

21   collateral here as well.  So I just didn't want to

22   go through that.

23       Q.    I apologize, but I am not following you,

24   Doctor.  They added additional collateral that you

43

1    couldn't pledge.  Is that the point?

2        A.    15 Wiggins.

3        Q.    15 Wiggins Realty Trust.

4        A.    It is --

5        Q.    It is a trust, and you couldn't pledge it?

6        A.    I couldn't pledge it in the different

7    covenants.  That was the error here.  By mistake I

8    had signed it here.  And it was -- I didn't go

9    through, and further negotiations took place after

10   this.

11       Q.    Do you remember the substance of those

12   negotiations?

13       A.    They came back.  They were still going into

14   the -- it was a circus, and overall it was like a

15   horse-trading, what they wanted, what they don't

16   want, all the bankers.  When money is plenty to lend

17   and there are not enough borrowers, they act

18   differently and vice versa.  You know what I am

19   talking about.  The person who was our contact was

20   Mark Azia, was the person who was -- he was our

21   point of contact.  And things were still up in the

22   air.  Details escape me.  But there were -- some

23   other offer was brought again later in the picture

24   sometime.

44

1        Q.    Let me show you what we previously marked
2    in the depositions of the past day and a half as
3    Exhibit P5 and ask if you have seen that document
4    before today.
5        A.    This came later.  This came later in the
6    picture.  I have seen it.
7        Q.    Do you recall ever signing and sending back
8    a commitment letter at or around that time to
9    Commerce Bank?
10       A.    No.
11       Q.    Is that the subsequent commitment letter
12   that you recalled receiving in your testimony a few
13   minutes ago?
14       A.    Correct.
15       Q.    Is there a reason, to the best of your
16   recollection, that you did not utilize the financing
17   evidenced by this commitment letter to close the
18   acquisition of 25 Wiggins?
19       A.    There was a reason.  The contact banker
20   from Commerce Bank had changed his position, post,
21   to Digital Federal, and I had a good working
22   relationship with him only at Commerce.  It was
23   comforting for me to see that Digital Credit Union
24   was willing to give me a better deal and I had a

45

1   contact person whom I could trust.  That is the

2   reason I did not want to go with Commerce Bank.

3       Q.   I have not been provided previously in this

4   litigation with copies of the closing documents from

5   the Digital Federal loan.  But to the extent you can

6   recall, Doctor -- and I am going to ask your counsel

7   to produce them -- do you recall what collateral was

8   pledged for that loan?

9       A.   Collateral was 25 Wiggins, per my personal

10  guarantee, and Sandy Point in Maine.

11      Q.   Did Digital Federal provide take-out

12  financing that took out the first mortgage on Sandy

13  Point, or are they in second position on Sandy

14  Point, do you recall?

15      A.   They took a second position.

16      Q.   Other than your comfort level with Mr.

17  Azia, was there anything that was superior about

18  Digital Federal Credit's financing offer to

19  Commerce's financing offer?

20      A.   The conditions, terms were more agreeable.

21  Some points are less than Commerce.  Most

22  importantly for me is the familiarity and trust that

23  you develop during the course of the times.  I am an

24  old-timer in that sense.  But that played a big

46

1  role.

2      Q.    Commerce, at the time of the closing of the

3  Digital Federal Credit loan, had an outstanding

4  credit line or credit facility to Toxikon, is that

5  right, an accounts receivable financing?

6      A.    Something like that, yes.

7      Q.    Do you recall when it was that Toxikon got

8  that line from Commerce Bank?

9      A.    When we started working with Commerce Bank.

10     Q.    Do you remember when that was?

11     A.    Early 2000, probably, or late, early --

12 somewhere in 2000, 2001.

13     Q.    Dr. Desai, did you think that Nancy and

14 Dexter had acted with the appropriate urgency in

15 April and May of 2003 to get financing to close the

16 original purchase and sale agreement?

17     A.    I am very sure.  They have been working

18 with me for many years, and I have no doubt about

19 that.

20     Q.    As the date came for closing that in either

21 late June, early July, and there was no financing

22 lined up, were you at all unhappy that they hadn't

23 been able to get financing lined up?

24     A.    I primarily do not blame anybody.

47

1  Actually, it's my responsibility.  I am the loser.
2  And they all gained.  Finally it comes to that.  I
3  was very convinced at a personal level of comfort,
4  so to speak, with the Eastern Bank which I had been
5  dealing with the last 20-some years.  I had no
6  reason to doubt why it wasn't coming through unless
7  otherwise they told me so.
8      Q.    Did you have a contact at that time at
9  Eastern Bank that you spoke to personally?
10     A.    I had two people, but I don't remember the
11 names.  Sorry.
12     Q.    Which office or branch did you deal with?
13     A.    Boston branch.  It is downtown somewhere.
14           MR. GRAY:  Let's take a couple of more
15 minutes.
16           (Recess taken)
17     BY MR. GRAY:
18     Q.    With respect to pursuing the financing from
19 Hudson, do you recall whether Bluestone or Nancy or
20 Dexter ever proposed to Hudson that they take
21 different collateral other than 15 Wiggins and
22 Indian Town Road, which you said you could not
23 pledge?
24     A.    No matter what we gave them, they were

48

1   totally insisting upon these collateral which would

2   not be given.  Every collateral was given to them.

3   And I think that they were not satisfied with

4   anything that I was giving.  They knew right from

5   the beginning what my options or deficiency or

6   inability to fund the property.  It was falling on

7   deaf ears.  And they knew almost everything that I

8   owned.  They knew.  And I was willing to pledge

9   everything that was there.  It was not sufficient.

10  But they were going after these two pieces which I

11  could not possibly give them.  If it was open and

12  free, I had no reason not to provide it.

13      Q.   With respect to the 15 Wiggins Avenue

14  Realty Trust, who was the trustee of that trust?

15      A.   15?  Trustee?  I don't know who is the

16  trustees, because I think it was originally --

17          MR. COHEN:  While he is thinking, why don't

18  we go off the record.

19          MR. GRAY:  That's fine.

20          (Discussion off the record)

21          MR. GRAY:  Let's strike that question.  I

22  will ask a different question.

23      Q.   What was the disability, to the best you

24  can recall, that prevented you from being able to

49

1    pledge any interest in 15 Wiggins Avenue as
2    collateral?

3        A.    There were restrictions that the bank posed
4    and that I have a contractual agreement with those
5    companies who was a mortgagee or mortgagor.  That's
6    what I was told by those banks.  I did contact them,
7    and that was given to me.  It was kept open.  They
8    were aware of it, all the things.  It was told
9    up-front to both Commerce and Hudson Realty,
10   Bluestone.  They all had my total obituaries, if you
11   want to say that one.  They had everything there.

12       Q.    To the best of your recollection, the
13   disability on both 15 Wiggins and Indian Town Road
14   was a prohibition by the existing mortgagees on any
15   secondary financing on the property?

16       A.    That's correct.

17       Q.    Do you have that understanding from
18   actually looking at the documents or from being told
19   that by someone or both?

20       A.    I believe it's both.

21       Q.    Do you have any recollection of who
22   informed you of that fact?

23       A.    Mostly by my controller and my accountant.

24       Q.    Do you know whether anyone ever approached

50

1    the mortgagees on those properties to ask if they
2    would permit some secondary financing or pledge of
3    that interest despite the fact that their mortgage
4    prohibited it?

5        A.    I really don't know.  I have no idea.  I
6    don't know.

7        Q.    Just to go back briefly to the Hudson
8    demand letter of late August 27.  And again, I
9    reference your affidavit for that date.  I don't
10   have the letter with me.  Do you recall whether you
11   or Toxikon ever responded that no break-up fee was
12   due because the letter agreement had expired?

13       A.    It's vague for me.  I really don't know how
14   it was handled afterwards, what response was
15   provided.

16       Q.    But it is fair to say that whatever
17   response was provided in late August or early
18   September would have been your position with respect
19   to why no break-up fee was owing?

20       A.    I had received no defined contract from
21   them stating this amount of money, these other
22   details, this is a date.  No commitment letter was
23   provided.  So I assumed I was in no violation of any
24   kind of agreement.

51

1          Q.    Your understanding that the break-up fee

2    was not due, then, is because since Hudson hadn't

3    committed to make a loan, you felt you had no

4    obligation to pay break-up fees; is that accurate?

5          A.    That is accurate.

6                MR. GRAY:   I think that's my last question

7    for the day.   Thank you, sir.

8                MR. COHEN:   I have no questions for you.

9                     (Whereupon, the deposition was

10                    concluded at 11:50 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              C E R T I F I C A T E

2        I, Laxman Desai, do hereby certify that I have

3    read the foregoing transcript of my testimony, and

4    further certify that said transcript (with/without)

5    suggested corrections is a true and accurate record

6    of said testimony.

7        Dated at Bedford MA, this 7th day of July ,

8    2005.

9

10

11

12                    *   *   *   *   *

13

14

15        On this 7th day of July , 2005,

16    before me, the undersigned Notary Public, personally

17    appeared ___Laxman S. Desai_____ and proved to

18    me through satisfactory evidence of identification,

19    which was driver' license and personally Known to the undersigned to be the person

20    whose name is signed above.

21

22

23    Notary Public

24    My commission expires: __Sept. 1, 2011

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                  )

3       I, Daniel P. Wolfe, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on the 29th day of June,

7   2005, at 10:00 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 5th day of July,

21  2005.

22

23                        Notary Public

24          My commission expires  9/18/09

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813