UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HUDSON REALTY CAPITAL LLC }
    Plaintiff }
}
v. }    CA NO. 1:04 CV 10243 MEL
}
LAXMAN S. DESAI }
    Defendant }

**AFFIDAVIT OF DEXTER WILLIAMS
IN OPPOSITION TO PLAINTIFF'S
RENEWED MOTION FOR
SUMMARY JUDGMENT**

Dexter Williams, on oath and personal knowledge, says and deposes as follows:

1.    My name is Dexter Williams. I am employed by Toxikon Corporation as its Controller and Chief Financial Officer, and have held this position since on or about March 2001.

2.    During calendar year 2003, I was asked by Dr. Desai to work with Nancy DiGiulio, Toxikon's Vice President of Operations, to secure additional office and laboratory space for Toxikon's growing business. Ms. DiGiulio and I worked together, she researching available properties. My work consisted primarily in the financial aspects of any potential acquisition transaction.

3.    After considering other properties, Dr. Desai eventually decided to acquire the commercial real estate at 25 Wiggins Avenue, Bedford, Massachusetts, an office/lab building located immediately adjacent to Toxikon's existing facility.

4.  A purchase and sales agreement was finalized with the owners of 25 Wiggins Avenue, a copy of which is hereto attached as *Exhibit A.* In pertinent part, the agreement provides that Dr. Desai would pay $4,850,000.00 for the property.

5.  In order to complete the acquisition of 25 Wiggins, Dr. Desai had to borrow most of the money needed. Dr. Desai retained the services of a real estate mortgage broker to procure the necessary financing to close the transaction, i.e. the purchase of 25 Wiggins by Dr. Desai.

6.  On or about July 1, 2003, Dr. Desai was presented with a "term sheet" from Hudson Realty Capital LLC (HRC), which is hereto attached as *Exhibit B.* The "term sheet" provides that that HRC is interested in making a loan in an amount not to exceed $5 million, collateralized by 25 Wiggins and by other assets owned or controlled by Dr. Desai to be determined by HRC, which would include a first mortgagee, an assignment of rents, leases, profits, and Dr. Desai's personal guaranties of compliance and repayment of all loans to be made, plus interest.

The "term sheet," *Exhibit B* hereto attached, specifically provided that " ... if the transaction contemplated ... is not consummated on or before July 31, 2003, then the terms and conditions set forth herein shall thereafter expire. ... Time shall be of the essence with respect to the foregoing expiration date... This proposal outlines the general terms and conditions under which Lender shall proceed and does not constitute a loan commitment, either express or implied, on behalf of the Lender, and does not impose any obligation on Lender to make the loan."

7.  I partially interpreted the "term sheet" to mean that HRC was to have the month of July 2003 to investigate and analyze Dr. Desai's ability to repay the money which would be borrowed. Typically, HRC would perform financial "due diligence" by examining Dr. Desai's and Toxikon's complete financial history. HRC would also review and analyze the business plan for the new facility. Using these component parts of financial due diligence, HRC would reach a conclusion that there was or was not a financial ability to keep HRC secure during the term of any proposed loan and that there was an ability to repay the borrowed money on the terms to be laid down.

8. I further interpreted the "term sheet," *Exhibit B* hereto attached, to require HRC to determine what additional collateral for the proposed loan would be needed to provide it with adequate assurances that even in the event of a default, HRC would be paid.

9. Lastly, because of pressure being exerted by the owners of 25 Wiggins on Dr. Desai to close the purchase/sales agreement, I interpreted the "term sheet," *Exhibit B* hereto attached, to require a firm loan commitment from HRC no later than July 31, 2003. In the absence of a firm loan commitment from HRC by that deadline, time being of the essence, I considered that Dr. Desai could walk way from HRC without obligation or liability and that HRC would also be free to commit its resources elsewhere after that date.

10. During July 2003, Ms. DiGiulio and I provided HRC with Dr. Desai's personal and corporate tax returns, banking information, personal and corporate financial statements, real estate deeds, real estate appraisals, real estate condition surveys, schedules and appraisals of personal and corporate personal property, business revenue projections, insurance information and other materials of a financial nature that HRC requested. No request from HRC was denied.

11. HRC was not satisfied with the financial information we provided, nor was it satisfied with the collateral Dr. Desai would be able to give to secure repayment of any loan to be made by HRC. Throughout July 2003, HRC requested additional collateral beyond 25 Wiggins itself. HRC requested that Dr. Desai pledge all of his other real estate holdings as collateral for this loan. Specifically, HRC wanted Dr. Desai to put up his family residence in Brookline, Massachusetts; his summer home in Ogunquit, Maine; his Florida real estate; and also Toxikon's principal office/laboratory facility located at 15 Wiggins Avenue, Bedford, Massachusetts.

12. During July 2003, Dr. Desai, Ms. DiGiulio and I provided the information requested by HRC on Dr. Desai's other real estate holdings, but with the explanations that Mrs. Desai would have to agree to include the family home in the collateral package; and that existing secured lenders on 15 Wiggins Avenue, Bedford, and on 675 Indiantown Road, Jupiter, Florida,

would have to give their consent to using those particular properties as further collateral for HRC.

13. Dr. Desai's personal residence is and had been owned by a trust controlled by Mrs. Desai for benefit of their daughter. Dr. Desai is neither a trustee or a beneficiary of this personal residence trust.

14. 15 Wiggins Avenue is and was owned by an entity other than Dr. Desai. The mortgage document securing the loan on that property does not permit Dr. Desai to assign or transfer any interest in 15 Wiggins Avenue, nor does it permit the property itself to be used as collateral for any other loan without the express written consent of that mortgage holder, which consent it could withhold for any reason, or for no reason at all. I am informed that Ms. DiGiulio verbally inquired of the willingness of that mortgage holder to so consent, but it would not do so. A true copy of the pertinent part of the mortgagee document concerning 15 Wiggins Avenue is hereto attached as *Exhibit C.*

15. 675 Indiantown Road, Jupiter Florida is an office building. Like 15 Wiggins Avenue, its mortgage document contained restrictions on alienation and required express written consent from the mortgagee before it could be used to collateralize a different loan agreement. A true copy of the pertinent part of this mortgagee document concerning 675 Indiantown Road is hereto attached as *Exhibit D.*

16. I am informed that Dr. Desai and Ms. DiGiulio told HRC that the collateral package for HRC could not and would not include 15 Wiggins Avenue and 675 Indiantown Road under any circumstances. Dr. Desai was willing, subject to Mrs. Desai's agreement, to pledge the family home to HRC, as part of the HRC transaction.

17. As of July 31, 2003, HRC was not satisfied with the collateral which Dr. Desai could provide to secure repayment of the proposed loan. There was thus no agreed upon collateral for the proposed loan as of July 31, 2003.

18. As of July 31, 2003, HRC had not presented me with any of the details of the loan package, i.e. the amount of the loan, the interest rate, maturity date, repayment terms applying to principal and interest; and most significantly, the details of any operational covenants and financial covenants to which Dr. Desai and Toxikon Corporation would have to adhere and comply, or be in default, and at the risk of losing all of the collateral pledged to the loan.

19. As of July 31, 2003, HRC had not issued a firm loan commitment letter or even a conditional loan commitment to Dr. Desai based on agreed loan amounts and agreed collateral.

20. As of July 31, 2003, Dr. Desai did not have the ability to consummate and close the purchase and sales agreement on 25 Wiggins Avenue as he did not have the necessary mortgage financing to pay the purchase price.

21. As of July 31, 2003, Dr. Desai had no mortgage financing arrangements with anyone as the only such dealings and efforts being made were with HRC and no one else.

22. As of July 31, 2003, HRC did not request an extension of time on the "term sheet," *Exhibit A*, clearly indicating to me that it had no further interest in making the loan unless it got all the collateral it demanded, some of which Dr. Desai could not give.

23. After July 31, 2003, I am informed of several further telephone calls and email exchanges between HRC and Ms. DiGiulio, but the proposed deal was essentially dead because collateral could not be agreed upon and the discussion never progressed to the point where actual promissory note terms and conditions were even proposed or discussed.

24. Finally, in late August 2003, Dr. Desai told Ms. DiGiulio and me that he was no longer pursuing HRC for the loan and that that had been communicated to HRC, through the loan broker. I had no other dealings with HRC after July 31, 2003.

25. Dr. Desai then instructed Ms. DiGiulio and me to come up with some way to save the substantial deposit he had paid towards the acquisition of 25 Wiggins Avenue since he was not going to be able to close that purchase.

26. By late August 2003, the owner of 25 Wiggins was not willing to further extend time for closing the purchase and sales agreement. August 29, 2003 was the deadline for the closing. Had HRC committed to a loan by July 31, 2003 deadline, Dr. Desai would have been able to close the 25 Wiggins Avenue acquisition on August 29, 2003. Instead, the owner was amenable to changing the deal to one in which Dr. Desai would lease 25 Wiggins and have an option to purchase it once financing could be arranged. Dr. Desai had no choice but to agree to the new arrangement, or lose the deposit money he had previously paid.

27. Dr. Desai entered into a lease/option agreement on 25 Wiggins Avenue. True copies of the Lease and the Option Agreement are hereto attached as *Exhibit E* and *Exhibit F*, respectively.

28. During the autumn of year 2003, Dr. Desai applied to Commerce Bank for mortgage financing to be able to close the 25 Wiggins sale. Commerce Bank was willing to lend purchase money financing to Dr. Desai, but only if Dr. Desai was willing to pledge 15 Wiggins Avenue to Commerce Bank as part of the collateral. Dr. Desai could not and would not do so. No loan was ever closed with Commerce Bank for the purchase of 25 Wiggins Avenue. A true copy of the Commerce Bank Commitment Letter dated December 10, 2003, is hereto attached as *Exhibit G.*

29. Ultimately, Dr. Desai acquired 25 Wiggins Avenue in June 2004 with financing provided by Digital Federal Credit Union.

Signed under the penalty of perjury on December   21  , 2006.

_____
Dexter Williams