## SECOND AMENDMENT TO OPTION AGREEMENT

**THIS SECOND AMENDMENT TO OPTION AGREEMENT** (this "**Amendment**") is made and entered into as of the 15th day of December, 2003, by and between Opta Food Ingredients, Inc., a Delaware corporation (hereinafter referred to as "**Seller**"), and Laxman S. Desai, an individual resident of Massachusetts (hereinafter referred to as "**Purchaser**").

WHEREAS, the parties hereto entered into that certain Option Agreement dated September 22, 2003, as amended by that certain First Amendment to Option Agreement dated November 25, 2003 (as amended, the "Agreement"), whereby Seller granted to Buyer, and Buyer accepted from Seller, an option to purchase the certain real property commonly known as 25 Wiggins Avenue, Bedford, Massachusetts, all as more particularly set forth in the Agreement; and

WHEREAS, Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

WHEREAS, each of the December Monthly Option Deposit and the Initial Option Deposit is due from Purchaser on or before December 15, 2003; and

WHEREAS, Seller and Purchaser desire to amend the Agreement to extend the due date for the Initial Option Deposit as more particularly set forth herein.

NOW THEREFORE, for and in consideration of the covenants, agreements and promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby covenant and agree as follows:

1.     Section 2.2.1 of Part I of the Agreement is hereby amended by deleting from the first line thereof the date "December 15, 2003" and replacing it with the date "December 18, 2003".

2.     Notwithstanding Section 2.2.2 of Part I of the Agreement, the December Monthly Option Deposit shall be due from Purchaser on or before December 18, 2003.

3.     Notwithstanding anything in the Agreement to the contrary, (a) each Deposit due from Purchaser under the Agreement after the date hereof (including, without limitation, the Initial Option Deposit and the December Monthly Option Deposit) shall be paid to Seller rather than to Escrow Agent, and (b) Purchaser acknowledges and agrees that each Deposit shall be (i) deemed earned when paid, and (ii) non-refundable to Purchaser; provided, however, that if the Closing shall occur, Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit paid by Purchaser under the Agreement.

4.     Consistent with paragraph 3 above, Purchaser hereby authorizes Escrow Agent, upon the mutual execution and delivery of this Amendment, to pay to Seller the October Monthly Option Deposit and the November Monthly Option Deposit previously made by Purchaser under the Agreement.

5.      Except as amended hereby the Agreement is unchanged and the Agreement as amended hereby is hereby ratified and confirmed.

6.      This Amendment may be executed in two or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Amendment.

*[Signatures on following page]*



**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment under seal as of the date first set forth above.

**SELLER**:

OPTA FOOD INGREDIENTS, INC.

By:_____
Name:
Its:

**PURCHASER**:

_____
Laxman S. Desai

## FIRST AMENDMENT TO OPTION AGREEMENT

**THIS FIRST AMENDMENT TO OPTION AGREEMENT** (this "**Amendment**") is made and entered into as of the 25th day of November, 2003, by and between Opta Food Ingredients, Inc., a Delaware corporation (hereinafter referred to as "**Seller**"), and Laxman S. Desai, an individual resident of Massachusetts (hereinafter referred to as "**Purchaser**").

WHEREAS, the parties hereto entered into that certain Option Agreement dated September 22, 2003 (the "Agreement"), whereby Seller granted to Buyer, and Buyer accepted from Seller, an option to purchase the certain real property commonly known as 25 Wiggins Avenue, Bedford, Massachusetts, all as more particularly set forth in the Agreement; and

WHEREAS, Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

WHEREAS, the Initial Option Deposit is due to Seller from Purchaser on or before December 1, 2003; and

WHEREAS, Seller and Purchaser desire to amend the Agreement to extend the due date for the Initial Option Deposit as more particularly set forth herein.

NOW THEREFORE, for and in consideration of the covenants, agreements and promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby covenant and agree as follows:

1.      <u>Section 2.2.1</u> of Part I of the Agreement is hereby amended by deleting from the first line thereof the date "December 1, 2003" and replacing it with the date "December 15, 2003".

2.      Except as amended hereby the Agreement is unchanged and the Agreement as amended hereby is hereby ratified and confirmed.

3.      This Amendment may be executed in two or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Amendment.

*[Signatures on following page]*

IN WITNESS WHEREOF, the parties hereto have executed this Amendment under seal as of the date first set forth above.

SELLER:

OPTA FOOD INGREDIENTS, INC.

By: _____

Name: _____

Its: _____

PURCHASER:

_____

Laxman S. Desai

TRA First Amendment to Option Agreement - 25 Wiggins Ave. Bedford MA

NOV. 26. 2003  11:26AM     G-OATE HALL & STEWART 6172434000                NO. 735    P. 9

IN WITNESS WHEREOF, the parties hereto have executed this Amendment under seal as of the date first set forth above.

SELLER:

OPTA FOOD INGREDIENTS, INC.

By:_____

Name:

Its:

PURCHASER:

Laxman S. Desai

TRA First Amendment to Option Agreement - 25 Wiggins Ave. Bedford MA.DOC

## OPTION AGREEMENT

**THIS OPTION AGREEMENT** (the "**Agreement**") is made and entered into as of the 22nd day of September 2003 (the "**Effective Date**"), by and between Opta Food Ingredients, Inc., a Delaware corporation (hereinafter referred to as "**Seller**"), and Laxman S. Desai, an individual resident of Massachusetts (hereinafter referred to as "**Purchaser**").

### RECITALS

WHEREAS, Purchaser is the controlling shareholder of Toxikon Corporation, a Massachusetts corporation ("Toxikon").

WHEREAS, Seller and Toxikon had entered into that certain Agreement of Purchase and Sale dated March 13, 2003, as amended by that certain First Amendment to Agreement of Purchase and Sale dated April 28, 2003, as further amended by that certain Second Amendment to Agreement of Purchase and Sale dated May 21, 2003, as further amended by that certain Third Amendment to Agreement of Purchase and Sale dated July 22, 2003, as further amended by that certain Fourth Amendment to Agreement of Purchase and Sale dated August 26, 2003, and as further amended by that certain Fifth Amendment to Agreement of Purchase and Sale dated September 12, 2003 (as amended, the "**Purchase Agreement**"), whereby Seller agreed to sell to Toxikon, and Toxikon agreed to purchase from Seller, the Property (as hereinafter defined); and

WHEREAS, Toxikon is unable to obtain the financing necessary to acquire the Property in accordance with the terms of the Purchase Agreement; and

WHEREAS, Seller is willing to grant to Purchaser, and Purchaser is willing to accept from Seller, an option to purchase the Property, all as more particularly set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

### *PART I: OPTION*

### ARTICLE I.

### Option, Purchase Price and Exercise of Option

**1.1     Option; Purchase Price.**  Seller hereby grants Purchaser an option (the "**Option**") to purchase the Property for a purchase price (the "**Purchase Price**") of Four Million Eight Hundred Fifty Thousand Dollars ($4,850,000.00).

**1.2     Exercise of Option.**  Purchaser must exercise the Option, if at all, by written notice to Seller (the "**Option Notice**") on or before 5:00 p.m. on September 22, 2004.

TRA 1828469_3.DOC

## ARTICLE II.

### Option Payments; Option Deposits

**2.1**    **Option Payments**. As set forth below, Purchaser shall pay, or cause to be paid, to Seller the Initial Option Payment, the Additional Option Payment and the Monthly Option Payments (each as defined below, and, collectively, the "**Option Payments**") in immediately available federal funds. Purchaser acknowledges and agrees that the Option Payments shall be (i) deemed earned when paid, and (ii) non-refundable to Purchaser; provided, however, that if the Closing shall occur, Purchaser shall receive a credit against the Purchase Price in the amount of the Initial Option Payment and the Additional Option Payment.

**2.1.1**    **Initial Option Payment**. Simultaneously with the mutual execution and delivery of this Agreement, Purchaser shall pay to Seller Four Hundred Thousand Dollars ($400,000.00) (the "**Initial Option Payment**"). In satisfaction of Purchaser's obligations under this Section 2.1.1, Toxikon hereby authorizes Escrow Agent, upon the mutual execution and delivery of this Agreement, to pay to Seller the "Deposit" and the "Closing Extension Payments" made by Toxikon under the Purchase Agreement (as such terms are defined therein).

**2.1.2**    **Additional Option Payment**. Simultaneously with the mutual execution and delivery of this Agreement, Purchaser shall pay to Seller One Hundred Thousand Dollars ($100,000.00) (the "**Additional Option Payment**").

**2.1.3**    **Monthly Option Payments**. On or before October 15, 2003, and on or before the 15th of each month thereafter during the term of this Agreement, Purchaser shall pay to Seller Thirty Thousand Dollars ($30,000.00) (each such payment a "**Monthly Option Payment**" and collectively, the "**Monthly Option Payments**").

**2.2**    **Option Deposits**. As set forth below, Purchaser shall deposit the Initial Option Deposit and the Monthly Option Deposits (each as defined below, and, collectively, the "**Deposit**") with Escrow Agent in immediately available federal funds. Purchaser acknowledges and agrees that once made, each Deposit shall be non-refundable to Purchaser (except as otherwise provided in this Agreement); provided, however, that if the Closing shall occur, Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit made.

**2.2.1**    **Initial Option Deposit**. On or before December 1, 2003, Purchaser shall deposit Seven Hundred Thousand Dollars ($700,000.00) (the "**Initial Option Deposit**") with Escrow Agent.

**2.2.2**    **Monthly Option Deposits**. On or before October 15, 2003, and on or before the 15th of each month thereafter during the term of this Agreement, Purchaser shall deposit Twenty Thousand Dollars ($20,000.00) (each such payment a "**Monthly Option Deposit**" and, collectively, the "**Monthly Option Deposits**") with Escrow Agent.

## ARTICLE III.

### Purchase Agreement

**3.1**   **Purchase Agreement**. This Agreement contains all the terms and provisions between Seller, Purchaser and Toxikon relative to the Property and the matters set forth herein and no prior or contemporaneous agreement or understanding pertaining to the same shall be of any force or effect. This Agreement supercedes the Purchase Agreement and the Purchase Agreement shall hereafter have no force or effect. Each party hereby releases the other from any and all damages, claims, actions, causes of action and obligations under the Purchase Agreement or relating thereto.

## *PART II – TERMS AND CONDITIONS*

### ARTICLE I.

### Property

**1.1**   **Property**. The Property to be conveyed hereunder shall mean and include all of Seller's right, title and interest in and to the following:

**1.1.1.**   **Land and Improvements**. That certain real property lying and being situated in Bedford, Massachusetts and commonly known as and numbered 25 Wiggins Avenue, being more particularly described on Exhibit A attached hereto and incorporated herein by reference thereto (the "**Land**"), together with the building and all other improvements located thereon (collectively, the "**Improvements**");

**1.1.2.**   **Real Property**. All rights, privileges and easements appurtenant to Seller's interest in the Land and the Improvements, if any, including, without limitation, all of Seller's right, title and interest, if any, in and to all mineral and water rights and all easements, licenses, covenants and other rights-of-way or other appurtenances used in connection with the beneficial use and enjoyment of the Land and the Improvements (the Land, the Improvements and all such easements and appurtenances are sometimes collectively referred to herein as the "**Real Property**");

**1.1.3.**   **Personal Property**. All machinery, equipment and fixtures, if any, owned by Seller and used in connection with the Real Property as of the Effective Date (as defined in Section 16.4 of this Agreement) (the "**Personal Property**"), but specifically excluding therefrom any trade fixtures of Seller, including without limitation, and equipment and machinery that is used in connection with Seller's business operations at the Property; and

**1.1.4.**   **Intangible Property**. All of the Seller's interest, if any, in and to any service, equipment, supply and maintenance contracts listed on Exhibit F attached hereto (the "**Contracts**"), all leases of the Real Property or the Improvements listed on Exhibit G attached hereto (the "**Leases**"), all plans, specifications and architectural or other drawings related to the Property (the "**Plans and Specifications**") and to any guarantees, licenses, approvals, certificates, permits and warranties relating to the Real Property or the Personal Property, to the extent assignable and in Seller's possession (the "**Intangible Property**"). (The Real Property,

TRA 1828469_3.DOC                    3

the Personal Property, the Contracts, the Leases, the Plans and Specifications and the Intangible Property are sometimes collectively hereinafter referred to as the "**Property**"). It is hereby acknowledged by the parties that Seller shall not convey to Purchaser claims relating to any real property tax refunds or rebates for periods accruing prior to the Closing, existing insurance claims, if any, as of the Effective Date and any existing claims against previous tenants of the Property, which claims shall be reserved by Seller.

## ARTICLE II.

### Purchase Price

**2.1     Purchase Price**. The Purchase Price, as adjusted by all prorations as provided for herein, shall be paid to Seller by Purchaser at Closing, as herein defined, by wire transfer of immediately available federal funds.

## ARTICLE III.

### Option Payments and Deposit

**3.1     Intentionally Omitted**.

**3.2     Intentionally Omitted**.

**3.3     Intentionally Omitted**.

**3.4     Timing**. If Purchaser shall fail to pay any of the Option Payments or deposit any Deposit within the time period provided for above, time being of the essence, Seller may terminate this Agreement by giving written notice to Purchaser and Escrow Agent, in which case this Agreement shall be null and void ab initio and in such event Escrow Agent shall immediately deliver to Seller all copies of this Agreement in its possession and thereafter neither party shall have any further rights or obligations to the other hereunder, except as otherwise set forth in this Agreement.

**3.5     Intentionally Omitted**.

**3.6     Interest Bearing**. The Deposit shall (a) be held in an interest-bearing escrow account by Escrow Agent and (b) include any interest earned thereon. To allow Escrow Agent to establish the interest bearing account, Purchaser and Seller shall indicate their respective tax identification numbers below their signature lines.

**3.6     Escrow Agent**. Escrow Agent is executing this Agreement to acknowledge Escrow Agent's responsibilities hereunder, which may be modified only by a written amendment signed by all of the parties. Any amendment to this Agreement that is not signed by Escrow Agent shall be effective as to the parties thereto, but shall not be binding on Escrow Agent. Escrow Agent shall accept the Deposit with the understanding of the parties that Escrow Agent is not a party to this Agreement except to the extent of its specific responsibilities hereunder, and does not assume or have any liability for the performance or non-performance of Purchaser or

Seller hereunder.   Additional provisions with respect to the Escrow Agent are set forth in Section 16.17.

## ARTICLE IV.

### Closing, Prorations and Closing Costs

**4.1**   **Closing**.   The closing of the purchase and sale of the Property shall occur on or before 10:00 a.m. Eastern time on the date that is fifteen (15) days after the date of Purchaser's Option Notice, and shall be held at the offices of Purchaser's lender's attorney, provided the same is located in downtown Boston and further provide that Purchaser shall provide notice of such location together with Purchaser's Option Notice, failing which the Closing shall be at the offices of Choate, Hall & Stewart, 53 State Street, Exchange Place, Boston, Massachusetts, or at such other place agreed to by Seller and Purchaser, or by a mutually acceptable escrow arrangement with the Escrow Agent.   "**Closing**" shall be deemed to have occurred when the Title Company (as defined in Section 6.1 of this Agreement) has been instructed by both parties to release escrow and to record the Deed. Time is hereby made of the essence. The date of Closing is referred to in this Agreement as the "**Closing Date**."

**4.2.**   **Prorations**.   All matters involving prorations or adjustments to be made in connection with Closing and not specifically provided for in some other provision of this Agreement shall be adjusted in accordance with this Section 4.2.   Except as otherwise set forth herein, all items to be prorated pursuant to this Section 4.2 shall be prorated as of midnight of the day immediately preceding the Closing Date, with Purchaser to be treated as the owner of the Property for purposes of prorations of income and expenses on and after the Closing Date.

**4.2.1.**   **Taxes**.   Real estate and personal property taxes and special assessments, if any, shall be prorated as of the Closing Date. Seller shall pay at or prior to Closing all real estate and personal property taxes and special assessments attributable to the Property to, but not including, the Closing Date.   If the real estate and/or personal property tax rate and assessments have not been set for the year in which the Closing occurs, then the proration of such taxes shall be based upon the rate and assessments for the preceding tax year and such proration shall be adjusted in cash between Seller and Purchaser upon presentation of written evidence that the actual taxes paid for the year in which the Closing occurs differ from the amounts used in the Closing in accordance with Section 4.2.5 hereof. All taxes imposed due to a change of use of the Property after the Closing Date shall be paid by the Purchaser. If any taxes which have been apportioned shall subsequently be reduced by abatement, the amount of such abatement, less the cost of obtaining the same shall be equitably apportioned between the parties hereto.

**4.2.2.**   **Insurance**.   There shall be no proration of Seller's insurance premiums or assignment of Seller's insurance policies.   Purchaser shall be obligated (at its own election) to obtain any insurance coverage deemed necessary or appropriate by Purchaser.

**4.2.3.**   **Utilities**.   All telephone, cable, electric, sewer, water and other utility bills, trash removal bills, janitorial and maintenance service bills and all other operating expenses relating to the Property and allocable to the period prior to the Closing Date shall be determined and paid by Seller before Closing, if possible, or shall be paid thereafter by Seller or adjusted

between Purchaser and Seller immediately after the same have been determined. Seller shall use reasonable efforts to ensure that all utility meters will be read as of the Closing Date. Purchaser shall cause all utility services to be placed in Purchaser's name as of the Closing Date. If permitted by the applicable utilities, all utility deposits in Seller's name shall be assigned to Purchaser as of the Closing Date and Seller shall receive a credit therefor at Closing.

      **4.2.4. Contracts**. All amounts payable under the Contracts accepted and assumed by Purchaser shall be prorated and adjusted as of the Closing Date.

      **4.2.5. Calculations**. For purposes of calculating prorations, Purchaser shall be deemed to hold title to the Property, and, therefore entitled to the income therefrom and responsible for the expenses thereof for the entire day upon which the Closing occurs. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty five (365) day year. The amount of such prorations shall be initially performed at Closing but shall be subject to adjustment in cash after the Closing as and when complete and accurate information becomes available (or as soon thereafter as may be practicable). Seller and Purchaser agree to cooperate and use their best efforts to make such adjustments no later than sixty (60) days after the Closing (or as soon thereafter as may be practicable). Except as set forth in this Section 4.2, all items of income and expense which accrue for the period prior to the Closing will be for the account of Seller and all items of income and expense which accrue for the period on and after the Closing will be for the account of Purchaser. The provisions of Section 4.2 shall survive the Closing.

      **4.2.6. Prepaid Items**. Any prepaid items, including, without limitation, fees for licenses which are transferred to the Purchaser at the Closing and annual permit and inspection fees, shall be apportioned between the Seller and the Purchaser at the Closing.

      **4.2.7 Rents/Tenant Charges**. At Closing, all rents actually paid and collected, and any other charges owing and which have been collected by Seller for or in respect of the month in which the Closing occurs shall be prorated as of and through the Closing Date in accordance with Section 4.2.5, and the prorated amount attributable to the period following the Closing shall be credited against the Purchase Price. After Closing, Purchaser shall deliver to Seller any and all rents accrued but uncollected as of the Closing Date to the extent subsequently collected by Purchaser; provided, however, Purchaser shall apply such rents received after Closing first to payment of current rent then due, and thereafter to delinquent rents (other than "true up" payments received from tenants attributable to a year-end reconciliation of actual and budgeted pass-through payments which shall be allocated among Seller and Purchaser pro rata in accordance with their respective period of ownership as set forth in Section 4.2.5). Seller shall have the right, after Closing, to proceed against tenants for rents allocable to the period of Seller's ownership of the Property; provided, however, that Seller shall not have the right to evict any tenant. Purchaser agrees that it shall use commercially reasonable efforts to collect all pass-through rents payable by tenants and any delinquent rents (provided, however, that Purchaser shall have no obligation to institute legal proceedings, including an action for unlawful detainer, against a tenant owing delinquent rents). Any common area maintenance charges and other charges and expenses payable by the tenants under the Leases (collectively, the "Tenant Charges") on an estimated basis shall be reconciled against actual charges and expenses as of

and at the Closing, to the extent then possible. Rents and any other sums due from tenants which are in arrears or are not yet due and payable on the Closing Date shall be adjusted and apportioned if, as and when collected by other Seller or Purchaser, and shall be first applied to the most recent obligations of the payor. Thereafter, Seller and Purchaser shall cooperate and adjust the actual charges and expenses as provided in Section 4.2.5. If the final reconciliation shows that Purchaser or Seller owes the other additional sums, the party owing such sums shall pay such amount to the other party within ten (10) days after Purchaser's receipt of the final reconciliation. Other than as set forth in this Section 4.2.7, there shall be no further reconciliation of such Tenant Charges and they shall be presumed to be accurate. The provisions of this Section 4.2.7 shall survive the Closing.

4.3.    **Closing Costs**. All transfer taxes or documentary stamps on the deed shall be paid by Seller. Purchaser shall be responsible for title examination costs, title insurance premiums for any title insurance (including any extended coverage and endorsements) required by Purchaser or Purchaser's lender (if any), and all other costs associated with Purchaser's due diligence and Purchaser's financing costs. Except as provided in Section 16.16, each party shall be responsible for its own attorney's fees. Any costs and expenses incurred by Escrow Agent (including, without limitation, reasonable attorneys' fees in connection with any dispute hereunder involving Escrow Agent as escrowee of the Deposit), shall be split equally between the parties. All other fees or charges not specified shall be paid in accordance with the standard custom and practice prevailing in Middlesex County, Massachusetts.

## ARTICLE V.

### Right of Inspection.

5.1.    **Right of Inspection**. Commencing on the Effective Date, Purchaser and its agents shall have the right during normal business hours, with reasonable advance notice to Seller (such notice to be no less than twenty-four (24) hours, but which such notice may be given verbally), at Purchaser's sole cost and expense and at Purchaser's and its agents' sole risk, to perform inspections and tests of the Property and to perform such other analyses, inquiries and investigations as Purchaser shall deem necessary or appropriate; provided, however, that in no event shall (i) such inspections or tests unreasonably disrupt or disturb the on-going operation of the Property or the rights of the tenants at the Property, or (ii) Purchaser or its agents or representatives conduct any physical testing, drilling, boring, sampling or removal of, on or through the surface of the Property (or any part or portion thereof) including, without limitation, any ground borings or invasive testing of the Improvements (collectively, "**Physical Testing**"), without Seller's prior written consent, which consent may be given or withheld in Seller's sole and absolute discretion. In the event Purchaser desires to conduct any such Physical Testing of the Property, then Purchaser shall submit to Seller, for Seller's approval, a written detailed description of the scope and extent of the proposed Physical Testing, which approval may be given or withheld in Seller's sole and absolute discretion. If Seller does not approve the Physical Testing or approves only a portion thereof, Purchaser may, at its option, by sending written notice to Seller, elect to either (i) terminate this Agreement or (ii) conduct that portion of the Physical Testing approved by Seller, if any. In the event Purchaser terminates this Agreement as aforesaid, this Agreement shall terminate and be of no further force and effect other than the Surviving Termination Obligations (as defined in Section 16.12 of this Agreement). In no event

TRA 1828469_3.DOC                    7

shall Seller be obligated as a condition of this transaction to perform or pay for any environmental remediation of the Property recommended by any such Physical Testing. After making such tests and inspections, Purchaser agrees to promptly restore the Property to substantially the same condition that existed prior to such tests and inspections (which obligation shall survive the Closing or any termination of this Agreement). Prior to Purchaser entering the Property to conduct the inspections and tests described above, Purchaser shall obtain and maintain, at Purchaser's sole cost and expense, and shall deliver to Seller evidence satisfactory to Seller of, the following insurance coverage, and shall cause each of its agents and contractors to obtain and maintain, and, upon request of Seller, shall deliver to Seller evidence of, the following insurance coverage: general liability insurance, from an insurer reasonably acceptable to Seller, in the amount of One Million and No/100 Dollars ($1,000,000.00) combined single limit for personal injury and property damage per occurrence, such policy to name Seller as an additional insured party, which insurance shall provide coverage against any claim for personal liability or property damage caused by Purchaser or its agents, employees or contractors in connection with such inspections and tests. The aforementioned insurance may be obtained under a blanket policy carried by Purchaser or its agents, consultants or contractors, as the case may be. Seller shall have the right, in its discretion, to accompany Purchaser and/or its agents during any inspection provided Seller or its agents do not unreasonably interfere with Purchaser's inspection.

     5.2.   **Inspection Obligations and Indemnity**. Purchaser and its agents and representatives shall: (a) not interfere with the operation and maintenance of the Real Property; (b) not damage any part of the Property or any personal property thereon; (c) not injure or otherwise cause bodily harm to Seller, its agents, contractors and employees; (d) promptly pay when due the costs of all tests, investigations and examinations ordered or requested by Purchaser to be done with regard to the Property; (e) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder; (f) restore the Improvements and the surface of the Real Property to substantially the same condition that existed in which the same was found before any such inspection or tests were undertaken; and (g) not reveal or disclose any information obtained concerning the Property to anyone outside Purchaser's organization other than its agents, consultants and representatives and prospective lenders and their agents and consultants for underwriting purposes and except as otherwise required by applicable law. Purchaser shall, at its sole cost and expense, comply with all applicable federal, state and local laws, statutes, rules, regulations, ordinances or policies in conducting its inspection of the Property and Physical Testing. Except to the extent caused by the negligence or intentional act of Seller, its employees or agents, Purchaser shall and does hereby agree to assume all risk and to indemnify, defend and hold the Seller, its stockholders, officers, directors, employees, agents, attorneys and their respective successors and assigns, harmless from and against any and all claims, demands, suits, obligations, payments, damages, losses, penalties, liabilities, costs and expenses (including but not limited to attorneys' fees) arising out of Purchaser's or Purchaser's agents' actions taken in, on or about the Property in the exercise of the inspection rights granted pursuant to Section 5.1, including, without limitation, (i) claims made by any tenant against Seller for any interference with any tenant's use or damage to its premises or property in connection with Purchaser's review of the Property, and (ii) Purchaser's obligations pursuant to this Section 5.2; provided, however, that the foregoing indemnity shall not apply to Purchaser's discovery of hazardous substances or materials (as defined in clause (f) of Section 8.2) or any other adverse condition in or about the Property, unless and only to the extent that Purchaser, its

TRA 1828469_3.DOC        8

agents, or representatives (A) cause a release of any such hazardous substances or materials or (B) otherwise exacerbate any such existing condition. This Section 5.2 shall survive the Closing and/or any termination of this Agreement.

**5.3. Seller Deliveries.** Purchaser acknowledges that Seller has delivered to Purchaser (and hereafter, upon reasonable request of Purchaser, Seller shall continue to make the same available to Purchaser) all of the items specified on Exhibit B attached hereto (the "**Documents**"), and Purchase further acknowledges that Seller makes no representations or warranties of any kind regarding the accuracy, thoroughness or completeness of or conclusions drawn in the information contained in such documents, if any, relating to the Property. Purchaser hereby waives any and all claims against Seller arising out of the accuracy, completeness, conclusions or statements expressed in materials so furnished and any and all claims arising out of any duty of Seller to acquire, seek or obtain such materials. Notwithstanding anything contained in the preceding sentence, Seller has not and will not deliver or make available to Purchaser Seller's internal memoranda, attorney-client privileged materials, internal appraisals and economic evaluations of the Property, and reports regarding the Property prepared by Seller or its affiliates solely for internal use or for the information of the investors in Seller. Purchaser acknowledges that any and all of the Documents that are not otherwise known by or available to the public are proprietary and confidential in nature and will be delivered to Purchaser solely to assist Purchaser in determining the feasibility of purchasing the Property. Purchaser agrees not to disclose such non-public Documents or any of the provisions, terms or conditions thereof to any party outside of Purchaser's organization other than its agents, consultants and representatives and prospective lenders and agents and consultants for underwriting purposes. Purchaser shall return all of the Documents on or before three (3) business days after this Agreement is terminated for any reason. This Section 5.3 shall survive any termination of this Agreement without limitation.

**5.4. Independent Examination.** Purchaser is relying upon its own independent examination of the Property and all matters relating thereto and, except for the warranties and representations of Seller expressly set forth herein, not upon any statements of Seller (excluding the limited matters expressly represented by Seller in Article VII hereof) or of any officer, director, employee, agent or attorney of Seller with respect to acquiring the Property. Seller shall not be deemed to have represented or warranted the completeness or accuracy of any studies, investigations and reports heretofore or hereafter furnished to Purchaser. The provisions of this Section 5.4 shall survive Closing and/or termination of this Agreement.

**5.5. Intentionally Omitted.**

**5.6. Copies of Reports.** As additional consideration for the transaction contemplated herein, Purchaser agrees that it will provide to Seller, within five (5) days following a written request therefor, copies of any and all final reports, tests or studies relating to the Property, including but not limited to those involving environmental matters. Notwithstanding any provision of this Agreement, no termination of this Agreement shall terminate Purchaser's obligations pursuant to the foregoing sentence.

**5.7. Intentionally Omitted.**

TRA 1828469_3.DOC                 9

**5.8.** **Purchaser's Approvals**. From and after the Effective Date Purchaser may apply for and obtain all licenses, permits and approvals (if any) required by applicable governmental authorities (including, without limitation, the Town of Bedford) necessary for the operation of Purchaser's business at the Property (collectively, hereinafter called the "**Approvals**"), all at Purchaser's sole cost and expense; provided, however, that no Approvals shall be effective against the Property unless and until Purchaser shall acquire the Property. Seller agrees, at no cost to Seller, to execute any applications or authorization letters reasonably acceptable to Seller in support of the Approvals.

**5.9.** **Intentionally Omitted**.

## ARTICLE VI.

### Title and Survey Matters

**6.1.** **Title**. Purchaser and Seller hereby agree that (i) all non-delinquent property taxes and assessments, (ii) all matters created by, through or under Purchaser, including, without limitation, any documents or instruments to be recorded as part of any financing for the acquisition of the Property by Purchaser, (iii) local, state and federal laws, ordinances or governmental regulations, including, but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property, and (iv) any title exception or survey matter disclosed on the title insurance commitment for an Owner's Policy of Title Insurance (the "**Commitment**"), issued by Fidelity National Title Insurance Company of New York (the "**Title Company**"), covering the Real Property and with an effective date of September 9, 2003 (a copy of which Commitment is attached hereto as Exhibit I), shall constitute "**Permitted Exceptions**"; provided, however, that any (x) any title or survey matter first arising after the effective date of the Commitment and (y) real estate taxes other than those real estate taxes not yet due and payable as of the Closing Date, shall not be deemed a Permitted Exception. Except as set forth in Section 5.8 herein, without Seller's prior written consent, Purchaser shall not make any application to any governmental agency for any permit, approval, license or other entitlement for the Property or the use or development thereof. Notwithstanding anything to the contrary, except as required in Section 13.1, in no event shall Seller be obligated to remove or cure any title exceptions or survey matters, except only that Seller shall be obligated to remove at Seller's sole cost and expense (a) any mortgages securing any financing created or assumed in writing by Seller, and (b) any other monetary liens created by or against Seller, which are shown on the Commitment or first arise after the effective date of the Commitment without the requirement that Purchaser notify Seller of such matters or that the same are objections to title.

## ARTICLE VII.

### Representations and Warranties of the Seller

**7.1.** **Seller's Representations**. Seller represents and warrants that the following matters are true and correct as of the Effective Date with respect to the Property.

**7.1.1.** **Authority**. Seller is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. This Agreement has been duly

authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and does not violate any provision of any material agreement or judicial order, judgment, writ, injunction or decree of any court or governmental authority to which Seller is a party or to which Seller is subject. All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Seller, and (ii) be legal, valid and binding obligations of Seller.

**7.1.2. No Violations**. To the best of Seller's knowledge, this Agreement does not violate any provision of any material agreement or judicial order, judgment, writ, injunction or decree of any court or governmental authority to which Seller is a party or to which Seller is subject, and all documents to be executed by Seller which are to be delivered at Closing, will not, at the time of Closing, violate any provision of any material agreement or judicial order, judgment, writ, injunction or decree of any court or governmental authority to which Seller is a party or to which Seller is subject.

**7.1.3. Consents**. To the best of Seller's knowledge, no consent, approval, order or authorization of, or registration, declaration or filing, with any court, administrative agency or commission or other governmental entity, authority or instrumentality, domestic or foreign, or any third party, is required to be obtained or made by or with respect to Seller in connection with the execution and delivery by Seller of this Agreement or the consummation of the transaction contemplated hereby, other than those, the failure of which to obtain or make would not, individually or in the aggregate, materially delay or impair the ability of Seller to consummate the transactions contemplated by this Agreement.

**7.1.4. Bankruptcy or Debt of Seller**. Seller has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally. Seller has received no written notice of (i) the filing of an involuntary petition by Seller's creditors, (ii) the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, or (iii) the attachment or other judicial seizure of all, or substantially all, of Seller's assets.

**7.1.5. Litigation**. To the current, actual knowledge of Seller, there are no judgments unsatisfied against Seller or the Property or consent decrees or injunctions to which the Property is subject or to which Seller is subject that would affect Seller's ability to convey the Property in accordance with the terms hereof and there is no litigation or proceeding pending of which Seller has been served with pleadings or has received written notice or which has been threatened in writing against or relating to Seller or the Property.

**7.1.6. Leases**. The only leases, tenancies, licenses, rights to use and occupancy agreements and amendments thereto in force for the Property as of the Effective Date are the Leases. Copies of the Leases delivered to Purchaser by Seller are true, accurate and complete copies of such Leases. To the best of Seller's knowledge, each of the Leases is in full force and effect and neither Seller nor any of the tenants under the Leases is in default thereunder.

**7.1.7. Contracts**. The list of Contracts set forth on Exhibit F is a true, complete and correct list of all service, equipment, supply and maintenance contracts or agreements

TRA 1828469_3.DOC                    11

involving the Property as of the date hereof. To the best of Seller's knowledge, each of the Contracts is in full force and effect and neither Seller not any other party under the Contracts is in default thereunder.

**7.1.8. No Notices.** To the best of Seller's knowledge, Seller has not received any written notices from governmental agencies or any other parties with respect to any pending or threatened condemnation proceedings with respect to the Property, or any proceeding which could or would cause the change, redefinition or other modification of the zoning classification, or of any building or environmental code requirements applicable to the Property, or any part thereof, or other matter concerning the Property.

**7.1.9. No Special Assessments** To the best of Seller's knowledge, Seller has not received written notice of any special assessment which would result in an increase in the real property tax assessment or other amounts due to municipal authorities with respect to the Property.

**7.1.10. No Other Sale.** Seller has not committed nor obligated itself in any manner whosoever to sell the Property or any interest therein to any party other than Purchaser.

**7.1.11. Foreign Person.** Seller is not a foreign person within the meaning of Section 1445(f) of the Internal Revenue Code, and Seller agrees to execute any and all documents necessary or required by the Internal Revenue Service or Purchaser in connection with such declaration(s).

**7.2.     Seller's Knowledge.** For purposes of this Agreement and any document delivered at Closing, whenever the phrases "to the best of Seller's knowledge", "to the current, actual, conscious knowledge of Seller" or the "knowledge" of Seller or words of similar import are used, they shall be deemed to refer to the current, actual, conscious knowledge only, of the Seller, and shall not include any implied, imputed or constructive knowledge of Seller and shall not constitute any representation that Seller has made or is obligated to make any independent investigation or have any implied duty to investigate.

**7.3.     Change in Representation/Waiver.** Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Purchaser shall not be entitled to rely on any representation made by Seller in this Article VII to the extent, prior to or at Closing, Purchaser shall have or obtain actual knowledge of any information that was contradictory to such representation or warranty; provided, however, if Purchaser determines prior to Closing that there is a breach of any of the representations and warranties made by Seller above, or discovers that any of the representations are inaccurate in any material way, or learns of any pending legal proceedings or administrative actions or any violations of existing laws, ordinances, regulations and building codes affecting the Property which would otherwise enable Purchaser to terminate this Agreement in accordance with its terms, then Purchaser may, at its option, by sending to Seller written notice of its election either (i) terminate this Agreement or (ii) waive such breach and proceed to Closing with no adjustment in the Purchase Price and Seller shall have no further liability as to such matter thereafter. In the event Purchaser terminates this Agreement for the reasons set forth above, the Deposit (to the extent made by Purchaser) shall be immediately refunded to Purchaser and neither Purchaser nor Seller shall thereafter have any other rights or

remedies hereunder other than under <u>Section 16.12</u> hereof. In furtherance thereof, Seller shall have no liability with respect to any of the foregoing representations and warranties or any representations and warranties made in any other document executed and delivered by Seller to Purchaser, to the extent that, prior to the Closing, Purchaser discovers or learns of information (from whatever source as a result of Purchaser's due diligence tests, investigations and inspections of the Property, or disclosure by Seller or Seller's agents and employees) that contradicts any such representations and warranties, or renders any such representations and warranties untrue or incorrect, and Purchaser nevertheless consummates the transaction contemplated by this Agreement.

    ·    **7.4.** **Survival.** The express representations and warranties made in <u>Section 7.1.1</u> above by Seller shall not merge into any instrument or conveyance delivered at the Closing; provided, however, that any action, suit or proceeding with respect to the truth, accuracy or completeness of such representations and warranties shall be commenced, if at all, on or before the date which is nine (9) months after the date of the Closing and, if not commenced on or before such date, thereafter such representations and warranties shall be void and of no force or effect.

## ARTICLE VIII.

### Representations and Warranties of Purchaser

    **8.1.** Purchaser represents and warrants to Seller that the following matters are true and correct as of the Effective Date.

    **8.1.1** **Authority.** Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. This Agreement has been duly authorized, executed and delivered by Purchaser, is the legal, valid and binding obligation of Purchaser. All documents to be executed by Purchaser which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Purchaser, and (ii) be the legal, valid and binding obligations of Purchaser.

    **8.1.2** **No Violations.** To the best of Purchaser's knowledge, this Agreement does not violate any provision of any material agreement or judicial order, judgment, writ, injunction or decree of any court or governmental authority to which Purchaser is a party or to which Purchaser is subject, and all documents to be executed by Purchaser which are to be delivered at Closing, at the time of Closing, will not violate any provision of any agreement or judicial order, judgment, writ, injunction or decree of any court or governmental authority to which Purchaser is a party or to which Purchaser is subject.

    **8.1.3** **Consents.** To the best of Purchaser's knowledge, no consent, approval, order or authorization of, or registration, declaration or filing, with any court, administrative agency or commission or other governmental entity, authority or instrumentality, domestic or foreign, or any third party, is required to be obtained or made by or with respect to Purchaser in connection with the execution and delivery by Purchaser of this Agreement or the consummation of the transaction contemplated hereby, other than those, the failure of which to obtain or make

would not, individually or in the aggregate, materially delay or impair the ability of Purchaser to consummate the transactions contemplated by this Agreement.

8.1.3. **Bankruptcy or Debt of Purchaser**. Purchaser has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by Purchaser's creditors, suffered the appointment of a receiver to take possession of all, or substantially all, of Purchaser's assets, suffered the attachment or other judicial seizure of all, or substantially all, of Purchaser's assets, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally.

8.1.4. **Litigation**. To the current, actual knowledge of Purchaser, there are no judgments unsatisfied against Purchaser or consent decrees or injunctions to which Purchaser is subject that would affect Purchaser's ability to acquire the Property in accordance with the terms hereof and there is no litigation or proceeding pending of which Purchaser has been served with pleadings or has received written notice or which has been threatened in writing against or relating to Purchaser that would affect Purchaser's ability to acquire the Property.

8.2. **Purchaser's Acknowledgment**. Purchaser acknowledges and agrees that, except as expressly provided in this Agreement, Seller has not made, does not make and specifically disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (a) the nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (b) the income to be derived from the Property, (c) the suitability of the Property for any and all activities and uses which Purchaser may conduct thereon, (d) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, including, without limitation, the Americans with Disabilities Act and any rules and regulations promulgated thereunder or in connection therewith, (e) the habitability, merchantability or fitness for a particular purpose of the Property, or (f) any other matter with respect to the Property, and specifically that Seller has not made, does not make and specifically disclaims any representations regarding solid waste, as defined by the U.S. Environmental Protection Agency regulations at 40 C.F.R., Part 261, or the disposal or existence, in or on the Property, of any hazardous substance, as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and applicable state laws and regulations promulgated thereunder. Purchaser further acknowledges and agrees that, except as expressly provided in this Agreement, having been given the opportunity to inspect the Property, Purchaser is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller. Purchaser further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information. **Purchaser further acknowledges and agrees that, except as expressly provided in this Agreement, the Deed or any other closing documents to be delivered by Seller pursuant to the terms and provisions hereof, and as a material inducement to the execution and delivery of this Agreement by Seller, the sale of the Property as provided for herein is made on an "AS IS, WHERE IS" CONDITION AND BASIS "WITH ALL FAULTS."** Purchaser acknowledges, represents and warrants that Purchaser is not in a significantly disparate bargaining position with

respect to Seller in connection with the transaction contemplated by this Agreement; that Purchaser freely and fairly agreed to this acknowledgment as part of the negotiations for the transaction contemplated by this Agreement; that Purchaser is represented by legal counsel in connection with this transaction and Purchaser has conferred with such legal counsel concerning this waiver.

8.3.    **Purchaser's Release**. Purchaser on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges, Seller, Seller's affiliates, Seller's investment manager, property manager, the partners, trustees, shareholders, beneficiaries, directors, officers, employees, attorneys and agents of each of them, and their respective heirs, successors, personal representatives and assigns from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with (i) the physical condition of the Property, (ii) the condition of title to the Property, (iii) the presence on, under or about the Property of any hazardous or regulated substance, or (iv) the Property's compliance with any applicable federal, state or local law, rule or regulation, except such as arises out of breach of any of the representations and warranties of Seller set forth in Article VII, or Seller's fraud or intentional tortious wrongdoing. The terms and provisions of this Section 8.3 shall survive Closing and/or termination of this Agreement.

8.4.    **Survival**. The express representations and warranties made in Section 8.1.1 above by Purchaser shall not merge into any instrument of conveyance delivered at the Closing; provided, however, that any action, suit or proceeding with respect to the truth, accuracy or completeness of all such representations and warranties shall be commenced, if at all, on or before the date which is nine (9) months after the date of the Closing and, if not commenced on or before such date, thereafter shall be void and of no force or effect.

## ARTICLE IX.

### Seller's Interim Operating Covenants.

9.1.    **Operations**. Seller agrees, to the extent reasonable in its sole judgment, to continue to operate, manage and maintain the Improvements through the Closing Date in the ordinary course of Seller's business and substantially in accordance with Seller's present practice, subject to ordinary wear and tear and further subject to Article XII of this Agreement. Notwithstanding the foregoing, except as may otherwise be required in an emergency situation, from and after the date of Purchaser's Option Notice, Seller shall not make any material alteration to the Property without Purchaser's prior written consent, which in each case may be withheld in Purchaser's sole discretion but which shall be deemed granted if Purchaser fails to respond to a request for approval within five (5) business days after receipt of the request therefor together with a description of the proposed material alteration.

9.2.    **Maintain Insurance**. Seller agrees to maintain until the Closing Date fire and extended coverage insurance on the Property which is at least equivalent in all material respects to the insurance policies covering the Real Property and the Improvements as of the Effective Date.

TRA 1828469_3.DOC                    15

**9.3.** **Personal Property**. Seller agrees not to transfer or remove any Personal Property from the Improvements after the date of Purchaser's Option Notice except for repair or replacement thereof. Any items of Personal Property replaced after the date of Purchaser's Option Notice shall be promptly installed prior to Closing and shall be of substantially similar quality to the item of Personal Property being replaced.

**9.4** **Exclusivity**. From and after the Effective Date, and unless and until the termination of this Agreement, Seller shall not (a) market or show the Property to any other prospective purchasers, (b) solicit offers from prospective purchasers of the Property, and (c) accept any other offers for the sale of the Property or enter into any option agreements, letters of intent or purchase and sale agreements with respect to the sale of the Property.

**9.5** **New Leases**. From and after the date of Purchaser's Option Notice, Seller shall not renew, modify, cancel, waive any default under, accept surrender of, or accept any advance rental under any Lease nor shall Seller enter into any brokerage agreements, new leases, or other agreements (written or oral) relating to the occupancy of any portion of the Property without in each case obtaining the prior written consent of Purchaser, which in each case may be withheld in Purchaser's sole discretion but which shall be deemed granted if Purchaser fails to respond to a request for consent within five (5) business days after receipt of the request therefor together with a summary of lease terms and credit information of the proposed tenant. Any such new leases or other agreements relating to the occupancy of any portion of the Property which are entered into by Seller after the date hereof and which are consented or deemed consented to by Purchaser shall be deemed to be a "Lease" for purposes hereof.

**9.6** **New Contracts**. From and after the date of Purchaser's Option Notice, Seller shall not enter into or renew any management, service, guaranty, warranty or other contracts or agreements in any way relating to the Property, nor modify or agree to any modifications of any of the terms or conditions of any Contract (unless the same are cancelable upon not more than thirty (30) days notice and without premium or penalty) without obtaining the prior written consent of Purchaser, which in each case may be withheld in Purchaser's sole discretion but which shall be deemed granted if Purchaser fails to respond to a request for consent within five (5) business days after receipt of the request therefor together with a summary of business terms of the proposed contract. Any such new contracts are entered into by Seller after the date hereof and which are consented or deemed consented to by Purchaser shall be deemed to be a "Contract" for purposes hereof.

**9.7** **Compliance with Leases and Contracts**. Seller shall comply in all material respects with all of the obligations of the landlord under the Leases and with any and all Contracts.

**9.8** **Cancellation of Contracts**. At the direction of Purchaser at any time from and after the date of Purchaser's Option Notice, Seller will send to the service providers notice of termination of any Contracts, and Seller shall use good faith and reasonable efforts to make the termination of the Contracts effective as of the Closing Date (it being understood and agreed, however, that the termination date shall be governed by the termination provisions set forth in the applicable Contracts).

TRA 1828469_3.DOC                          16

**9.9    Change in Condition.**  To the extent that Seller shall become aware of any material change in any material condition with respect to the Property or of any other material event or condition which makes any of the limited matters expressly represented by Seller in Article VII hereof materially untrue, Seller shall promptly notify Purchaser of the same.

**9.10    SNDAs; Tenant Estoppels.**  At the request of Purchaser, Seller shall use reasonable, good-faith efforts to obtain the signatures of the tenants under the Leases to a subordination, non-disturbance and attornment agreement and/or a tenant estoppel certificate provided by or on behalf of Purchaser.

## ARTICLE X.

### Closing Conditions.

**10.1.    Conditions to Obligations of Seller.**  The obligations of Seller under this Agreement to sell the Property and consummate the other transactions contemplated hereby shall be subject to the satisfaction of the following conditions on or before the Closing Date except to the extent that any of such conditions may be waived by Seller in writing at Closing.

**10.1.1. Representations, Warranties and Covenants of Purchaser.**  All representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing Date, with the same force and effect as if such representations and warranties were made anew as of the Closing Date.  Any changes to such representations disclosed by Purchaser pursuant to Section 11.1.4 shall be acceptable to Seller, and Purchaser shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser prior to the Closing Date.

**10.1.2. No Orders.**  No order, writ, injunction or decree shall have been entered and be in effect by any court of competent jurisdiction or any governmental authority, and no statute, rule, regulation or other requirement shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transactions contemplated hereby.

**10.1.3. No Suits.**  No suit or other proceeding shall be pending or threatened by any third party before any court or governmental authority seeking to restrain or prohibit or declare illegal, or seeking substantial damages against Seller or any of its affiliates in connection with the transactions contemplated by this Agreement.

**10.1.4. Excise Tax Lien Waiver.**  If applicable, Seller shall have obtained an excise tax lien waiver from the Department of Revenue for the Commonwealth of Massachusetts (the "**Excise Tax Lien Waiver**").

**10.2    Conditions to Obligations of Purchaser.**  The obligations of Purchaser under this Agreement to purchase the Property and consummate the other transactions contemplated hereby shall be subject to the satisfaction of the following conditions on or before the Closing Date, except to the extent that any of such conditions may be waived by Purchaser in writing at Closing.

**10.2.1. Representations, Warranties and Covenants of Seller.** All representations and warranties of Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, with the same force and effect as if such representations and warranties were made anew as of the Closing Date. Any changes to such representations disclosed by Seller pursuant to Section 11.2.4 shall be acceptable to Purchaser, and Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller prior to the Closing Date.

**10.2.2. Intentionally Omitted.**

**10.2.3. Intentionally Omitted.**

**10.2.4. Possession of the Property.** Delivery by Seller of possession of the Property, subject to the Permitted Exceptions and the rights of tenants under the Leases and in substantially the same condition as existed as of the Effective Date (subject to all other provisions of this Agreement), reasonable wear and tear and damage due to condemnation or casualty (as set forth in Article XII herein) excepted.

**10.2.5. Title.** Title to the Real Property shall conform to the provisions of Section 6.1 of this Agreement.

## ARTICLE XI.

### Closing

**11.1. Purchaser's Closing Obligations.** Purchaser, at its sole cost and expense, shall deliver or cause to be delivered to Seller at Closing the following:

**11.1.1.** The Purchase Price, after all adjustments are made at the Closing as herein provided, by wire transfer or other immediately available federal funds, which amount shall be received in escrow by the Title Company at or before 10:00 a.m. Eastern time.

**11.1.2.** A blanket conveyance and bill of sale, substantially in the form attached hereto as Exhibit C (the "**General Assignment**"), duly executed by Purchaser, conveying and assigning to Purchaser the Personal Property, the Contracts, the Leases, the Plans and Specifications and the Intangible Property.

**11.1.3.** Evidence reasonably satisfactory to Seller and the Title Company that the person executing the Closing documents on behalf of Purchaser has full right, power and authority to do so.

**11.1.4.** A certificate indicating that the representations and warranties set forth in Article VIII are true and correct on the Closing Date, or, if there have been changes, describing such changes.

**11.1.5** A closing statement duly executed by Purchaser setting forth the Purchase Price and any adjustments thereto.

18

**11.1.6** An original executed counterpart of a lease (the "**Lease**"), in substantially the same form as the that certain Lease of even date herewith between Seller, as lessor thereunder, and Toxikon, as lessee thereunder (the "**Existing Lease**"), whereby Purchaser leases to Seller, and Seller leases from Purchaser, the space not occupied by Purchaser under the Existing Lease. Without limiting the foregoing, the Lease shall be at a rent of $10 per square foot on a triple net basis and for a term lasting through September 22, 2006.

**11.1.7** Such other documents as may be reasonably necessary or appropriate to effect the consummation of the transactions which are the subject of this Agreement.

**11.2. Seller's Closing Obligations.** Seller, at its sole cost and expense, shall deliver or cause to be delivered to Purchaser the following:

**11.2.1.** A quitclaim deed (the "**Deed**") in recordable form properly executed by Seller conveying to Purchaser the Land and Improvements in fee simple, subject only to the Permitted Exceptions, substantially in the form attached hereto as Exhibit D.

**11.2.2.** The General Assignment, duly executed by Seller, conveying and assigning to Purchaser the Personal Property, the Contracts, the Leases, the Plans and Specifications and the Intangible Property.

**11.2.3.** Evidence reasonably satisfactory to Purchaser and the Title Company that the person executing the Closing documents on behalf of Seller has full right, power and authority to do so.

**11.2.4.** A certificate indicating that the representations and warranties set forth in Article VII are true and correct on the Closing Date, or, if there have been changes, describing such changes.

**11.2.5.** A certificate substantially in the form attached hereto as Exhibit E ("**Non-foreign Entity Certification**") certifying that Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended.

**11.2.6.** The following items, to the extent in Seller's possession: (i) all keys for all entrance door and spaces which may be locked (whether occupied or not) in the Improvements; and (ii) all original books, records, tenant files, tenant database, operating reports, plans and specifications and other materials reasonably necessary to the continuity of operation of the Property.

**11.2.7** A closing statement duly executed by Seller setting forth the Purchase Price and any adjustments thereto.

**11.2.8** Either (i) a statement in the Deed that "the conveyance does not represent a sale of all or substantially all of the Seller's assets within the Commonwealth of Massachusetts," or (ii) the Excise Tax Lien Waiver.

**11.2.9** A notice from Seller advising each tenant of the sale of the Property and, where applicable, of the transfer of security deposits and that rental payments arising from and

after the Closing Date shall be payable to the Purchaser, substantially in the form attached hereto as **Exhibit H**.

**11.2.10** An original counterpart of each of the Contracts being assumed by the Purchaser and the Leases if in Seller's possession and control.

**11.2.11** An original executed counterpart of the Lease.

**11.2.12** Such other documents as may be reasonably necessary or appropriate to effect the consummation of the transactions which are the subject of this Agreement.

## ARTICLE XII.

### Risk of Loss.

**12.1. Condemnation and Casualty.** If, prior to the Closing Date, all or any portion of the Property is taken by condemnation or eminent domain, or is the subject of a pending taking, which has not been consummated, or is destroyed or damaged by fire or other casualty, Seller shall notify Purchaser of such fact promptly after Seller obtains knowledge thereof. If such condemnation or casualty is "**Material**" (as hereinafter defined), Purchaser shall have the option to terminate this Agreement upon notice to Seller given not later than fifteen (15) days after receipt of Seller's notice, or the Closing Date, whichever is earlier. If this Agreement is terminated, the Deposit (to the extent made by Purchaser) shall be returned to Purchaser and thereafter neither Seller nor Purchaser shall have any further rights or obligations to the other hereunder except with respect to the Surviving Termination Obligations. If this Agreement is not terminated, Seller shall not be obligated to repair any damage or destruction but (x) Seller shall assign, without recourse, and turn over to Purchaser all of the insurance proceeds or condemnation proceeds, as applicable, net of any costs of repairs and net of reasonable collection costs, in either case to the extent actually incurred or expended by Seller, (or, if such have not been awarded, all of its right, title and interest therein) payable with respect to such fire or other casualty or condemnation including any rent abatement insurance for such casualty or condemnation and (y) the parties shall proceed to Closing pursuant to the terms hereof without abatement of the Purchase Price except for a credit in the amount of the applicable insurance deductible.

**12.2. Condemnation Not Material.** If the condemnation is not Material, then the Closing shall occur without abatement of the Purchase Price and, after deducting Seller's reasonable costs and expenses incurred in collecting any award, Seller shall assign, without recourse, all remaining awards or any rights to collect awards to Purchaser on the Closing Date.

**12.3. Casualty Not Material.** If the Casualty is not Material, then the Closing shall occur without abatement of the Purchase Price except for a credit in the amount of the applicable deductible and Seller shall not be obligated to repair such damage or destruction and Seller shall assign, without recourse, and turn over to Purchaser all of the insurance proceeds net of any costs of repairs and net of reasonable collection costs, in either case to the extent actually incurred or expended by Seller, (or, if such have not been awarded, all of its right, title and interest therein) payable with respect to such fire or such casualty including any rent abatement insurance for such casualty.

**12.4.   Materiality.**  For purposes of this Article XII (i) with respect to a taking by eminent domain or condemnation, the term **"Material"** shall mean any taking whatsoever, regardless of the amount of the award or the amount of the Property taken, excluding, however, any taking solely of subsurface rights or takings for utility easements or right of way easements, if the surface of the Property, after such taking, may be used in substantially the same manner as though such rights had not been taken, and (ii) with respect to a casualty, the term **"Material"** shall mean any casualty such that the cost of repair, as reasonably estimated by Seller's engineer, is in excess of $175,000.00.

## ARTICLE XIII.

### Default

**13.1.   Default by Seller.**  If, on the Closing Date, Seller is unable to give title, make conveyance or deliver possession of the Property as required by this Agreement, or to satisfy any of the terms and conditions precedent to Closing set forth herein, or if the Property does not then conform to the provisions hereof, the time for performance hereunder shall be extended for such period, not to exceed thirty (30) days, as shall be reasonably specified by Purchaser, and Seller shall use reasonable efforts to give title or make conveyance or deliver possession as provided herein, or to satisfy such terms and conditions, to make the Property conform to the provisions hereof. Notwithstanding the foregoing, under no circumstances shall Seller's obligation to use reasonable efforts require Seller to expend more than Twenty-Five Thousand Dollars ($25,000.00) (the "Dollar Cap") in the aggregate, inclusive of attorney's fees, but exclusive of amounts required under 6.1(a) and (b); and, if Seller reasonably determines that the defect(s) or other matter(s) requiring cure by Seller pursuant to the preceding sentence can only be cured by the expenditure of an aggregate amount in excess of the Dollar Cap, then Seller shall not be required to expend any funds whatsoever. If, at the expiration of such extended time for performance, despite having used such reasonable efforts (subject to the limitations of the preceding sentence), Seller shall fail to convey title, or deliver possession, or make the Property conform, as the case may be, then the Deposit (to the extent made by Purchaser) shall be refunded to Purchaser and all obligations of parties hereto shall cease and this Agreement shall be void without recourse of the parties hereto.

At either the original or extended time for performance, Purchaser may elect to accept such title to and possession of the Property as Seller can deliver in its then condition and to thereupon pay the Purchase Price without any deductions, except such amount (i) necessary to remove all mortgages, liens or encumbrances to be removed pursuant to the provisions of Section 6.1 such adjustments computed in accordance with Section 4.2, or (ii) as provided pursuant to Article XII in the event of a condemnation or casualty, in either of which case Seller shall convey such title.

Notwithstanding any contrary provisions herein, Purchaser shall have the right to demand specific performance in the event of any default by Seller (in which event, Seller shall not have any liability whatsoever to Purchaser hereunder other than with respect to the Surviving Termination Obligations); provided, however, that Purchaser shall be deemed to have waived its right to specific performance, and this Agreement shall be void without recourse of the parties hereto, if Purchaser fails to deliver to Seller written notice of its intent to file a cause of action for

specific performance against Seller on or before thirty (30) days after written notice of termination from Seller or thirty (30) days after the scheduled Closing Date (as the same may be extended pursuant to the provisions of this Section 13.1), whichever shall occur first, or having given Seller such notice, fails to file a lawsuit asserting such cause of action within sixty (60) days after the scheduled Closing Date (as the same may be extended pursuant to the provisions of this Section 13.1). Notwithstanding the foregoing, nothing contained herein shall limit Purchaser's remedies at law or in equity, as to the Surviving Termination Obligations; provided, however, (a) Purchaser shall seek only actual damages and not consequential, special or indirect damages as a result of any default by Seller and (b) in no event shall Seller's aggregate liability to Purchaser under this Agreement exceed the amount set forth in Section 16.15 herein. Purchaser agrees to first seek recovery under any insurance policies and service contracts prior to seeking recovery from Seller and Seller shall not be liable to Purchaser if Purchaser's claim is satisfied from such insurance policies or service contracts  The provisions of this paragraph shall survive the Closing.

**13.2.  Default by Purchaser.**   In the event the Closing and the transactions contemplated hereby do not occur as provided herein by reason of any default of Purchaser, Purchaser and Seller agree it would be impractical and extremely difficult to fix the damages which Seller may suffer. Therefore, Purchaser and Seller hereby agree a reasonable estimate of the total net detriment Seller would suffer in the event Purchaser defaults and fails to complete the purchase of the Property is and shall be, as Seller's sole and exclusive remedy (whether at law or in equity), a sum equal to the Deposit. Upon such default by Purchaser, Seller shall have the right to receive the Deposit as its sole and exclusive remedy and thereupon this Agreement shall be terminated and neither Seller nor Purchaser shall have any further rights or obligations hereunder except with respect to the Surviving Termination Obligations. The amount of the Deposit shall be the full, agreed and liquidated damages for Purchaser's default and failure to complete the purchase of the Property, all other claims to damages or other remedies being hereby expressly waived by Seller. Notwithstanding the foregoing, nothing contained herein shall limit Seller's remedies at law or in equity as to the Surviving Termination Obligations.

## ARTICLE XIV.

### Brokers

**14.1.  Brokers**.  Purchaser and Seller each represents and warrants to the other that it has not dealt with any person or entity entitled to a brokerage commission, finder's fee or other compensation with respect to the transaction contemplated hereby other than Trammel Crow Company, whose compensation shall be the sole responsibility of Seller, and who shall be paid only upon the Closing of the purchase and sale contemplated hereby pursuant to a separate agreement. Purchaser hereby agrees to indemnify, defend, and hold Seller harmless from and against any losses, damages, costs and expenses (including, but not limited to, attorneys' fees and costs) incurred by Seller by reason of any breach or inaccuracy of the Purchaser's (or its nominee's) representations and warranties contained in this Article XIV. Seller hereby agrees to indemnify, defend, and hold Purchaser harmless from and against any losses, damages, costs and expenses (including, but not limited to, attorneys' fees and costs) incurred by Purchaser by reason of any breach or inaccuracy of Seller's representations and warranties contained in this Article XIV. Seller and Purchaser agree that it is their specific intent that no broker shall be a

party to or a third party beneficiary of this Agreement or the Deposit, that no broker shall have any rights or cause of action hereunder, and further that the consent of a broker shall not be necessary to any agreement, amendment, or document with respect to the transaction contemplated by this Agreement. The provisions of this Article XIV shall survive the Closing and/or termination of this Agreement.

## ARTICLE XV.

### Confidentiality

**15.1. Confidentiality.** Each of Seller and Purchaser expressly acknowledges and agrees that the transactions contemplated by this Agreement, the Documents that are not otherwise known by or readily available to the public and the terms, conditions and negotiations concerning the same shall be held in the strictest confidence and shall not be disclosed by either party except to its respective legal counsel, surveyor, title company, broker, accountants, consultants, officers, partners, directors and shareholders, prospective mortgage lenders, prospective investors and members, as applicable (the "**Authorized Representatives**"), and except and only to the extent that such disclosure may be necessary for its performance hereunder. Each of Seller and Purchaser agrees that it shall instruct each of its Authorized Representatives to maintain the confidentiality of such information and at the request of the other party hereto, to promptly inform such party of the identity of each such Authorized Representative. Purchaser further acknowledges and agrees that, unless and until the Closing occurs, all information and materials obtained by Purchaser in connection with the Property that are not otherwise known by or readily available to the public will not be disclosed by Purchaser to any third persons (other than to its Authorized Representatives) without the prior written consent of Seller. If the transaction contemplated by this Agreement does not occur for any reason whatsoever, Purchaser shall promptly return to Seller, and shall instruct its Authorized Representatives to return to Seller, all copies and originals of all documents and information provided to Purchaser. Nothing contained in this Section 15.1 shall preclude or limit either party from disclosing or accessing any information otherwise deemed confidential under this Section 15.1 in connection with the party's enforcement of its rights following a disagreement hereunder or in response to lawful process or subpoena or other valid or enforceable order of a court of competent jurisdiction or any filings with Authorities required by reason of the transactions provided for herein. The provisions of this Section 15.1 shall survive any termination of this Agreement.

## ARTICLE XVI.

### Miscellaneous

**16.1. Notices.** Any and all notices, requests, demands or other communications hereunder shall be deemed to have been duly given if in writing and if transmitted by hand delivery with receipt therefor, by facsimile delivery (with confirmation by hard copy), by overnight courier, or by registered or certified mail, return receipt requested, first class postage prepaid addressed as follows (or to such new address as the addressee of such a communication may have notified the sender thereof). Notices shall be deemed delivered and effective upon

actual receipt as evidenced by written receipt or third party documentation, such as express delivery or facsimile confirmation:

| To Purchaser: | Dr. Laxman Desai, President & CEO<br>Toxikon Corporation<br>15 Wiggins Avenue<br>Bedford, MA 01730<br>Attn: Dr. Laxman Desai, President & CEO<br>Phone: (781) 275-3330<br>Fax No.: (781) 280-0204<br>email: laxman.desai@toxikon.com |
|---|---|
| With a copy to: | Choate, Hall & Stewart<br>53 State Street<br>Exchange Place<br>Boston, MA 02109<br>Attn: Brian J. King, Esq.<br>Phone: (617) 248-5113<br>Fax No.: (617) 248-4000<br>email: bking@choate.com |
| To Seller: | Opta Food Ingredients, Inc.<br>25 Wiggins Avenue<br>Bedford, MA 01730<br>Attn: Scott Kumf, CFO and CÓO<br>Phone: (781) 276-5100<br>Fax No.: (781) 276-5101<br>email: skumf@opta-food.com |
| and to: | Stake Technology Ltd.<br>2838 Highway 7<br>Norval, Ontario Canada L0P 1K0<br>Attn:  Steven Bromley, Vice President and CFO<br>Phone: (905) 455-1990<br>Fax No.: (905) 455-2529<br>email: sbromley@staketech.com |
| With a copy to: | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111<br>Attn:  Mary-Laura Greely, Esq.<br>        Jeffrey M. Wiesen, Esq.<br>Phone: (617) 542-6000<br>Fax No.: (617) 542-2241<br>email: mlgreely@mintz.com |