UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUDSON REALTY CAPITAL LLC<br>　　Plaintiff<br><br>v.<br><br>LAXMAN S. DESAI<br>　　Defendant | CA NO. 1:04 CV 10243 MEL |

## AFFIDAVIT OF NANCY DIGIULIO IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

Nancy DiGiulio, on oath and personal knowledge says and deposes as follows:

1. My name is Nancy DiGiulio. I am employed by Toxikon Corporation as its Vice President of Operations, and have held this position continuously since 1982. My job responsibilities include running the day-to-day operations of Toxikon Corporation.

2. During year 2003, I was asked by Dr. Desai to work with Dexter Williams to find additional office/laboratory space for Toxikon's growing business opportunities. Mr. Williams and I did so.

3. After considering other properties which Mr. Williams and I located, Dr. Desai eventually decided to purchase the commercial building at 25 Wiggins Avenue, which is located immediately adjacent to Toxikon's existing facility.

4. In due course, Dr. Desai entered into a purchase and sales agreement for 25 Wiggins Avenue, a true copy of which is hereto attached as *Exhibit A.*

5. To complete this purchase, Dr. Desai had to arrange a purchase money first mortgage. Mr. Williams and I located the services of a mortgage broker whom Dr. Desai retained to assist in procuring the necessary funding to close the 25 Wiggins transaction.

6. On or about July 1, 2003, Dr. Desai was presented with a "term sheet" from Hudson Realty Capital LLC (HRC), which is hereto attached as *Exhibit B.*

7. Dr. Desai asked me to be the primary liaison and contact between HRC and himself, as he is frequently unavailable due to business meetings outside of Massachusetts.

8. As the primary contact/liaison person, I took most of the telephone calls, emails and other correspondence during the "due diligence" period called for in the term sheet. I provided the documents and information to HRC which was requested in its effort to determine if it wanted to make the requested loan to Dr. Desai.

9. I responded quickly to each and every request for information from HRC as there was strictly limited time period available to Dr. Desai to convince HRC to make the loan, i.e. to convert HRC's "interest in making a loan" into reality. I interpreted the time limitation in the term sheet to expire on July 31, 2003, and that thereafter HRC could put its resources elsewhere, and not invest with Dr. Desai.

10. As requested by HRC of me, I furnished to it the following items and information to assist in deciding, within the state time frame, whether to make the loan, or not. The documents submitted to HRC were: Toxikon's General Plan Summary with ProForma Cash Flow Analysis; Dr. Desai Personal Financial Statements; Personal Tax Returns; Toxikon Historical Financial Statements including comparative, year-to-year analysis, balance sheets, Profit and Loss Statements; Accountant prepared cash flow analyses; market analysis for Toxikon products, services; "Forecasted" Financial Statements prepared by CPA; Corporate Tax Returns and many documents and things ancillary thereto including real estate appraisals and property condition surveys on Dr. Desai's real estate holdings.

11.     In additional to providing written materials, I met with real estate appraisers and with property condition inspectors during the month of July 2003. I traveled to Florida to meet with one of HRC's principals, Richard Ortiz, so HRC could personally visit the Florida properties which HRC was demanding to be included in the collateral package.

12.     I received and reviewed proposed "boiler-plate" loan documents and reviewed them with our legal counsel in this transaction, Brian King of Choate, Hall & Stewart. I communicated Dr. Desai's comments to the proposed "boiler-plate" loan documents, but never received any response to our comments. Those "boiler-plate" loan documents included Proposed Opinion of Legal Counsel on "Authority and Enforceability"; proposed first mortgagee; proposed Promissory Note; Proposed Assignments of Warranties and Contract Rights; Proposed Assignments of Leases and Rent; proposed Hazardous Substance Indemnity Agreement; proposed Personal Guarantys; and proposed Cash Management Agreement.

13.     None of the proposed loan documents were ever submitted to Dr. Desai in final form for execution. In fact, the terms of the proposed loan and the collateral to secure it were *never* agreed upon by HRC and Dr. Desai.

14.     During the July 2003 "due diligence" period, while HRC was supposedly deciding whether to commit its resources to Dr. Desai, the negotiations or discussions about the loan broke down. HRC told me it was not satisfied with Toxikon's financial picture, existing or projected, and also that the collateral would have to include other Desai properties, such as the office building at Indiantown Road, Jupiter Florida, Toxikon's headquarters, located at 15 Wiggins Avenue, and Dr. Desai's summer home in Maine. HRC also demanded that Dr. Desai put up his Brookline home as part of the collateral. These demands caused a major problem with Dr. Desai as the loan he requested from HRC was $5 million and the value of all the collateral HRC wanted vastly exceeded that amount.

15.     While Dr. Desai was willing to discuss pledging his personal residence to this loan, the consent of Mrs. Desai was necessary because she owns that property. Information was

given to HRC about the Desai residence. Dr. Desai was also willing to discuss pledging his Maine residence and provided appraisals on that property, too.

16. On the insistence of HRC, I made inquiry of the mortgage holders on 15 Wiggins and 675 Indiantown Road to determine if those properties could be used as additional collateral for the proposed HRC loan to Dr. Desai. Each of these lenders directed me to the loan documents covering these two properties. In each instance, the loan documents explicitly provide that the mortgaged premises could not be used to collateralize any other loan unless the lender, in its sole discretion, agreed to it. Neither lender would so agree.

17. At this point, on or about late July 2003, after I informed HRC that neither 15 Wiggins Avenue nor 675 Indiantown Road were available for this loan, HRC seems to lose interest in making the loan which Dr. Desai requested. Dr. Desai had made it clear to me, and in turn I repeatedly told HRC that Dr. Desai could not and would not give HRC mortgagee positions against the Jupiter office building or the Toxikon headquarters building.

18. As of July 31, 2003, HRC had not issued a firm loan commitment to Dr. Desai, nor had HRC extended its own deadline of July 31, 2003. Prior to July 31, 2003, I repeatedly asked HRC to issues its formal loan commitment, to no avail.

19. After July 31, 2003, nothing occurred with respect to this transaction. The clock was ticking down on Dr. Desai's purchase and sales agreement and there was no financing commitment from HRC or anyone else. Dr. Desai was greatly concerned that he would have to forfeit his substantial deposit on the 25 Wiggins Purchase and Sales Agreement. We heard nothing from HRC until after Dr. Desai gave them notice that the negotiations were finished. This was the last week in August 2003.

20. At Dr. Desai's request, Mr. Williams and I explored ways to salvage the 25 Wiggins deal. After much discussion with the owners of 25 Wiggins, their lawyers, and our own financial advisors, the existing purchase and sales agreement was restructured into a lease with an option to purchase the 25 Wiggins property. The resulting Lease and Option Agreement are

hereto attached as *Exhibit C* and *Exhibit D*, respectively. This "re-structured" deal enabled Dr. Desai to salvage the transaction, gave him additional time to conclude a financing deal, and prevented forfeiture of the deposit money which had been paid to the owners of 25 Wiggins.

21. During the latter months of year 2003, I assisted Mr. Williams in making a loan application to Commerce Bank, with whom Toxikon had an existing banking relationship. Commerce Bank was willing to make a loan but its proposed terms were not acceptable to Dr. Desai because Commerce Bank also wanted 15 Wiggins as collateral. Dr. Desai did not take the loan from Commerce Bank.

22. Ultimately, in June 2004, Dr. Desai exercised his option and purchased 25 Wiggins with financing provided by Digital Federal Credit Union. Neither Toxikon's 15 Wiggins headquarters or the Jupiter Office Building is included in the loan package with Digital Federal Credit Union.

Signed under the penalty of perjury on December 19th, 2006.

_____
Nancy DiGiulio