FILED
IN CLERKS OFFICE
2007 MAR 22 P 1:42
U.S. DISTRICT COURT
DISTRICT OF MASS.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **HUDSON REALTY CAPITAL LLC,** | : | **Case No.: 04-CV-10243 (MEL)** |
| **Plaintiff** | : | |
| **- against -** | : | |
| **25 WIGGINS AVENUE LLC and DR. LAXMAN DESAI,** | : | |
| **Defendants** | : | |

**DEFENDANT'S TRIAL BRIEF**
**PURSUANT TO L.R. 16.5 (F)**

## 1. Introduction:

Defendant Laxman Desai ("Desai") hereby submits his Trial Brief pursuant to L.R. 16.5 (F) in advance of the jury-waived trial, now scheduled for March 26, 2007. Desai reserves his right under said Rule to amend this submission after the close of the evidence to conform requested findings to the evidence actually presented at trial.

Desai reminds the court that he is the sole defendant in this case. There is no such entity as "25 Wiggins Avenue LLC" as it was *never* legally organized in any state.

2. **Trial Counsel:**

Robert G. Cohen, Esq.
188 Oaks Road
Framingham, MA 01702
Phone: 508-875-0035
Fax: 508-875-0558
Email: RGCesq@aol.com
Mass. BBO #090340

3. **Requests for Findings of Fact:**

1. On or about March 14, 2003, defendant entered into a purchase and sales agreement to acquire the premises located at 25 Wiggins Avenue, Bedford, Massachusetts. The purchase and sales agreement and amendments to it provide, in pertinent part, as follows: that defendant would purchase the property for $4,850,000.00; that the time of the closing was in accordance with paragraph 4.1; and that the actual closing date of the agreement was extended in accordance with amendments to it necessitated by defendant's inability to complete the transaction without a mortgage loan.

2. To finance the acquisition of and build-out of 25 Wiggins Avenue, defendant retained the services of Patrick J. Bisceglia, of Bluestone Realty Advisors Inc., of White Plains, New York, on a non-exclusive basis, to procure such financing.

3. Mr. Bisceglia procured a "term sheet" or Letter Agreement from Hudson Realty Capital LLC, ("HRC") a private franchise firm, on or about July 1, 2003. The "term sheet" provides that HRC is "interested" in making a loan of "not to exceed $5 million" on the property provided that loan to collateral value could be agreed upon between HRC

and defendant. Even though the "term sheet" recites that the collateral for the proposed loan was the property itself, i.e. 25 Wiggins Avenue, it was understood by defendant that the collateral's value had to be appraised and determined to HRC's satisfaction. The amount of the proposed loan was not agreed upon in the "term sheet."

4. In addition to the vague and ambiguous reference to 25 Wiggins Avenue, as the "collateral" for the proposed loan, the "term sheet" requires the proposed loan be "secured by a first mortgage, an assignment of rents, leases and profits on the property and/or equipment used in connection with the property … and such property shall be subject to pledge of equity interests to no other liens or encumbrances … and no additional senior or secondary financing … either secured or unsecured."

5. The proposed loan "term sheet" further required that defendant personally guarantee payment of the proposed loan.

6. The proposed loan "term sheet" required that defendant give additional collateral to secure repayment of the proposed loan.

7. The proposed loan "term sheet" gave HRC the opportunity to investigate and analyze defendant's financial status before making a firm commitment to make the loan and to determine the value of collateral, the identify of specific collateral and the amount of the loan, i.e. the "due diligence" period.

8. Defendant was required by the "term sheet" to pay due diligence fees and expenses to HRC and has done so.

9. The "term sheet" for the proposed loan included the following specific language:

> *"If the transaction contemplated by this letter of intent is not consummated on or before July 31, 2003, then the terms and conditions set forth herein shall thereafter expire, without further notice or act of any kind by Lender or any other party. Time shall be of the essence with respect to the foregoing expiration date and the performance by Borrower, Principal(s) and Guarantor(s) under all of the Loan Documents.*

and

> *"This proposal shall expire on July 1, 2003. Please indicate your acceptance of this proposal by signing and returning same with the specified monies in the form of a bank check or wire the total sum of $15,000.00. Lender will then commence due diligence and begin initial documentation of the Loan. This proposal outlines the general terms and conditions under which Lender shall proceed and does not constitute a loan commitment, either express or implied, on behalf of the Lender, and does not impose any obligation on Lender to make the loan."*

10. During the month of July 2003, defendant provided "due diligence" financial information including personal and corporate tax returns, banking information, financial statements from Toxikon Corporation, financial statements, real estate deeds, real estate appraisals, appraisals of Toxikon business equipment and other "due diligence" materials including building condition surveys and environmental surveys to HRC. HRC was not satisfied by defendant's submissions and requested further additional information and materials from defendant, which defendant supplied.

11. On July 31, 2003, there was no agreement between HRC and defendant as to the identify of the collateral to be given to secure payment of the proposed loan beyond a first mortgage on 25 Wiggins itself; as to the value of additional collateral to be given to secure repayment; as to the amount of the loan to be made; or as to the text of the proposed loan documents. No loan commitment letter had issued by July 31, 2003. And, the "transaction contemplated" had not occurred by July 31, 2003, i.e. 25 Wiggins Avenue had not been purchased.

12. Through all of July 2003, HRC continuously demanded that defendant provide additional collateral. Specifically, HRC demanded that 15 Wiggins Avenue, Bedford, Massachusetts and 675 Indiantown Road in Jupiter, Florida, be included as part of the collateral, even though defendant continuously told HRC that those properties ***could not*** be part of the deal. HRC also demanded that defendant's personal residence be given as additional collateral even though that personal residence is owned by a trust controlled by defendant's wife for the benefit of defendant's child. HRC and defendant never agreed to include either 15 Wiggins Avenue or 675 Indiantown Road as additional collateral for the proposed loan, and could not reach agreement on the other collateral being demanded.

13. During July 2003, HRC also demanded that defendant's real estate in Palm Beach County, Florida, including 675 Indiantown Road, be included as additional collateral for the proposed loan. Defendant could not pledge 675 Indiantown Road or 15 Wiggins Avenue because of restrictions on the mortgages on these properties.

14. As of July 31, 2003, HRC had not committed to a loan and no terms of an actual loan had been agreed upon. Defendant did not have financing in place on July 31, 2003. Therefore, the closing date on the purchase and sales agreement had to be extended or defendant was at a risk of losing his deposit on 25 Wiggins Avenue.

15. Shortly after July 31, 2003, defendant concluded that it was not possible to negotiate a loan agreement with HRC, even though discussions on values of proposed collateral and on the identity of the collateral itself, beyond the first mortgage to be granted on 25 Wiggins itself continued briefly after July 31, 2003. Defendant further concluded he could not purchase 25 Wiggins Avenue at that time because he had no financing to do so, but was determined not to forfeit his substantial deposit on that property. A final extension of the Purchase and Sales Agreement was negotiated.

16. On August 25, 2003, defendant instructed the broker, Mr. Bisceglia, to tell HRC that defendant was no longer interested in either continuing to discuss proposed loan terms or in doing a loan with HRC under any circumstances or conditions. The "term sheet" had expired on July 31, 2003, and no extension of the "term sheet" had been signed or even proposed by HRC. The arrangement with HRC had expired of its own terms and was nothing more than a failed negotiation.

17. Defendant has paid HRC for due diligence fees, expenses and for lawyers' fees under the July 1, 2003 "term sheet." Defendant owes nothing further to HRC on this proposed

loan because HRC never committed to make a loan; because the "deal" never got beyond the negotiation stage; and lastly, because the "term sheet" expired on July 31, 2003 when the "contemplated transaction" did not close by that date, time being of the essence, and said "term sheet" having been drafted by HRC without input from or negotiation with defendant.

18. During the autumn of 2003, defendant applied to Commerce Bank and Trust Company for financing so it could conclude the purchase of 25 Wiggins Avenue. Commerce issued a commitment letter on or about December 10, 2003. However, defendant did not proceed with financing through Commerce Bank.

19. Defendant concluded his purchase of 25 Wiggins Avenue on June 15, 2004, having obtained financing from Digital Federal Credit Union, and after having paid lease and option payments since September 2003.

20. On August 27, 2003, after HRC was told by Mr. Bisceglia that defendant was not going to deal with HRC, defendant received a facsimile letter from HRC. HRC's letter is factually incorrect in that it states as follows:

> "*Obligor (Desai) ... is proceeding to accomplish its financial objectives through means other than Lender's proposed financing.*'

This was not true as HRC's "interest" in making the proposed loan expired on July 31, 2003, without a loan agreement being made. Desai's obligations to HRC ended on July 31, 2003. And, HRC was free to commit its limited financial resources elsewhere to other loans after July 31, 2003, by virtue of the "time is of the essence" provision.

21. As August 31, 2003 approached, defendant was confronted with the reasonable likelihood of forfeiting the substantial deposit on the 25 Wiggins Avenue deal as he did not have the cash on hand to close or to do the required build-out to make the new building fit for Toxikon's purposes. HRC knew that the 25 Wiggins Avenue purchase and sales agreement had been extended several times and yet it did nothing to extend its "letter of intent." Upon the expiration of the "letter of intent" / "term sheet" on July 31, 2003, it was defendant's right to consider the HRC deal a dead item, and he did so consider it.

22. Owner of 25 Wiggins Avenue was not willing to extend the purchasae and sales agreement beyond August 29, 2003, but was willing to grant an option to purchase the property to be exercised when financing was arranged and on the further condition that defendant lease the 25 Wiggins Avenue building. Given defendant's financial predicament, and having substantial cash invested in 25 Wiggins Avenue, defendant had no alternative but to agree to owner's proposal for 25 Wiggins Avenue.

23. Prior to July 31, 2003, defendant's objective with respect to 25 Wiggins Avenue was to purchase it and to close on that sale with financing provided by HRC. But, HRC never committed to make the loan. HRC frustrated defendant's objectives and did not assist in accomplishing defendant's objective. HRC's failure to commit to the loan nearly caused defendant to the substantial deposit on 25 Wiggins Avenue.

4. **Defendant's Witnesses.**

Laxman Desai.
Dexter Williams.
Nancy DiGiulio

Defendant does not intend to call any expert witnesses.

5. **Defendant's Exhibits.**

1. Letter dated July 1, 2003 from Hudson Realty Capital to Laxman Desai.
2. Letter dated August 27, 2003 from Hudson Realty Capital to Laxman Desai.
3. Purchase and Sales Agreement dated March 14, 2003.
4. Nationsbanc Mortgage Loan Agreement, Page 25.
5. Mortgage Document from Jupiter Professional Building to First Union National Bank, Pages 17-20.
6. Lease dated September 22, 2003 between Opta Foods and Toxikon.
7. Option Agreement dated September 22, 2003 between Opta Foods and Toxikon.
8. First Amendment to Option Agreement.
9. Second Amendment to Option Agreement.
10. Letter from Commerce Bank dated December 10, 2003 to Laxman Desai.
11. Letter from Bluestone Realty Advisors dated June 23, 2003 to Richard Ortiz.
12. Toxikon General Plan and Summary/25 Wiggins Avenue Timelines with Transmittal Letter dated July 11, 2003 from Toxikon to Hudson.
13. Proposed Loan Documents re: Hudson Realty Capital/25 Wiggins Avenue
14. Hudson Realty Capital Answers to Desai Interrogatories.
15. Email from Joe Iskaros to Nancy DiGiulio dated August 5, 2003.
16. Email from Nancy DiGiulio to PJ Bisceglia dated July 25, 2003.
17. Email from Nancy DiGiulio to PJ Bisceglia dated July 24, 2003.
18. Email from Michael McGuire dated July 18, 2003 Proposed Loan Docs.

Defendant reserves its right to amend this list.

6. **Defendant's Requests for Rulings of Law.**

A. **Standards for Interpretation of the "Term Sheet"**

Resolution here depends upon a proper interpretation of the Term Sheet. These are usually questions of law for the Court. *Lumber Mut. Ins. Co. Zoltek Corp., 419 Mass. 704, 707 (1995).* "In the absence of an ambiguity, {the Court} will 'construe words of the {document} in their usual and ordinary sense.'" *116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001).* The mere facts that parties disagree on the proper construction of a document's language does not necessarily establish an ambiguity. *Lumbermans Mut. Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).*

The document is, however, to be read in light of the circumstances of its execution, which may enable a Court to see whether its words can be understood or are actually ambiguous. *Robert Industries Inc. v. Spence, Mass. 751 753 (1973).*

When an element of ambiguity does appear in a document, the Court is to consider the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. *MacDonald v. Gough, 326 Mass. 93, 96 (1950).* "The object of the {Court} is to construe the {document} as a whole, in a reasonable and practical way, consistent with its language, background and purpose." *USM Corp. v. Arthur D. Little Systems Inc., 28 Mass. App. Ct. 108, 116 (1989).* The Court is to act in a way to give effect to the Term Sheet as a rational business instrument to carry out the intent of the parties, if possible. *Starr v. Fordham, 420 Mass. 178, 192 (1990).* Even in the case of an ambiguous document, interpretation is a

matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of American, Inc., *48 Mass. App. Ct. 115, 119 (1999).*

Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of this written document. City of Haverhill v. George Brox, Inc., *47 Mass. App. Ct. 717, 720 (1999).*

**B. Desai Is Not Liable For A "Break Up" Fee Because No Loan Was Ever Committed And Because The Parties' Obligation To Each Expired.**

Desai is not liable to plaintiff for a "break up" fee or for any other fee or expense in connection with the "term sheet" because he did not breach any agreement he had with HRC. No loan was ever committed to Desai or actually made to Desai by HRC. The negotiation conducted by these parties for the proposed loan failed to produce a loan agreement. By its own terms, i.e. the "time is of the essence" provision, the "term sheet" expired on July 31, 2003 because the contemplated transaction did not occur. The term sheet was not renewed or extended beyond July 31, 2003 by the parties. Time was of the essence. After July 31, 2003, Desai was free to make other financing arrangements without further obligation whatsoever, and HRC was also free to commit its resources to other deals. That is why HRC utilized the July 31, 2003 "drop dead" date.

The evidence is substantial, clear and convincing that there was no actual loan agreement which had been committed to; the amount of the loan was never established, nor was the collateral to secure loan repayment identified and agreed upon. The term sheet expired before the contemplated transaction occurred. The term sheet was not extended or renewed beyond July 31,

2003, time being of the essence. HRC limited its exposure to Desai to a 31 day period, after which it could commit to other loans, without either party having recourse to the other.

Desai did nothing nefarious to avoid any contractual obligation. He did not breach any contract. He did not use HRC as a "stalking horse" to make a better deal elsewhere. Instead, Desai acted to preserve his purchase rights by accepting the option offer and a lease. Defendant had no choice to do so because the extended purchase and sales agreement was scheduled to close and he was without sufficient funds to close it. Desai's alternative was to forfeit his deposit because the Seller would not further extend the Purchase and Sales Agreement. Desai was free after July 31, 2003 to make the lease/option agreement with Opta because the agreement with HRC had expired of its own terms. The lease/option deal was not an alternate financing arrangement for Desai to acquire 25 Wiggins.

Based on the evidence, there was no enforceable Agreement in existence after July 31, 2003; the negotiations between HRC and Desai failed to produce any agreement on material loan terms; there was no intention by either party to be bound after July 31, 2003; and the "break-up" fee obligation expired with the rest of the July 1, 2003 term sheet. Situation *Management Systems Inc. v. Malouf Inc., 430 Mass. 875, 724 NE2nd 699 (2000); Lafayette Place Associates v. BRA, 427 Mass. 509, 694 NE2nd 820 (1998); Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 647 NE2nd 1174 (1995).* Nothing done or not done by Desai is a breach of contract which triggered the "break-up" fee. *TAL Financial Corp. v. CSC Consulting Inc., Mass. SJC# 09578 decided March 31, 2006; Dynamic Machine Works Inc. v. Machine & Electric Consultants Inc., 444 Mass. 768 (2005); McCarthy v. Tobin, 429 Mass. 84 (1999); Realty Developing Co. v. Wakefield Ready Mix Concrete Co., 327 Mass. 535 (1951).*

**C. Hudson Realty Capital LLC Did Not Negotiate In Good Faith.**

Business transactions such as this one, governed by Massachusetts law, must be conducted in good faith. *Anthony's Pier Four Inc. v. HBC Assocs., 411 Mass. 451, 471-74, 583 NE2d 806, 819-21 (1991)(citing Drucker v. Roland Wm. Jutras Assoc., 370 Mass. 383, 385, 348, N.E.2d 763, 765 (1976); Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9, 548 NE2d 188, 193 (1990); Fortune v. National Cash Register Co., 373 Mass. 96, 105, 346 NE2d 1251, 1257-58 (1977); Kerrigan v. Boston, 361 Mass. 24, 33 278 NE2d 387, 393-94 (1972); 37 J. Nolan Massachusetts Practice Tort Law, § 11 a10 (1979).* Here, even though Desai complied with requests for financial information, personal information, and property information, HRC was never satisfied. HRC continuously changed its position on which collateral would be acceptable, and the value of it. HRC's continued demand that 15 Wiggins and 675 Indiantown Road be part of the collateral, even though it knew that to do so would cause Desai to violate existing loan agreements covering those properties proves lack of good faith. HRC sought to procure Desai's' breach of pre-existing mortgage contracts on those properties. Such acts and practices by plaintiff not only jeopardized Desai's good relations with the lenders on 15 Wiggins and 675 Indiantown Road, but would have rendered plaintiff liable for interfering with a third party's advantageous mortgage relationship with Desai. *King v. Driscoll, 418 Mass. 576, 587, 638 NE2d 488, 494-95 (1994); G.S. Enterprises, Inc. v. Falmouth Marine Inc., 410 Mass. 262, 571 NE2d 1363 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 551 NE2d 20 (1990); See also Chemew County Gold, Inc. v. Wnuk, 9 Mass. App. Ct. 506, 509, 402 Ne2d 1069, 1072 (1980).* ("[i]n its classic form, the tort … involves the undoing of a business arrangement bound by contract."). The reasonable inference to be drawn from HRC's continued insistence

that 15 Wiggins and 675 Indiantown be part of the deal is that HRC's conduct was predatory in nature in violation of the obligation to deal in good faith.

**D. <u>There Was No "Disguised Alternate Financing Scheme."</u>**

Desai was contractually bound to purchase 25 Wiggins, or forfeit his substantial deposit money. Desai had no "escape" clause to invoke to cancel the 25 Wiggins agreement. Not having mortgage financing to close 25 Wiggins after the HRC "letter of intent" expired, Desai took the only course of action which was reasonable. Desai agreed to lease the property with an option to purchase it, thereby preserving his substantial cash down payment in 25 Wiggins and providing additional time to secure purchase money and construction mortgage financing.

Sometime in the autumn of 2003, Desai applied to Commerce Bank & Trust Company for a mortgage loan. He received a loan commitment letter on or about December 10, 2003, subject to stated conditions, which were not acceptable. Desai signed Commerce's offer on December 31, 2003, in error.

Desai did not accept the Commerce loan commitment and did not close any loan with Commerce Bank to purchase 25 Wiggins.

Ultimately, in June 2004, Desai purchased 25 Wiggins using acquisition financing provided under a loan agreement with Digital Federal Employees Credit Union.

HRC contends that Desai employed a scheme by leasing the property with an option to buy it to avoid his obligations under the "letter of intent." However, HRC ignores its own plain language as follows:

> *"If the transaction contemplated by this letter of intent is not consumed on or before July 31, 2003, then the terms and conditions set forth herein shall thereafter expire, without further notice or act of any kind by Lender or any other party. Time shall be of the essence with respect to the foregoing expiration date and the performance by Borrower, Principal(s) and Guarantor(s) under all of the loan documents."*

and further,

> *"This proposal shall expire on July 1, 2003. Please indicate your acceptance of this proposal by signing and returning same with the specified monies in the form of a bank check or wire the total sum of $15,000.00. Lender will then commence due diligence and begin initial documentation of the Loan. This proposal outlines the general terms and conditions under which Lender shall proceed and does not constitute a loan commitment, either express or implied, on behalf of the Lender, and does not impose any obligation on Lender to make the loan."*

Time being of the essence, the "letter of intent" expired. Desai and HRC were both then free after July 31, 2003 to make other loan arrangements without further obligation. HRC's attempt to issue a "commitment" on August 27, 2003 was not only too late, but still lacking in detail as to loan terms. There never was a loan commitment from HRC and it never agreed to make a loan to Desai. The August 27, 2003 letter imposed no obligation on Desai. *Mendel Kern Inc. v. Workshop Inc., 400 Mass. 277, 508 NE2nd 853 (1987); Situation Management Systems v. Malouf Inc., 430 Mass. 875, 724 NE2nd 699 (2000).*

There was no subterfuge by Desai whatsoever. There was no loan made to Desai. There cannot be an obligation to pay a "break-up" fee, because there must first be, as a condition precedent to any such liability, a reasonable loan commitment as contemplated by the Term Sheet. But, there was none. *Massachusetts Mun. Wholesale Elc. Co. v. Danvers, 411 Mass. 39, 45, 577 NE2d 293, 287-288 (1991); Sechrest v. Safiol, 383 Mass. 568, 571, 419 NE2d 1384, 1386 (1981); Tilo Roofing Co. v. Pellerin, 331 Mass. 743, 746, 122 NE2d 460, 462 91954); Malden Knitting Mills v. United States Rubber Co., 301 Mass. 229, 233, 16 NE 707, 710 (1938); Wood v. Roy Lapidus Inc., 10 Mass. App. Ct. 761, 764, n.5, 413 NE2d 345, 348 n.5 (1980).* The text on which HRC relies requires that the break-up fee is triggered if, after a commitment is made, "but prior to finding the loan," Desai goes to a competitor for financing. This did not occur.

**E. Desai Has Paid All Fees and Expenses To Hudson.**

The "letter of intent" required Desai to pay Hudson's "due diligence" expenses and fees. He has completely done so. Plaintiff has offered no evidence of any open, unpaid invoices for "due diligence" expenses beyond that for which Desai had already paid.

**F. Claim for Attorneys' Fees.**

Plaintiff is not entitled to recover its attorneys' fees based upon a contract provision where there is no breach of contract. *TAL Financial Corp. v. CSC Consulting Inc., supra.* But, in the event an award of counsel fees is sought, such award must be limited to "reasonable" fees only. *Cummings v. National Shawmut Bank, 284 Mass. 563 (1933); Stanford v. President & Fellows of Harvard College, 2001 WL 716834 quoting U.S. v. MDC 847 F2nd 12 (1st cir. 1988)(a court reviewing an application for an award of attorneys' fees is not handcuffed by*

*counsel's submission of time records); State of Colorado and City of Greeley v. Goodell Brothers Inc., 1987 WL 13509; Microsoft Corporation v. United Computer Resources of New Jersey Inc., 216 F. Supp. 2nd 383 (D.N.J. 2002); Cargill Inc. v. Beaver Coal & Oil Co., 424 Mass. 356 (1997); Stowe v. Bologna, 417 Mass. 199 (1994).*

Defendant
Laxman S. Desai
By his attorney

Robert G. Cohen, Esq. BBO#090340
188 Oaks Road
Framingham, MA 01702
(508) 875-0035

Date: March 22, 2007